DISABILITY RIGHTS FLORIDA,      CASE NO:  8:10-CV-2666-MSS-TGW
INC.,
          Plaintiff,

VS.                             Tampa, Florida
                                January 5, 2012
GRADY JUDD,                     10:30 a.m.
        Defendant.
_____/


              TRANSCRIPT OF BENCH TRIAL
        BEFORE THE HONORABLE MARY S. SCRIVEN
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

Counsel for Plaintiff:    PAUL E. LILES, ESQUIRE
                          CHRISTOPHER T. WHITE, ESQUIRE
                          Disability Rights Florida, Inc.
                          1000 N. Ashley Drive
                          Suite 640
                          Tampa, Florida  33602
                          (850)488-9071 (EXT) 9770
                          Paull@disabilityrightsflorida.org
                          MS. KRISTEN C. LENTZ
                          Florida Institutional Legal Services
                          14620 W. Newberry
                          Suite 412
                          Newberry, Florida  32669
                          (352)375-2494
                          Klentz@filsinc.org

Counsel for Defendant:    HANK B. CAMPBELL, ESQUIRE
                          WILLIAM T. MCKINLEY, ESQUIRE
                          Valenti, Campbell, Trohn, Tamayo &
                          Aranda, PA
                          P. O. Box 2369
                          Lakeland, Florida  33806-2369
                          (863)686-0043
                          h.campbell@vcttalawyers.com
                          b.mckinley@vcttalawyers.com


     CLAUDIA SPANGLER-FRY, OFFICIAL U. S. COURT REPORTER

1   MS. ANNE GIBSON, In-House Counsel
    for Sheriff Grady Judd
2
    Court Reporter:        CLAUDIA SPANGLER-FRY, RPR, CM
3   Official Court Reporter
    801 North Florida Avenue
4   7th Floor
    Tampa, Florida  33602
5   (813)301-5575
    cookiefry@aol.com
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   P R O C E E D I N G S

2   January 5, 2012

3   * * * * * *

4   THE COURT:  Good morning, please call the case.

5   THE CLERK:  Yes, Your Honor.  In the matter of

6   Disability Rights Florida, Incorporated versus Grady Judd, Case

7   8:10-Civil-2666.

8   Counsel, please state your appearances starting with

9   counsel for the Plaintiff.

10   MR. LILES:  Please the Court, Your Honor, Paul Liles

11   on behalf of Disability Rights Florida along with co-counsel,

12   Christopher White and Kristen Lentz.

13   THE COURT:  Good morning.

14   For the defense.

15   MR. CAMPBELL:  Yes, Your Honor, I apologize for my

16   voice, I'm Hank Campbell for Defendant Sheriff Grady Judd.

17   MR. MCKINLEY:  Bill McKinley on behalf of Sheriff

18   Grady Judd, and we have general counsel here for the Sheriff,

19   Anne Gibson.

20   THE COURT:  Good morning.

21   Now the purpose of this proceeding is to hear the

22   bench trial of this matter seeking injunctive and declaratory

23   relief concerning the authority of the P&A to have access to

24   and investigate claims or alleged claims of neglect or

25   mistreatment of persons with disabilities under applicable

1  Federal Law.

2      I've read the parties' papers.  There is a motion in

3  limine first to be addressed concerning the late --

4  substantially late designation by the defense of an expert on

5  the issue of the use of restraints in connection with the

6  mentally disabled and their maintenance and treatment and

7  control.

8      Yes, sir.

9      MR. MCKINLEY:  If I may, we will not be calling Mr

10  Hoelscher as a witness.

11      THE COURT:  All right.

12      Your motion then is granted by stipulation.

13      MR. MCKINLEY:  Thank you.

14      THE COURT:  What is this fight about and how can I

15  help you?  I've read the papers, it looks to me like -- you can

16  have a seat counsel -- looks to me like the agency had received

17  a complaint.

18      I don't know why we're getting the feedback on this

19  mic, do you know, Ms. Vizza?  I'm getting feedback on my

20  speaker.

21      (Brief Pause.)

22      Testing.  That's better.

23      The agency apparently showed up having allegedly

24  received a complaint, an anonymous tip, concerning mistreatment

25  of mentally disabled individuals in the care of the Sheriff at

1  the facility.

2      The case law seems to suggest that even an anonymous

3  tip is sufficient to meet the requirements under the statute

4  binding Eleventh Circuit precedent, which I can do nothing but

5  enforce, setting aside the question of whether that constitutes

6  probable cause or not, that appears to be what they got, and

7  there is case authority suggesting that the determination of

8  the type of probable cause contemplated by this statute is,

9  number one, different than the standard criminal probable

10 cause, and number two, lies within the sole providence of the

11 agency tasked with this investigatory authority.

12      So I'm not sure what we would litigate about if those

13 facts are largely undisputed.  And so then the question is, so

14 what, and if the Plaintiff suggests to the Court that

15 reasonable unaccompanied access means unannounced, unfettered,

16 unsecured access to every aspect of a prison facility, that

17 seems to go beyond what would be contemplated to be reasonable,

18 under law and logic, and the notion that the Court should sit

19 to determine policy and procedure for implementation of

20 reasonable unaccompanied access in a prison may be beyond the

21 elements available in this record, even if within the Court's

22 technical authority.

23      To put it bluntly, why can't you all work this out?

24 What's the problem?

25      MR. CAMPBELL:  I'll defer to the Plaintiff.

1    THE COURT:  Then I'll defer to you when the Plaintiff

2  finishes.

3    MR. CAMPBELL:  Yes, Your Honor.

4    MR. LILES:  Wish me to stay here or go to the podium,

5  Your Honor?

6    THE COURT:  Probably the podium 'cause your microphone

7  is not adequate.

8    MR. LILES:  Your Honor, we have made every effort to

9  try to work this out to avoid any type of judicial

10  intervention.  When we went to the facility, we asked for

11  access, we went back to the facility asking for access, we sent

12  correspondence specifically identifying our statutory authority

13  asking for access.  We did that on three occasions before we

14  even filed a lawsuit.  We've gone through mediation at length

15  --

16    THE COURT:  What kind of access do you want?

17    MR. LILES:  We believe that -- at this time, we're

18  looking just for the initial access to the facility to do the

19  investigation based upon the report that came in.  We'd like a

20  finding from this Court --

21    THE COURT:  What kind of access do you want?

22    MR. LILES:  We want access to the facilities where the

23  alleged abuse and neglect took place.

24    THE COURT:  With what level of supervision by prison

25  officials and prison security personnel?

1    MR. LILES:  We believe that they're going to have to

2 unlock the doors to allow us to have access, they're going to

3 -- and once they give us access to the facilities where the

4 alleged abuse or neglect took place or is alleged to have taken

5 place, for us to interview the persons there and to look at the

6 facilities where the allegations took place.

7    THE COURT:  Where would the security people be at the

8 time that they unlock the infirmary doors?

9    MR. LILES:  They would be in some position that they

10 need to maintain the security for the facility which is what

11 they did when they took the representatives from Disability

12 Rights Florida into the infirmary on the 3rd of September.

13    THE COURT:  Do you believe that that level of access

14 is sufficient?

15    MR. LILES:  I believe that that level of their

16 accompanying us is sufficient.  I cannot stipulate that the

17 amount of access that was received on the 3rd of September was

18 sufficient because we were denied the opportunity to speak with

19 other individuals who were in the infirmary at that time

20    THE COURT:  Supervising officials in the treatment

21 facility or patients?

22    MR. LILES:  Yes, all of them.  We saw some of the jail

23 staff, the evidence will show that.  We did not see any male

24 inmates who were in the infirmary.  We were not permitted to

25 see them.  We were told that that was outside the scope of or

1   access.  And so we are asking this Court to declare what our

2   rights are because there is a dispute that we cannot resolve

3   between the parties despite significant efforts to do so.

4          THE COURT:  Well, if I declare that your rights are to

5   have reasonable unaccompanied access, I'm merely stating what

6   the statute says.

7          MR. LILES:  But we need the Court to help declare what

8   the scope of that would be in a jail type facility.

9          THE COURT:  What efforts have you made to have the

10  regulatory bodies promulgate more precise language in the

11  context of a prison facility?  That's their job.

12         MR. LILES:  You mean the Congress or --

13         THE COURT:  The regulatory agency that promulgated

14  CFR, 'cause they added this reasonable unaccompanied access

15  language around the bounds of the statute, not Congress.

16         MR. LILES:  All right.

17         I agree, the Department is just as responsible for the

18  Code of Federal Regulations with regard to that.  The answer to

19  your question, Your Honor, is that we have not contacted the

20  Department of Justice to make a regulatory change.  We have the

21  legal authority under the current statutes and regulations,

22  however, to seek judicial relief and this is the process that's

23  been recognized by the Courts in Tarwater.

24         THE COURT:  Do you believe that the Statute is

25  unclear?

1    MR. LILES:  We believe the statute is very clear and
2  we believe that we've been denied our right of access.

3    THE COURT:  All right.

4    Counsel.

5    MR. CAMPBELL:  Thank you, Your Honor.

6    You asked why are we here and what can you do to help
7  and why couldn't we work this out.  My suggestion to you would
8  be the attorneys' fee issue is the reason this hasn't been
9  worked out.  That is a prevailing part of being entitled to
10  attorneys' fees.

11    This situation was worked out on September 2 and 3.
12  We believe the facts will show, contrary to argument of
13  counsel, that they were given the exact access they asked for
14  in a reasonable time and that they were asked whether they
15  needed anything else and they declined anything at that time.

16    And if you look at what followed after that, which is
17  nearly a year and a half ago, you won't find any
18  correspondence, and there's several pieces of very strong
19  correspondence, you won't find any actions on the part of the
20  Plaintiff that they tried to come back, that they said they
21  didn't have enough access, that they requested to come back.

22    In fact, the testimony of the investigator, we
23  believe, will be consistent with her deposition which is that
24  no effort has been made to come back and that's because they
25  got everything they were entitled to when they first came.

1    Now, what they want you to do, they tell you this law

2  is clear and then they want you to declare that.  We would

3  submit that that's not appropriate for the Court to do, to

4  basically say, and Judge Lazzara before you questioned them in

5  a similar vein to how you're questioning today.  What do you

6  want me to do; tell them what the law is?  That's not what a

7  declaratory judgment is for.  That does not establish a case in

8  controversy.

9    We believe the facts will show that our -- excuse me

10  -- our jail personnel acted with extreme speed, much faster

11  than the Plaintiff did, to determine who they were when they

12  showed up because they had no clue, to determine what their

13  authority was and then to comply with their request.

14    The probable cause issue, and it doesn't matter

15  whether it's a probable cause issue or whether it's a report of

16  abuse, we believe the report or what was found as probable

17  cause cannot be so as a matter of law.  What they claim was the

18  abuse or the potential abuse was the restraining of a prisoner

19  in a jail.  We would submit to you that that's contrary to the

20  definition of abuse under the pertinent Federal laws.

21    So that's why we have raised the probable cause issue

22  which is appropriate for this Court to consider under several

23  cases in that the position of Plaintiff is you're restraining

24  disabled people in the infirmary.  We restrain everyone in the

25  infirmary.  We're required to do so through our policies and

1    procedures that are approved through the State and accredited.

2          So the threshold issue on the probable cause is, was

3    this even a report of abuse or neglect that could be

4    investigated.  But once they came, our staff did not raise that

5    issue, we raised the issue.  Our staff complied with their

6    request reasonably and appropriately.  There is no case in

7    controversy for this Court to determine in an advisory opinion

8    to tell us that we should comply with what the Plaintiff

9    suggests is clear law is not appropriate.

10          I couldn't find the cite very quickly, looking there,

11    but you asked about the Code of Federal Regulations, which is a

12    very good point.  There's a Kentucky Law Review Article, it's

13    14 or 15 years old, and it talks about the P&A System's attempt

14    to get the regulators to adopt rules that are more clear; do

15    you need to give access within 24 hours; do you need to give it

16    within three days; what is an unaccompanied reasonable access

17    in various contexts which obviously is very different than the

18    jail setting.

19          And they declined to do that.  So they did, in fact,

20    leave it up, to some extent, to a case-by-case basis as to what

21    is the request, what is the probable cause and what is a

22    reasonable response to that request.  And we believe we made a

23    very reasonable and prompt response.

24          THE COURT:  And who is the final arbiter of whether

25    you did or didn't?

1          MR. CAMPBELL:  Well, that would be you if there were a

2    pled case asking you to look back and say, did they do this

3    properly, that would be you.  That's not the pleading in this

4    case.

5          In fact, at one time during the hearing after they

6    dismissed the records production aspect of the case, which was

7    a lookback, it was the position of the Plaintiffs, we're not

8    really looking back to September 2 or 3, we're looking in the

9    future, we want a ruling for future access.  And that's not

10    appropriate under the case law either.

11          THE COURT:  Counsel, is that true, you're looking for

12    a ruling for the future or are you looking to see whether what

13    was done in September was adequate?

14          MR. LILES:  Your Honor, counsel misstates.  We

15    specifically asked for the Court to define that they did not

16    provide us the appropriate access, reasonable access on

17    September 2nd and September 3rd, when Disability Rights Florida

18    -- and on September 28th, October 21st, November 2nd, when we

19    sent letters asking them to provide us with their written

20    reasons for not providing the access, that they do so, that

21    that was -- continues to be a violation and it forced us to

22    file the lawsuit on November 29th.

23          And the reason we've not gone back is that we can't be

24    expected to go do something that would be a futile act when

25    we've gotten no response and we have to resort to the Courts.

1 The only way we can force them to take an action is for the

2 Court to direct them to do so.  So that's what we're seeking.

3 We also want to not have to deal with this problem in

4 the future, and so we do ask for the Court to give injunctive

5 relief to insure that we get access in the event that we

6 receive another report of abuse and neglect at their facility.

7 MR. CAMPBELL:  May I briefly respond?

8 THE COURT:  Yes, sir.

9 MR. CAMPBELL:  Your Honor, there is an order that was

10 stipulated to by the parties that once they dismissed the

11 records claim, which was based on a stipulated dismissal, that

12 the following was the only remaining claim of Plaintiff, and I

13 will quote, "the right and scope of Disability Rights Florida's

14 access to the Polk County Jail facilities and persons within

15 the facilities when investigating reports of abuse and neglect

16 within the facilities and whether either party is entitled to

17 attorneys' fees and costs".  They're asking for prospective

18 relief as to the right and scope of their access.

19 THE COURT:  What's the docket number for that order?

20 MR. CAMPBELL:  I'm sorry.

21 THE COURT:  What's the docket number for that order?

22 MR. CAMPBELL:  I apologize, Your Honor, I don't have

23 the document number ruling, I'll try to find it.  May 17th,

24 2011, is a stipulated motion to dismiss records claims.  I do

25 have a copy if you want me to bring it up.

1          THE COURT:  No, I'll find it up here if I can log in.

2          (Brief Pause.)

3          MR. MCKINLEY:  Your Honor, I believe that is document

4    41 and the stipulated -- and the order is document 44, Your

5    Honor.

6          THE COURT:  Thank you.

7          MR. LILES:  May I briefly respond, Your Honor?

8          THE COURT:  Yes, sir.

9          MR. LILES:  Your Honor, the right and scope includes

10   the right of our scope and scope of our access on September 2nd

11   and 3rd.  It is not just limited to prospective relief.

12         THE COURT:  What are the attorneys' fees that have

13   been incurred to date?

14         MR. LILES:  At this point in time, we've exceeded

15   $100,000 in attorneys' fees litigating this issue.

16         THE COURT:  How far exceeded?

17         MR. LILES:  I have to go --

18         THE COURT:  200,000 or closer to 100,000?

19         MR. LILES:  Closer to 100,000, Your Honor.

20         THE COURT:  The proposed order the Plaintiff has filed

21   will be consistent with the allegation of the defense about the

22   relief the Plaintiff is seeking.  Specifically, the Defendant

23   -- the Plaintiff asks that the Defendant be permanently

24   enjoined from preventing or interfering with P&A's access as

25   provided by Federal Law to residents' records, et cetera, when

1  P&A is investigating allegations of abuse.  The Defendant shall

2  provide P&A with reasonable unaccompanied access to residents,

3  facilities and programs for the purpose of investigating

4  allegations of abuse.  Almost quoting verbatim the content of

5  the statute, such as termination of -- termination of inquiries

6  upon the inmates' requests and so forth.

7           So I'm not sure that what is suggested isn't true with

8  respect to what level of relief, it just says, please tell them

9  to follow the law is what the injunction says.

10          MR. LILES:  Your Honor, if you'll look at page 18 of

11  the proposed findings of fact and conclusions of law, we made a

12  specific request that the Court find and declare that the

13  Florida's P&A was and is entitled to reasonable unannounced

14  access to the jail infirmary.

15          THE COURT:  Well, unannounced is not in the statutes,

16  I'm not sure where that language comes from.

17          MR. LILES:  It's in the regulations, Your Honor.

18          THE COURT:  I didn't see it in the regulations either.

19  It says reasonable unaccompanied access and it says that that

20  access can occur within business hours, but I couldn't find

21  language saying unannounced.  You can point it out to me, but I

22  wasn't able to find it on my own.

23          MR. LILES:  I'll locate it, Your Honor, and address it

24  with you.

25          THE COURT:  All right.

1    MR. LILES:  The Defendant violated the law by failing

2  to provide either reasonable or timely access, so we're

3  specifically asking for the Court to make a finding and declare

4  that that's true.  And then we're looking for the injunctive

5  relief which would be prospective.

6    THE COURT:  Well, the injunction you're asking me to

7  enter is an injunction telling them to follow the law, not

8  telling them to allow us to come back to the facility and

9  evaluate this specific claim that has been asserted concerning

10  this specific or some other similarly situated individual in

11  this facility being restrained under these circumstances.

12    You're saying, tell them to tell us that we can --

13  that they will follow the law.  Are you asking me to tell them

14  to allow you to come back and conduct this inspection you're

15  asking for and to set the parameters for how that specific

16  inspection will occur?

17    MR. LILES:  That's correct, Your Honor.

18    THE COURT:  That's not what your injunction asks for.

19  Your injunction says, tell them to follow the law, almost

20  verbatim, doesn't it?

21    MR. LILES:  I didn't see it that way, Your Honor.

22    THE COURT:  Well, tell me where in the injunction it

23  doesn't track the language of the statute.

24    MR. LILES:  We made an effort to track the statute so

25  that we would not run afoul of the law, but at the same time,

1 we recognize that in a jail facility that there are going to be

2 certain restrictions that will have to take place because of

3 the necessity of the security of the jail.

4 　　　　THE COURT:  So if I do what you're asking me to do,

5 say they didn't do it right in September, so do it right in the

6 future, and if you show up there tomorrow with this order in

7 your hand that looks just like the statute, what's going to

8 happen differently?

9 　　　　MR. LILES:  Well, I would presume, Your Honor, that if

10 we showed up with an order that was one of the requirements

11 that they made us to have, is to have an order granting us

12 access, and they specifically said they weren't going to grant

13 us access without an order, so we would have an order in hand

14 that would comply with part of the problem that we had the

15 first time through.  Secondly --

16 　　　　THE COURT:  Well, they backed off that requirement,

17 didn't they?

18 　　　　MR. LILES:  No, Your Honor, they didn't.

19 　　　　THE COURT:  So in September when you showed up, they

20 said, we're not going to let you -- we're going to let you come

21 in now because now you have an order?

22 　　　　MR. LILES:  No, they allowed us access to only a

23 portion of the infirmary.  On April 1st, they produced an

24 affidavit showing that there were 13 individuals in the

25 infirmary on September 1st.  On September 2nd, according to

Captain Burke's own notes, he indicates that there is at least
one male inmate, Jonathan Harvey, and he was subsequently
identified as the naked male that was observed by our
confidential informant with regard to being in restraints.
They did not permit us access to Mr. Harvey at any time.

THE COURT:  Is Mr. Harvey still there?

MR. LILES:  We don't know, Your Honor.  We have not
been able to get any information from them save from the names
of the people from the Court which was ordered by the Court in
April, 7 months after we attempted access.  So, we have been
hamstrung trying to do an investigation and we've been forced
to go through the Court and we need the Court to tell them
specifically what the limits of our authority are in the
circumstances of a jail.

THE COURT:  But your proposed order doesn't do that.
Your proposed order says what you did before was not adequate
to meet the requirements of the law and in the future, follow
the law.  That's what your proposed order says.  It doesn't say
when the P&A arrives at the jail, here are the four things that
must happen and here is the method by which this shall be
accomplished and it is so ordered by this Court.

There need not be notice as long as it's within
business hours, standard business hours, 9:00 to 5:00, the
person shows up with some certified identification of who they
are, and the only people who can accompany them are two or

1 three Sheriff's officials who are necessary to maintain

2 security of the facility, and you can have two of your people

3 with four of their people or one of your persons with -- we can

4 speak to three supervisors and all the patients.

5 I mean, it doesn't say any of that. It just says, in

6 the future, follow the law. And if you're asking me to

7 promulgate regulations for this facility, or any other

8 facility, I need to understand how I get to that point, what

9 evidence you intend to offer to support such a conclusion and

10 what authority I have to promulgate regulations concerning P&A

11 review beyond the regulations that are in the statute.

12 MR. LILES: We're not asking you to promulgate a

13 regulation, Your Honor, we're asking you to interpret what the

14 regulations currently provides.

15 THE COURT: What witness will you bring today to tell

16 me what is reasonable unaccompanied access in a jail facility

17 for the review and investigation of abuse of the mentally

18 disabled?

19 MR. LILES: Your Honor, we believe that that's a legal

20 issue and it's already been determined by other Courts

21 including the Eleventh Circuit.

22 THE COURT: The Eleventh Circuit has never, to my

23 knowledge, made a conclusion concerning what level and what

24 procedure of access is appropriate in a prison facility. You

25 have a prison facility case?

1    MR. LILES:  Do not have a jail facility in the State

2  of Florida.  We do have the ones that we cited in our briefs,

3  both in the summary judgment motion and our Pre-Trial brief,

4  talks about jail facilities, the Gerard case out of Iowa deals

5  with a jail facility, but the statute regulations specifically

6  relate to jail facilities --

7    THE COURT:  There's no question that it does, but then

8  it has this broad reasonable unaccompanied access business

9  which you're asking me to construe.

10    MR. LILES:  That's correct, Your Honor.

11    THE COURT:  And if you have a witness who can tell me

12  how to do that, I'm happy to hear from him or her.

13    Who will you call as your first witness?

14    MR. LILES:  We would be calling as our first witness

15  Linda Siemer, who was the representative who was doing the

16  investigation.

17    THE COURT:  And are you invoking the rule?

18    MR. LILES:  The rule, yes, Your Honor.

19    THE COURT:  The rule of sequestration is invoked in

20  this matter.  Any witnesses who would be expected to testify

21  must be excused.  Those witnesses are not free to discuss --

22  excuse me, counsel -- those witnesses are not free to discuss

23  this matter with anyone during the period of their

24  sequestration, including counsel.  They're not free to discuss

25  what other witnesses said either as to their exact testimony or

the tenor and nature of their testimony or success or lack of
success of their testimony. Don't talk about anything having
to do with what's going on in the Courtroom while you're under
sequestration with anyone.

And so there will not be any issue of confusion, if
the Court determines that the rule has been violated, the
witness will not be allowed to testify and other sanctions
might apply.

You may excuse your witnesses, counsel, you're
responsible for insuring your witnesses are not in the
Courtroom if you know them to be testifying witnesses.

Now, are there witnesses that are on people's lists to
keep them out of the Courtroom that no one really intends to
call or do you know who you're going to call? You're going to
call two witnesses this morning?

MR. LILES: That's correct, Your Honor.

THE COURT: And you're going to call -- you have eight
additional witnesses in addition to the two and you've taken
off one?

MR. MCKINLEY: Your Honor, we've pared it down
somewhat. At this point, we have, I believe, a total of six
witnesses which one is also representing the party, the Sheriff
here today, and if she needs to be sequestered, we need to be
clear about that with the Court.

THE COURT: What is the nature of her testimony?

1    MR. MCKINLEY:  She was present, she's a fact witness

2  on both days, Your Honor, when this was taking place.

3          THE COURT:  Counsel.

4          MR. LILES:  I'm not going to have any objection to her

5  remaining here if she's going to be the representative of the

6  Sheriff at this point in time.

7          THE COURT:  All right.

8          Well, my only requirement with respect to that is that

9  if she's going to testify about facts that other witnesses

10  would corroborate or also testify about, she can be the first

11  witness to be called by the Sheriff as to those salient facts,

12  therefore, she could not frame her testimony to comport with

13  other testimony she's heard from other witnesses.  So she's

14  free to testify, but she has to go first in respect to the case

15  the Sheriff might try to assert factually.

16          MR. CAMPBELL:  And alternatively, could we send her

17  out during that preceding testimony?

18          THE COURT:  No, she can either be in and not be

19  sequestered or she can go first, 'cause I can't be concerned

20  about whether she heard part of it, half of it, most of it.

21  She can be here or she can be out, that's your choice.

22          MR. CAMPBELL:  Okay.

23          THE COURT:  If she's in, she goes first.

24          MR. CAMPBELL:  Very good, I understand.

25          THE COURT:  We're going to push through this case.  I

1  don't think it should take two days.  I have read these papers,

2  I've read affidavits, I've read the legal authority, I've read

3  all the cases, I think I understand what the issue is.  And I

4  don't need duplicative testimony of witnesses.  Let's hear your

5  first witness.

6       And I apologize for our late start, we're having to

7  share facilities because of the construction and lack of space

8  in the building in that course.

9       MR. CAMPBELL:  May I excuse Ms. Gibson, if that's all

10 right?

11      THE COURT:  That's fine.

12      MR. LILES:  May it please the Court, there's some

13 other preliminary matters I'd like to go through with the Court

14 in advance.

15      THE COURT:  Yes, sir.

16      MR. LILES:  One, I'm not sure that the Court has

17 entered a ruling yet on the motion in limine for the probable

18 cause issue.  I'd like to renew that motion in limine.

19      THE COURT:  The motion is granted.

20      MR. LILES:  Okay.  Is that also true with regard to

21 the policies and procedures that were part of that motion?

22      THE COURT:  I think they can tell me -- they have to

23 tell me what their policies and procedures are with respect to

24 the method by which they responded to your demands.  I'm not

25 sure we can cull out policies and procedures, so to that

1  extent, no.

2        To the issue of whether there was probable cause is
3  irrelevant because there was a complaint and whether you
4  believe that the complaint raised adequate issues of neglect,
5  there's nobody here to testify about it, number one, because
6  the expert is gone, and this argument that the regulations
7  permit restraint of mentally disabled people begs the question
8  under what circumstances and it gives the P&A the authority to
9  go see.

10        And so there was a complaint of abuse, they were
11 trying to see and the question then becomes whether the access
12 provided was reasonable unaccompanied access as contemplated by
13 the regulations, and if not, what this Court, if anything, can
14 do about it within the parameters of the evidence that's
15 provided.

16        MR. LILES:  The other thing, Your Honor, is that we
17 have joint exhibits that counsel have agreed upon, Exhibits 1
18 through 9, and Exhibit Number 9 is a composite exhibit, and I'd
19 like to submit that and have this admitted as evidence at this
20 time.

21        THE COURT:  Any objection?

22        MR. CAMPBELL:  No, Your Honor.

23        THE COURT:  They'll be received.

24     (Thereupon, Joint Exhibits 1 through 9 were so designated
25 for EVIDENCE.)

1      MR. LILES:  May I approach?

2      THE COURT:  Yes, you may.

3      MR. LILES:  Finally, Your Honor, counsel and I have

4  spoken with each other with regard -- we have witnesses that

5  are on each of our witness lists, Ms. Siemer and Captain Burke.

6  We are amenable to having their testimony be taken out of order

7  in order to expedite the case if that's okay with the Court.

8      THE COURT:  That's fine.

9      MR. LILES:  Thank you, Your Honor.

10     THE COURT:  Please call your first witness.

11     MR. WHITE:  Good morning, Your Honor, the Plaintiff

12  calls Linda Siemer.

13     THE COURT:  You need to go and get her.

14     Mr. Stokes, they can get their own witnesses.

15     Please come forward to be sworn.

16  Thereupon,

17                      LINDA SIEMER,

18  having first been duly sworn to tell the truth, the whole

19  truth, and nothing but the truth, was examined and testified as

20  follows:

21     THE WITNESS:  Yes, ma'am.

22     THE CLERK:  Please take a seat in the witness box.

23     Please state your name and spell your last name for

24  the record.

25     THE WITNESS:  Linda Siemer, it's S-I-E-M-E-R.

1    THE COURT:  Ms. Siemer, you're under oath, you have to

2  give truthful answers to the questions that are asked.  If you

3  give false answers, you face penalties of perjury, false

4  statement and obstruction of justice.

5         You understand that?

6         THE WITNESS:  Yes, Your Honor.

7         THE COURT:  Also, wait until counsel completes his

8  question before you start your response.  If you see opposing

9  counsel stand to object, wait until I rule on the objection

10 before you begin your response.

11        Do you understand that?

12        THE WITNESS:  Yes, Your Honor.

13        THE COURT:  Counsel, you may proceed.

14        MR. WHITE:  Thank you, Your Honor.

15                    DIRECT EXAMINATION

16 BY MR. WHITE:

17 Q.  Good morning, Ms. Siemer.  Would you please tell me where

18 you're employed.

19 A.  Disability Rights Florida.

20 Q.  And what is your job title there?

21 A.  Advocate investigator.

22 Q.  What is the physical location that you work at?

23 A.  7600 Arrow Lane, Yalaha, Florida, 34797.

24 Q.  Could you please spell Yalaha for the Court?

25 A.  Y-A-L-A-H-A.

1  Q.  Ms. Siemer, how long have you worked at Disability Rights
2  Florida?
3  A.  Three and a half years.
4  Q.  And what are your job responsibilities as an advocate
5  investigator?
6  A.  I advocate for individuals' rights and services as well as
7  I investigate abuse and neglect -- alleged abuse and neglect in
8  facilities.
9  Q.  Those investigations of abuse and neglect that you
10  conducted, how much have you performed in your time at
11  Disability Rights Florida?
12  A.  Approximately 70.
13  Q.  And of those 70, how many have been secured facilities like
14  jails or prisons?
15  A.  40.
16  Q.  And in those 40 investigations, how many of those have you
17  been denied access to either individuals or the facilities?
18          MR. CAMPBELL:  Objection, relevance?
19          THE COURT:  Overruled.  You can answer.
20          THE WITNESS:  I'm sorry?
21  BY MR. WHITE:
22  Q.  I'll ask it again.
23          Of those 40 investigations that you've conducted of
24  secured facilities, how many times have you been denied access
25  to either the facilities or individuals?

1  A.  None.

2  Q.  Ms. Siemer, can you tell me what is necessary for you to

3  start an investigation of abuse or neglect?

4  A.  We receive a complaint or report about abuse and neglect.

5  Q.  And that abuse or neglect, does it have to be on specific

6  individuals?

7  A.  It would have to be on somebody with a disability of some

8  type.

9  Q.  Do you have to have identifying information, like a name,

10  to be able to conduct the investigation?

11  A.  No.

12  Q.  In your experience conducting these investigations and

13  specifically those 40 investigations in the secured facilities,

14  what type of access have you been granted?

15  A.  Our access usually consists of, we're escorted to the area

16  that we're looking for in the investigation.  We're entitled to

17  be able to talk to the client that may be involved with the

18  alleged situation and we talk to them alone as well as we may

19  talk to staff or other individuals that may be in the facility

20  to collaborate or tell us what went on during that time.

21  Q.  When you're dealing with an individual who may be a threat

22  of harm or danger to yourself or themselves in a secured

23  facility, is there typically someone nearby?

24  A.  Normally what will happen is they'll give us enough space

25  that we can have a private conversation, but they're there for

1  security reasons.

2  Q.  Ms. Siemer, were you involved with the attempt to

3  investigate the Polk County Jail in Bartow in September, 2010?

4  A.  Yes.

5  Q.  What was the nature of that investigation?

6  A.  Abuse and neglect.

7  Q.  How did you learn of the alleged abuse and neglect that

8  took place in the Polk County Jail?

9  A.  I received a call from a confidential informant.

10  Q.  And when did that telephone call take place?

11  A.  On September 2nd, late morning.

12  Q.  And where did you take that call?

13  A.  I'm sorry, September 1st.

14  Q.  Where did you take that call?

15  A.  In my office.

16  Q.  What were you told by the informant in this telephone call?

17  A.  That there was an individual, a young lady, in the Polk

18  County Jail infirmary that appeared to have an intellectual

19  disability as well as cerebral palsy and mental health issues.

20  There were signs that she may have been hallucinating or have

21  schizophrenia.

22        There were also two other issues that that person

23  brought up, was that there was a gentleman in four-point

24  restraints in a bed and appeared to have some mental health

25  issues as well as several other folks in the infirmary who may

1   meet that criteria as well.

2   Q.  Was the informant detailed in terms of what constituted

3   these restraints?  If I may, let me rephrase that.

4          What did the informant mean by two-point restraints

5   and four-point restraints?

6   A.  They were metal handcuffs to the beds with a gentleman she

7   explained that it was for his arms and his legs.  With the

8   young lady, she was in two-point restraints which was one arm

9   and one leg.

10  Q.  Was the informant able to give you any information on the

11  names of these individuals?

12  A.  Only the female.

13  Q.  And where were these individuals located?

14  A.  In the Polk County Jail infirmary.

15  Q.  And what was the name that was provided to you?

16  A.  Georgia Holloway.

17  Q.  What did you do after you completed the telephone call with

18  the informant?

19  A.  I then prepared to open the case, clear my calendar so I

20  could go to the jail and investigate my findings on what was

21  given to me.

22  Q.  Did you go to the jail on September 1st?

23  A.  No, I did not.

24  Q.  Why did you not go to the jail on the 1st?

25  A.  I needed to clear my calendar with some other issues that I

1  was handling and arrange for other team members to take over my

2  cases that needed attention.

3  Q.  When did you go to the Polk County Jail?

4  A.  September 2nd.

5  Q.  And who, if anyone, accompanied you to the jail on the 2nd?

6  A.  Mr. Liles.

7  Q.  And what was Mr. Liles' role in the investigation?

8  A.  As advocate investigators, we sometimes take attorneys with

9  us in order to provide the legal access for what our authority

10  is because we don't practice law as advocates.

11  Q.  What happened when you arrived at the Polk County Jail in

12  Bartow on September 2nd?

13  A.  Mr. Liles and I met up.  We had our driver's license, our

14  business cards and our badges and a sheet that explained our

15  authority to the Polk County Jail.  We went up to the

16  receptionist desk, provided her with the three documents of

17  identification as well as the authorization.

18  Q.  Did the receptionist grant you access at that time?

19  A.  She asked us to have a seat in the lobby and then she went

20  in to get someone.

21  Q.  Someone came to speak with you?

22  A.  Yes.

23  Q.  Do you know who that individual was?

24  A.  Captain Burke.

25  Q.  And where did this conversation occur?

1  A.  Started out in the lobby and then we moved into Major

2  Allen's office.

3  Q.  And who is present for this discussion?

4  A.  Major Allen, Captain Burke, Mr. Liles and myself at that

5  time.

6  Q.  What discussion was had regarding your access?

7  A.  Mr. Liles explained our access to them and then we were

8  told that they were going to contact their attorney to provide

9  them information on what they should do of allowing us to have

10  access.

11  Q.  What areas of the jail did you request access to on

12  September 2nd?

13  A.  The infirmary.

14  Q.  And did the Defendant grant you and Mr. Liles access to the

15  infirmary on September 2nd?

16  A.  No.

17  Q.  What individuals in the jail did you request access to on

18  September 2nd?

19  A.  Georgia Holloway, the gentleman that was reported to us in

20  four-point restraints and any other individual that was in the

21  infirmary that may have a disability.

22  Q.  On September 2nd, did the Defendant grant you and Mr. Liles

23  access to Georgia Holloway in the infirmary?

24  A.  No.

25  Q.  On September 2nd, did the Defendant grant you and Mr. Liles

1    access to the naked restrained male in the infirmary?

2    A.   No.

3    Q.   On September 2nd, did the Defendant grant you and Mr. Liles

4    access to any other individuals who were in the infirmary who

5    had disabilities?

6    A.   No.

7         THE COURT:   Counsel, she didn't testify that the

8    person said that the individual was unclothed.

9         Was that part of what the informant said to you?

10        THE WITNESS:   Yes, ma'am.

11        MR. WHITE:   Thank you, Your Honor.

12   BY MR. WHITE:

13   Q.   Ms. Siemer, on September 2nd, did you get the opportunity

14   to meet with Georgia Holloway?

15   A.   Yes, we did.

16   Q.   And where did you meet with her?

17   A.   We met her in the attorney visiting area.

18   Q.   And under what authority did you get the opportunity to

19   meet with Ms. Holloway?

20   A.   Mr. Liles' Bar Association card.

21   Q.   Who was present when you met with Ms. Holloway on September

22   2nd?

23   A.   Mr. Liles, myself and there was an officer with us.

24   Q.   Were you able to meet in a secluded room to be able to

25   discuss -- to interview Ms. Holloway?

A.  Yes, we were given a small room where we had to place her

wheelchair in on an angle, and Mr. Liles and I were permitted

to go in that room with her.

Q.  What did you observe when you met with Ms. Holloway?

A.  Ms. Holloway was in a wheelchair with her arm restrained.

Her arms, because of her cerebral palsy, her arms were turned

in, so one of her arms was connected to the wheelchair with

metal handcuffs, and her leg that was turned out from the

cerebral palsy was also secured in that way, with the metal

handcuffs.

Q.  Did you make any other physical observations of

Ms. Holloway at that time?

A.  Ms. Holloway was very un -- had no ability to be able to

communicate with us.  She appeared to have some psychosis and

some hallucinations.

Q.  Had Ms. Holloway suffered any trauma that you could tell?

A.  Yes, she was missing her two front teeth, which, when we

had looked at her booking folder, were there.

Q.  And just to make sure that I'm clear, so you had seen

Ms. Holloway's booking photo before you had gone to the jail?

A.  That was part of my preparation before I went to the jail

to check out what her charges were and what was going on.  It's

a normal technique that we use.

Q.  Did you learn anything about the alleged abuse or neglect

from your conversation with Holloway?

1  A.  No, sir.

2  Q.  What did you do upon completing your interview with

3  Ms. Holloway?

4  A.  We then went back out to the lobby and asked to talk to

5  Captain Burke.  At that time, we requested to see the infirmary

6  again, to see the naked man in four-point restraints and anyone

7  else in the jail as well as the incident report with

8  Ms. Holloway's teeth and medical records.

9  Q.  You said you asked to see anyone else in the jail?

10  A.  With a disability in the infirmary.

11  Q.  What was the outcome of that discussion; were you granted

12  access to those requests at that time?

13  A.  We were not.  We were told that they needed to talk to

14  their attorney and then they would get back to us.

15  Q.  And what did you do after that discussion ended?

16  A.  We left and awaited their call.

17  Q.  When did you next return to the Polk County Jail in Bartow?

18  A.  September 3rd.

19  Q.  Why did you return?

20  A.  I was called by Mr. Liles telling me we had access to the

21  infirmary, Georgia Holloway and her records and the other

22  individuals in the infirmary, that they were going to give us

23  access to that.

24  Q.  What time of day did you return on September 3rd?

25  A.  I believe it was around 2:30.

```
 1   Q.  Who, if anyone, accompanied you to the jail on September
 2   3rd?
 3   A.  Mr. Liles accompanied me again.
 4   Q.  And what did you do upon entering the jail?
 5   A.  We again provided the staff, the receptionist with our
 6   driver's license, our business cards and our I.D.s.
 7   Q.  Did the receptionist again get someone to speak with you
 8   about your access?
 9   A.  Yes.
10   Q.  And who did you speak with on September 3rd?
11   A.  Captain Burke came out and brought us into Major Allen's
12   office.
13   Q.  Who was present in Major Allen's office on September 3rd?
14   A.  Captain Burke, Major -- I'm sorry, Major Allen, Mr. Liles,
15   myself and Ms. Gibson who was introduced to us as the attorney
16   for the Sheriff.
17   Q.  Did you meet with Georgia Holloway on September 3rd?
18   A.  Yes, we did, as we went through the infirmary.
19   Q.  Where did you meet with Ms. Holloway?
20   A.  Ms. Holloway was in a room in a bed in what we were told
21   was the infirmary.  She was in a room by herself in a metal
22   cot, again, handcuffed with metal cuffs on her arm and her leg.
23   She was with a staff sitting with her and I asked permission to
24   talk to her, they granted me permission.  I went over to try to
25   talk to her again, she was incoherent and still very much
```

1  hallucinating, talking to people who weren't there.

2  Q.  Were you able to conduct an interview with Ms. Holloway in

3  private?

4  A.  No, everyone was there, Mr. Liles was there, Ms. Gibson was

5  there and Captain Burke was there.

6          THE COURT:  When you say "there," where do you mean

7  exactly?

8          THE WITNESS:  It is a small room that housed about one

9  bed and it was just in the area there.

10          THE COURT:  Like a private hospital room?

11          THE WITNESS:  Yes.

12          THE COURT:  And all the individuals were in the same

13  room?

14          THE WITNESS:  Yes.

15          THE COURT:  Did you ask them to leave?

16          THE WITNESS:  No, I did not.

17  BY MR. WHITE:

18  Q.  Did you learn anything more about the alleged abuse and

19  neglect from that interview with Georgia Holloway on September

20  3rd?

21  A.  No.

22  Q.  Ms. Siemer, how many other inmates did you observe in the

23  infirmary?

24  A.  None.

25  Q.  Can you describe for me what you had access to when you

1  were taken to the infirmary?

2  A.  We walked through a nurse's station and then into a large

3  room which was divided with curtains and there were no

4  individuals in that area.

5  Q.  Did you ask if there were other individuals in the

6  infirmary?

7  A.  Yes, we did, and we were told there were none.

8  Q.  Ms. Siemer, on September 3rd, did the Defendant grant you

9  and Mr. Liles access to the restrained unnamed male that had

10  been identified by the confidential informant?

11  A.  No.

12  Q.  On September 3rd, did the Defendant grant you and Mr. Liles

13  access to any other individuals in the infirmary?

14  A.  No.

15  Q.  Ms. Siemer, have you ever received any written document

16  from the jail staff stating the reasons for denying access to

17  the male that had been identified by the confidential

18  informant?

19  A.  I have not.

20  Q.  And have you ever received a written document from the jail

21  staff stating the reasons for denying access to any other

22  individuals in the infirmary with a disability?

23  A.  I have not.

24  Q.  Have you completed at this time your investigation into the

25  complaint you received from the informant on September 1st,

```
 1  2010?
 2  A.   No.
 3           MR. WHITE:  Your Honor, may I confer with counsel?
 4           THE COURT:  Yes.
 5           MR. WHITE:  Thank you.
 6           (Brief pause.)
 7           We have nothing further at this time.
 8           THE COURT:  Did you ever receive a report that there
 9  were other people in the infirmary on September 2nd?
10           THE WITNESS:  I believe in April, the attorneys
11  received that, Your Honor.
12           THE COURT:  They received a report that indicated
13  other people, in fact, were in the infirmary on the 2nd and
14  3rd?
15           THE WITNESS:  I believe that it was for the 1st and
16  I'm not sure if it was for the 2nd.  I've never seen that
17  document, I just heard that.
18           THE COURT:  So you don't know?
19           THE WITNESS:  I don't know.
20           THE COURT:  Okay.
21           Counsel.
22           MR. CAMPBELL:  Thank you, Your Honor.
23                        CROSS-EXAMINATION
24  BY MR. CAMPBELL:
25  Q.   Morning, Ms. Siemer.
```

A.  Morning, sir.

Q.  Actually, when you asked to see other disabled individuals in the infirmary, weren't you told there were none on September 3rd, when you asked?

A.  Yes, we were told there were none.

Q.  Okay.  So it wasn't that you were denied access to a disabled person unless they told you incorrectly that there were none in the infirmary on September 3rd?

A.  Yes, sir.

Q.  Now, part of the reason it took from the morning of September 1st till the mid afternoon of September 2nd to get the report and actually go to the jail, part of that was planning that was done as to what you were going to do, correct?

A.  Yes, sir.

Q.  And who you were going to take?

A.  Yes, sir.

Q.  And whether someone ought to call ahead and tell the jail, this is who we are and this is our authority; that was discussed as well?

A.  No, sir.

Q.  It wasn't discussed whether or not to let the jail know who you all were and what you were coming to do as opposed to showing up unannounced?

A.  Normally, in an investigation --

1    THE COURT:  The question was, was it discussed; yes or

2  no?

3    THE WITNESS:  No.

4    MR. CAMPBELL:  Excuse me, Your Honor.

5    (Brief Pause.)

6    THE COURT:  Do you have a copy of the transcript?

7    MR. CAMPBELL:  I do, Your Honor.

8    THE COURT:  May I see it?

9    MR. CAMPBELL:  Yes, it's going to take me a second to

10  find it, but yes.

11    May I approach?

12    THE COURT:  That's fine, you can find it, then

13  approach.

14    MR. CAMPBELL:  I can find you a copy, I meant the

15  place.

16    THE COURT:  Oh.

17    MR. CAMPBELL:  Your Honor, it's page -- I apologize, I

18  did not expect this, I have others that are marked -- just page

19  32.

20    Would you like me to provide a copy to the witness?

21    THE COURT:  Wait one second.  Page 32, line what?

22    MR. CAMPBELL:  Line 11 through 15.

23    THE COURT:  You can ask her the question and then if

24  she needs to refresh, she can.

25  BY MR. CAMPBELL:

```
 1  Q.  Do you recall your deposition being taken in this case?

 2  A.  Yes.

 3  Q.  And do you recall being asked:

 4          Was any prior notification given to the Polk County

 5  Sheriff's Office?

 6          And your answer was; No, sir.

 7          And then being asked; Was that discussed?

 8          And your answer was; yes, sir.

 9          MR. WHITE:  Objection, relevance.

10          THE COURT:  Overruled.

11          MR. CAMPBELL:  And I'll be glad to provide you this.

12  We're discussing the prior two pages, what you were doing on

13  the 1st in order to plan and go to the jail.

14          THE WITNESS:  Specifically, normally what we do is --

15          THE COURT:  Do you recall that answer at your

16  deposition?

17          THE WITNESS:  I recall the deposition, but I don't

18  recall that exactly, I'm sorry.  We normally discuss -- if it's

19  an abuse investigation, we don't give notification, so...

20  BY MR CAMPBELL:

21  Q.  Okay.  But that's when there's some urgency, an immediate

22  threat; isn't that accurate?

23  A.  An immediate threat.

24  Q.  I asked you; usually, you do not give notification when

25  there's an immediate threat to the potential client?
```

A.  Yes, but sometimes we do investigations where we don't give

notice just because we want to see the situation as it is in a

natural state.

Q.  Okay.  And then the followup question, just to make sure

you knew what we were talking about, this is beginning at line

21.

          Okay, were you anticipating a lawsuit at the time that

you --

          THE COURT:  No, that's not proper impeachment.

          MR. CAMPBELL:  I'm sorry?

          THE COURT:  That's not proper impeachment.

          MR. CAMPBELL:  It's the next part of the question, and

I'm not arguing with your ruling, I again say, at the time you

were discussing whether or not to give notice, and that was the

part I was trying to impeach, that that, in fact, was a

discussion.

          In fact, Mr. Liles objects to a number of these

questions when I try to ask about them because it's

attorney/client privilege, and I didn't try to go further.  But

there is a whole series of questions there where I'm saying;

And what do you recall about the discussion as to whether or

not to notify the Polk County Sheriff's Office.  That's line

six, and again, the objection by Mr. Liles is; Well, that

discussion is protected by the attorney/client privilege.

          I'm just trying to establish through those questions

1  that, in fact, that was a discussion --

2       THE COURT:  And it's still not proper impeachment.

3  You've impeached the witness, you may move on.

4       MR. CAMPBELL:  Thank you, Your Honor.  I was not

5  meaning to argue.

6       THE COURT:  So to back up to where we are, having

7  heard your deposition testimony that you did discuss the prior

8  notification to the Sheriff and having testified today that you

9  didn't discuss prior notification to the Sheriff; which is

10  true?  Did you or didn't you discuss prior notification to the

11  Sheriff of your anticipated visit?

12       THE WITNESS:  I believe we did discuss it.

13       THE COURT:  What was determined?

14       THE WITNESS:  It was determined that we were going to

15  treat this as an investigation and that we were going to go in

16  unannounced.

17       THE COURT:  Counsel.

18       MR. CAMPBELL:  Yes, thank you.

19  BY MR CAMPBELL:

20  Q.  Other things that were discussed in the planning that took

21  place for the more than 24 hours between the time the report

22  came in in the morning of the 1st, when you all actually went

23  to the jail on the 2nd was who would go, correct?

24  A.  Yes.

25  Q.  And Mr. Liles, it was determined that he should go because

1  sometimes when you go on these investigations unannounced,

2  people don't know who you all are -- I'm sorry -- who you are

3  as an organization or what your authority is, correct?

4  A.  Yes.

5  Q.  So you take Mr. Liles to help explain that, a lawyer from

6  the organization, to explain to the jail who you are?

7  A.  Yes.

8  Q.  And you also normally take certain documentation with you

9  that would help to explain the authority to the jail, your

10  appointment by the Governor, where in the statutes somebody

11  could actually look to verify what the authority is, correct?

12  A.  Yes.

13  Q.  And it was decided the day before what you all would take

14  to give to the jail on the unannounced visit to explain your

15  authority?

16  A.  Yes.

17  Q.  Now, you certainly, with your experience as you've already

18  testified, you understand what your authority is, correct?

19  A.  Yes.

20  Q.  And you understand what it takes, as far as probable cause

21  or a report of abuse or neglect, to trigger your investigatory

22  authority, correct?

23  A.  Yes.

24  Q.  And what type of records you may or may not be entitled to?

25  A.  Yes.

1  Q.  And your access, what your access should be to a facility

2  or to persons?

3  A.  We usually leave that up to the attorneys to explain.

4  Q.  Okay.  Anything else other than talking about all of those

5  things and clearing your calendar that occurred between the

6  time the report came in on the morning of the 1st when you all

7  went to the facility mid afternoon on the 2nd?

8  A.  No, sir.

9  Q.  Do you recall why it was mid afternoon that you all went on

10 the 2nd?

11 A.  I do not recall.

12 Q.  Do you recall whether or not there was a discussion as to

13 whether or not this jail would have any idea who you were or

14 what your authority was?

15 A.  Could you repeat that?

16 Q.  Yes.  Do you recall whether there was a discussion about

17 what the jail personnel -- what the Sheriff's personnel may

18 know about who you all were and what your authority was?

19 A.  I think because that was the first time I was in the Polk

20 County Jail, that we were looking for making sure that

21 everything was handled and that he could explain that better

22 than I could.

23 Q.  Okay.  Do you think it was a reasonable time period for

24 your work that once you received this report of what you

25 believe was abuse or neglect on the morning of the 1st, that

1    you then went the mid afternoon of the 2nd; was that a

2    reasonable time period from your perspective?

3    A.   We look at about 24 hours.

4             THE COURT:  Yes?

5             THE WITNESS:  Yes.

6    BY MR CAMPBELL:

7    Q.   Okay.  Now, from the jail's perspective, you look at it

8    from that perspective as well as to what might be a reasonable

9    response time?

10            MR. WHITE:  Objection, calls for speculation.

11            THE COURT:  Overruled.

12            THE WITNESS:  I don't know that I would know what time

13   the jail would need to make their decisions.

14   BY MR CAMPBELL:

15   Q.   Okay.  But it's reasonable from your perspective with all

16   your knowledge and experience that over 24 hours is sufficient.

17   Do you think that over 24 hours for the jail, starting from

18   zero, as was the case in this particular instance, that 24

19   hours would be a reasonable time period?

20   A.   Yes.

21   Q.   Okay.  Now, the plan that you made on the day before as to

22   what to do, other than what to take and who to take and whether

23   to give notice, the plan you made was to do, I think, four

24   things; one was to try to meet with Georgia Holloway, correct?

25   A.   Yes.

1  Q.  One was to inspect the infirmary?

2  A.  Yes.

3      THE COURT:  Can you pull the microphone toward you.

4  You can sit up in your seat, just pull the microphone out of

5  the hole, it will come forward.  Okay, that's fine.

6  BY MR. CAMPBELL:

7  Q.  One was to inspect the infirmary; that was second?

8  A.  Yes.

9  Q.  One was to review records of the infirmary and Georgia

10  Holloway; that was third?

11  A.  Yes.

12  Q.  And then four, there was some attempt to identify this

13  person that you all wanted to see who you believed was a naked

14  man in four-point restraints?

15  A.  Yes.

16  Q.  Okay.  Within the 24 hours from the time that you showed up

17  on September 3rd, were you able to complete plan number one,

18  interview Georgia Holloway?

19  A.  Yes, but not in the infirmary.

20  Q.  Right.  Within 24 hours, were you then allowed to interview

21  Georgia Holloway in the infirmary?

22  A.  Yes.

23  Q.  That was the next day?

24  A.  Yes.

25  Q.  So within an hour or so of your getting there, you were

1  allowed to -- you were authorized by the jail to see Georgia

2  Holloway, and within 24 hours, you were allowed to see her in

3  the infirmary?

4  A.  Yes.

5  Q.  And the records you wanted to review, were they provided to

6  you within that 24-hour time frame?

7  A.  We were allowed to see her medical records, we still have

8  never seen the incident reports or the arrest or what happened

9  to her front teeth.

10  Q.  And on that point, do you know if there's an incident

11  report?

12  A.  No, sir, because we haven't been provided any records.

13  Q.  Okay.  If there was no incident report about her teeth,

14  then there wouldn't be a failure to provide you the records, it

15  would be that there is no such report?

16          MR. WHITE:  Objection, Your Honor.

17          THE COURT:  I'm sorry, what's the objection?

18          MR. WHITE:  Relevance.

19          THE COURT:  Overruled.

20          Can you -- would it be unreasonable to refuse to

21  provide records if there was no incident report?

22          MR. CAMPBELL:  Thank you, Your Honor, I wish could

23  have asked that.

24          THE WITNESS:  Yes, but, Your Honor, when we received

25  the records, there is records showing that her teeth were

1  injured and that they provided a dental exam to her, removal of

2  the roots of the teeth and some other things once we got the

3  medical records.

4  BY MR CAMPBELL:

5  Q.  And you actually --

6          MR. CAMPBELL:  Were you through, Your Honor?

7          THE COURT:  Yes.

8  BY MR. CAMPBELL:

9  Q.  You actually reviewed those records that next day within

10  the 24-hour time frame?

11  A.  Except that the dental information was not in the records

12  that I reviewed the day that I was there.

13  Q.  Okay.  All right.

14          So, other than this incident report that you wanted,

15  you accomplished, one, interviewing Georgia Holloway twice,

16  once in an attorney booth and once in the infirmary, correct?

17  A.  Yes.

18  Q.  You visited the infirmary and looked at the infirmary?

19  A.  Yes.

20  Q.  And you got the records except for this incident report?

21  A.  Yes.

22  Q.  And it wasn't just her records, you were provided a lot of

23  other records that you asked for, such as policies and

24  procedures of the jail, policies and procedures of the medical

25  care providers, CMS, correct?

1  A.  On the 3rd, we were provided the policies and procedures

2  for the CMS only.

3  Q.  And that's all you asked for, correct?

4  A.  I don't recall, I'm sorry.

5  Q.  Well, in your deposition, if you testified that the only

6  record you didn't see was the incident report that you asked

7  for, would that be accurate still today?

8  A.  Yes.

9        THE COURT:  Counsel, is there an incident report?

10        MR. CAMPBELL:  I'm sorry?

11        THE COURT:  Is there an incident report?

12        MR. CAMPBELL:  No, Your Honor.

13  BY MR CAMPBELL:

14  Q.  Did you have any interaction with the attorneys for the

15  Sheriff prior to meeting Ms. Gibson on the 3rd about scheduling

16  you all to return once they could do some research?

17  A.  We were told that they would talk to Ms. Gibson and get

18  back with us and let us know, which they did.

19  Q.  And are you aware of the conversations that occurred,

20  multiple conversations that occurred the night of the 2nd, the

21  late afternoon and night of the 2nd, between Mr. Liles and the

22  General Counsel's office?

23        MR. WHITE:  Objection, Your Honor, the question calls

24  for speculation.

25        THE COURT:  Overruled.

1      THE WITNESS:  I was not privy to any of those.

2  BY MR CAMPBELL:

3  Q.  Were you privy to any conversations between Mr. Liles and

4  either Ms. Gibson or Captain Burke about seeing a male prisoner

5  on September 3rd?

6      MR. WHITE:  Objection again, Your Honor.

7      THE COURT:  He's asking her if she was privy to the

8  conversations, that doesn't call for speculation, it calls for

9  an answer.

10     MR. WHITE:  Thank you, Your Honor.

11     THE COURT:  You can answer.

12     THE WITNESS:  I don't recall.

13 BY MR CAMPBELL:

14 Q.  Do you recall the jail personnel asking Mr. Liles whether

15 or not there was a complaint of abuse or neglect that reflected

16 the authority of your organization to see male prisoners?

17 A.  Yes.

18 Q.  And do you recall Mr. Liles' response?

19 A.  No, I don't.

20 Q.  Do you recall conversations between Ms. Gibson and Captain

21 Burke with Mr. Liles at the conclusion of the inspection of the

22 records, the inspection of the facility, and the second meeting

23 with Georgia Holloway, where he was asked is there anything

24 else within your authority that we can do for you today?

25 A.  I think at that point, I recall that Mr. Liles asked if we

1  could see the naked man who was in four-point restraints.

2  Q.  Right, and isn't that when the question came up, well, do

3  you have authority to see the naked man pursuant to a

4  complaint, and wasn't that asked of him?

5  A.  It was within our authority.

6  Q.  Okay.  Do you recall his response to the jail personnel?

7  A.  Not word for word, sir.

8  Q.  Do you recall whether it was positive or negative, meaning

9  yes, it's within our authority to see this man, or no, it's not

10  within our authority?

11  A.  It would have been positive that we should be able to see

12  him.

13       THE COURT:  No, the question is, do you recall his

14  answer, not what his answer should have been.

15       THE WITNESS:  No, I don't recall his answer.

16  BY MR CAMPBELL:

17  Q.  I think I got an answer, but let me make sure.

18       Do you recall the questioning at the end of the day,

19  is there anything else we can do within your authority for you?

20  A.  And I think that we asked for the incident report and that

21  we asked to see the naked man and any other person that was in

22  the infirmary that may have a disability.

23  Q.  Okay.  And then there's a conversation with Mr. Liles and

24  then do you recall, is there anything else?  What was the final

25  conversation that you recall as you all left on the 3rd; was

1  it, is there anything else we can do and the answer was no?

2  A.  We still needed the records that we asked for and we were

3  still putting that request out.

4  Q.  You needed copies of the records because you had been

5  provided the records to review?

6  A.  We reviewed the records, I tagged the records that we were

7  asking for and we were asking for copies.  We were told at that

8  time that CMS, the contract person for the infirmary, needed to

9  verify with their attorney whether or not we could have those

10  copies under our access authority.

11  Q.  In fact, CMS had large concerns about turning over patient

12  records without having approval of their attorney, correct?

13  A.  Correct.

14  Q.  But they let you have them and review them, they just said

15  we've got to get authority before we can let copies go?

16  A.  Correct.

17  Q.  Okay.  After you left on the 3rd, whatever that last

18  conversation was, after you left on the 3rd, how many times

19  have you called the jail to ask for any more information?

20  A.  Once I finished my part of the investigation, it's turned

21  over to the --

22      THE COURT:  How many times have you personally called

23  the jail?

24      THE WITNESS:  I have not called back again on the

25  Georgia Holloway issue.

BY MR CAMPBELL:

Q.  How many times have you sought any additional records

review from the jail since September 3rd?

A.  On Georgia Holloway?

Q.  On anyone relating to September 2 or 3?

A.  I have not.

Q.  How many times have you called the jail to say we haven't

finished our investigation, we would like to have access to the

men's infirmary or to some other place in the jail?

A.  I have not.

Q.  Are you aware of the discovery process in this case where

the incident report was requested?

A.  Yes.

Q.  And are you aware it was not produced, there was no

incident report to produce?

A.  I'm not aware that there isn't one, but we have not

received one, so that's all I can --

Q.  Are you aware, and you're probably not, so this is almost a

rhetorical question, I apologize --

        THE COURT:  You don't need to ask rhetorical

questions, counsel.

        MR CAMPBELL:  It's almost rhetorical.

        THE COURT:  Please move on.

        MR. CAMPBELL:  Yes, Your Honor.

BY MR CAMPBELL:

1  Q.  There were, in fact, letters written to the jail about

2  receiving the copies of the records that were requested from

3  CMS and the jail by your organization, correct?

4  A.  Yes.

5  Q.  Okay.  And those letters were following up saying we still

6  haven't received copies, we want to receive copies?

7  A.  Yes.

8  Q.  Do you recall those letters anywhere saying, and we still

9  want to see the naked man in the four-point restraints?

10 A.  I believe that those documents were just for records.

11 Q.  And do you recall any correspondence of that nature, and I

12 think there were three or four, I apologize, they're in

13 evidence, that they said, you haven't given us sufficient

14 access to the facility or the records for our investigation;

15 anything in those letters that you recall?

16 A.  Not that I recall.

17 Q.  In those letters, do you recall that there's a reference to

18 the statute and it's what I call the DD statute.  Maybe I

19 should get --

20        MR. CAMPBELL:  May I?

21        THE COURT:  Yes, sir.

22        MR. CAMPBELL:  Very quickly.

23        (Brief Pause.)

24 BY MR CAMPBELL:

25 Q.  Do you recall that in your organization statutory

1  authority, there is a time frame that suggested for reasonable
2  production of records?

3          MR. WHITE:  Objection, Your Honor, the records claim
4  has been dismissed, I think that this is not relevant at this
5  point.

6          THE COURT:  Counsel.

7          MR. CAMPBELL:  They want you to -- they want you to
8  declare that we were --

9          THE COURT:  Sustained.  Please move on.

10         MR CAMPBELL:  Okay.  Is it -- I don't want to violate
11  your order, so I apologize.

12         THE COURT:  The records review and the sufficiency of
13  it and the reasonableness of it and the timeliness of it has
14  been removed from the case, so please move on.

15         MR. CAMPBELL:  I understand, Your Honor, very good.
16  BY MR CAMPBELL:
17  Q.  Your concern, as far as abuse and neglect of Georgia
18  Holloway, was that restraining her with one or two-point
19  restraints was, in your mind, abuse or neglect, correct?
20  A.  Yes.
21  Q.  And unless she was either harmful to herself or harmful to
22  others in the jail infirmary setting, she should not be
23  restrained?

24         MR. WHITE:  Objection, relevance.

25         THE COURT:  Overruled.

1    THE WITNESS:  With Georgia Holloway's physical

2 condition in the restraints and the mental health issues, it is

3 a concern that that would be where she didn't have the freedom

4 of movement, unlimited freedom of movement that she needed.

5 BY MR. CAMPBELL:

6 Q.  Now, while she's there, she's being observed by medical

7 personnel, correct?

8 A.  When I observed her, she was only with a deputy.

9 Q.  Okay.  In the infirmary, she's not being regularly observed

10 by medical personnel or you don't know?

11    MR. WHITE:  Objection, Your Honor, that calls for

12 speculation.

13    THE COURT:  Overruled.

14    THE WITNESS:  I don't know.

15 BY MR CAMPBELL:

16 Q.  Do you know what the restraint policies are in the State or

17 nationwide with regard to prisoners in a hospital setting?

18    MR. WHITE:  Your Honor, if I may object, again.  I

19 believe Your Honor stated earlier on that we don't need to go

20 to probable cause and I think this pathway we're going down is

21 about whether or not the restraint that was actually observed

22 in the infirmary actually constitutes probable cause.  I think

23 we're just going down a path that actually isn't helping

24 advance what we need to discuss at this time.

25    THE COURT:  Overruled.

1          Do you know what the national policies are in prisons

2    concerning use of restraints?

3          THE WITNESS:  No, I do not.

4    BY MR CAMPBELL:

5    Q.  How about in the nursing home setting?

6    A.  Yes, I do.

7    Q.  With prisoners?

8    A.  With prisoners, no.

9    Q.  Okay.  How about in the mental health facility setting with

10   prisoners?

11   A.  No, I do not.

12   Q.  Do you know if it's any different than what's in the

13   policies --

14          THE COURT:  If she doesn't know, she doesn't know

15   whether they're different.

16          MR. CAMPBELL:  And I won't argue if you are telling me

17   not to ask, that I was going to say, do you know if they're

18   different than --

19          THE COURT:  Please move on.

20          MR. CAMPBELL:  Yes, Your Honor.

21   BY MR. CAMPBELL:

22   Q.  Other than the letters that we referenced earlier that are

23   in the exhibits, are you aware of anyone in your organization

24   seeking access at the Polk County Jail for anything relating to

25   the complaint of September 1, 2010?

```
 1  A.  I am not aware of anything except the letters that were
 2  sent.
 3           MR. CAMPBELL:   May I?
 4           THE COURT:  Yes, sir.
 5           MR. CAMPBELL:   Thank you.
 6           (Brief Pause.)
 7           May I ask another question, Your Honor?
 8           THE COURT:  Yes, sir.
 9  BY MR CAMPBELL:
10  Q.  Were you present when either somebody from your
11  organization or somebody from the jail asked Nurse Murray --
12  sorry if you can't understand me.
13           Were you present when anyone asked Nurse Murray on the
14  3rd whether there were any other disabled people in the
15  infirmary?
16  A.  I believe Mr. Liles asked her that question.
17  Q.  What was her answer?
18  A.  I don't believe she gave us a confirmed answer.
19           THE COURT:  What was her answer?
20           THE WITNESS:  I think she just kind of didn't answer
21  it.  I don't remember a direct answer of that.
22           I don't recall, it's been a year.
23  BY MR CAMPBELL:
24  Q.  And you don't recall pressing then for an answer, are there
25  other disabled people?
```

1  A.  I believe that we asked the jail folks if there was and we,

2  you know, we continued to ask that question.

3  Q.  Right.  And somebody then went to ask Nurse Murray, are

4  there any disabled people in the infirmary, correct?

5  A.  Correct.

6  Q.  Would you expect Nurse Murray to be a better source of that

7  information than the jail personnel?

8  A.  Yes.

9          MR. CAMPBELL:  That's all I have.

10         Thank you, Your Honor.

11         THE COURT:  Thank you.

12         MR. WHITE:  Redirect, Your Honor?

13         THE COURT:  Briefly.

14         MR. WHITE:  Thank you, Your Honor.

15                     REDIRECT EXAMINATION

16 BY MR. WHITE:

17 Q.  Ms. Siemer, to your knowledge, is there anything in the

18 statutes or regulations that requires prior notification before

19 starting an investigation?

20 A.  I'm told by our attorneys that there is not.

21 Q.  And Ms. Siemer, in regards to the investigation, in

22 starting the investigation of Georgia Holloway, was your

23 response within the normal time frames --

24         THE COURT:  This is still direct, this is still

25 direct.

1    MR. WHITE:  Yes, Your Honor.

2  BY MR. WHITE:

3  Q.  What is the typical time frame or the average time frame

4  for you to begin an investigation when you get a call regarding

5  abuse and neglect?

6  A.  It could be anywhere from 24 to 48 hours, depending on what

7  else is going on in our case loads.

8  Q.  Ms. Siemer, what access or what authority were you able to

9  meet with Ms. Holloway on September 2nd?

10  A.  Mr. Liles' Bar card.

11  Q.  Were you given access to anyone in the facilities or the

12  facilities through the P&A's access on September 2nd?

13  A.  No, sir.

14  Q.  And what don't you have at this point in time to complete

15  your investigation of the complaint that you received on

16  September 1st from the informant?

17  A.  We still have not received her jail file, Georgia

18  Holloway's jail file, and we've not really done what we believe

19  is a thorough investigation of the infirmary --

20  Q.  Have you had --

21  A.  -- with persons with disabilities.

22  Q.  Were you granted access to everyone that you had requested

23  to have access to in terms of individuals?

24  A.  No.

25    MR. WHITE:  Thank you.

1          THE COURT:  Thank you, you may step down.

2          And I assume her testimony is concluded?

3          MR. WHITE:  Yes, Your Honor.

4          THE COURT:  And you're free to stay or go at your

5   pleasure, but you can't discuss what you've testified about in

6   the Courtroom with anyone else.

7          You understand?

8          THE WITNESS:  Yes.

9          THE COURT:  All right.

10          Who's your next witness?

11          MR. LILES:  Call Captain Craig Burke.

12          THE COURT:  How long will his testimony be?

13          MR. LILES:  My side, I'm expecting less than 15

14   minutes.

15          THE COURT:  And from the defense?

16          MR. CAMPBELL:  Depending on what he asks, probably 15

17   to 30 minutes.

18          THE COURT:  All right.

19          We'll break here for lunch, we'll return at five after

20   1:00 to continue the trial.  We're in recess.

21          (Thereupon, a luncheon recess was taken.)

22          Any matters to address before we call the next

23   witness?

24          MR. LILES:  We call Captain Craig Burke, if it please

25   Your Honor.

1        MR. CAMPBELL:  Not from the defense, Your Honor.

2        THE COURT:  All right.

3        Please come forward, sir, to be sworn.

4        MR. LILES:  May I move the podium?

5        THE COURT:  You may.

6   Thereupon,

7                        CRAIG BURKE,

8   having first been duly sworn to tell the truth, the whole

9   truth, and nothing but the truth, was examined and testified as

10  follows:

11       THE WITNESS:  Yes, ma'am.

12       THE CLERK:  Please take a seat in the witness box.

13       Please state your name and spell your last name for

14  the record.

15       THE WITNESS:  Craig Burke, B-U-R-K-E.

16       THE COURT:  Sir, you're under oath, you must give

17  truthful answers to the questions that are asked of you.  If

18  you give false answers, you face penalties of perjury, false

19  statement and obstruction of justice.

20       Do you understand that?

21       THE WITNESS:  Yes, ma'am.

22       THE COURT:  If the lawyer is asking a question, wait

23  until he completes his question before you start your response

24  so you are not talking over him.  If you see counsel stand to

25  object, wait until I rule on the objection before you give your

1  response.

2         You understand that?

3         THE WITNESS:  Yes, ma'am.

4         THE COURT:  You may proceed.

5                    DIRECT EXAMINATION

6  BY MR. LILES:

7  Q.  Are you currently employed, sir?

8  A.  I'm actually retired.

9  Q.  Were you employed in September of 2010?

10  A.  Yes, sir.

11  Q.  With whom were you employed?

12  A.  Polk County Sheriff's Office.

13  Q.  And how long have you been at the Polk County Sheriff's

14  Office?

15  A.  18 years.

16  Q.  What duties and responsibilities did you have in September

17  of 2010?

18  A.  I was the Facility Commander of the Central County Jail in

19  Bartow.

20  Q.  What are the duties and responsibilities for that position?

21  A.  I oversee the daily security operations of the Central

22  County Jail.

23  Q.  Is that located at 2390 Bob Phillips Road in Bartow,

24  Florida?

25  A.  Yes, sir.

1  Q.  Is that the location for the infirmary for the Polk County

2  Jail?

3  A.  Yes, sir.

4  Q.  Does the jail have regular business hours?

5  A.  Yes, sir.

6  Q.  What are they?

7  A.  8:00 to 5:00, Monday through Friday.

8  Q.  Were you on duty on September 2nd, 2010?

9  A.  Yes, sir.

10  Q.  And what period of time were you working on that date?

11  A.  8:00 to 5:00 were the normal business hours.

12  Q.  Do you recall persons from the Advocacy Center for Persons

13  with Disabilities, Inc., stopping by the Polk County Jail on

14  September 2nd?

15  A.  Yes, sir.

16  Q.  And when they arrived, was that during the normal business

17  hours?

18  A.  Yes, sir.

19  Q.  What did you understand to be the reason for their visit?

20  A.  I wasn't sure at the time of their arrival.

21  Q.  After they arrived, what did you understand the reason for

22  their visit?

23  A.  After some extensive research and consulting with our

24  attorney, it was finally determined that there was an

25  allegation of abuse.

1  Q.  What were they requesting access for?

2  A.  That wasn't clear.

3  Q.  Did they ask to go see any part of the jail or the

4  infirmary?

5  A.  Not initially.

6  Q.  When did you learn that they were looking to go to the jail

7  or infirmary?

8  A.  After we contacted our legal or general counsel, we went

9  back out and tried to obtain some more information regarding

10  the purpose of the visit, and then it was determined that you

11  and Ms. Siemer wanted to go to the infirmary to see a specific

12  inmate.

13  Q.  Just one person?

14  A.  Yes, sir.

15  Q.  You recall giving a deposition in this case, sir?

16  A.  Yes.

17  Q.  You recall giving that deposition on May 16th, 2011?

18          THE COURT:  Do you have a copy for the Court, counsel?

19          MR. LILES:  I do, Your Honor.  May I approach?

20          THE COURT:  Please.

21          MR. LILES:  Also --

22          THE COURT:  What line and page do you intend to refer

23  to?

24          MR. LILES:  I'm going to go to several lines and

25  pages, Your Honor.  The first one will be page 26, line 25.

BY MR. LILES:

Q. Do you recall --

THE COURT: Improper impeachment, counsel.

Please proceed to the next line and page.

BY MR. LILES:

Q. Who is Lieutenant Galloway?

A. He was the Administrative Lieutenant at the Central County Jail.

Q. Do you recall Lieutenant Galloway coming to your attention on September 2nd?

A. I have daily interactions with Lieutenant Galloway.

Q. Sir, my question is, on September 2nd, do you recall Lieutenant Galloway coming in to talk to you about this issue?

A. Yes.

Q. And what did Lieutenant Galloway tell you?

A. That there was individuals from the -- an organization that wanted to have access to the facility for an investigation.

Q. What facility?

A. At the Central County Jail.

Q. Any part of the facility at the Central County Jail?

A. I don't recall him specifically saying that.

MR. LILES: Your Honor, at this time, I'll refer to deposition page 26, line 25.

THE COURT: Yes.

BY MR. LILES:

1    Q.   Do you recall this question and the answer, sir?

2        What is it that Lieutenant Galloway told you?

3        Answer:   That two individuals were requesting access

4 to the infirmary alleging or saying that they had received an

5 allegation of abuse of inmates at the Polk County Jail.

6        Do you recall that answer, sir?

7    A.   Okay.   Yes, sir, if that's what my deposition says.

8    Q.   Was you memory fresher at that time than it is today, sir?

9    A.   Yes, sir.   I also had a time-line I was able to access.   If

10 you had that, it would probably better serve me.

11        MR. LILES:   Your Honor, that's an exhibit that is in

12 evidence at this time.

13        THE COURT:   He's not entitled to read from an exhibit,

14 he has to give his testimony.

15        MR. LILES:   Right.

16 BY MR. LILES:

17    Q.   Did the representatives from the P&A agency provide you

18 with their credentials?

19    A.   I don't recall if it was initially, but they were presented

20 at the Central County Jail, yes, sir.

21    Q.   Did the P&A credentials presented contain the name of the

22 organization?

23    A.   Yes, sir, I believe so.

24    Q.   Did they contain the name and photo of the person attached

25 to the organization?

1  A.  Yes, sir, I believe so.

2  Q.  Did they contain the statutory authority for the

3  organization?

4  A.  That I don't recall.

5  Q.  Once again, sir, I want to refer you to your deposition on

6  page 44.

7        THE COURT:  That's not proper impeachment, he hasn't

8  given an inconsistent answer.  He says he can't remember.  You

9  can give him his deposition and let him refresh his

10  recollection.  You can ask him if anything would, and give him

11  that thing to allow him to refresh his recollection.

12        MR. LILES:  May I approach the witness, Your Honor?

13        THE COURT:  You may.

14        (Brief pause.)

15        THE WITNESS:  Yes, sir, it says you gave what you

16  presented as your original credentials.

17  BY MR. LILES:

18  Q.  The question deals with statutory authority, sir.  You were

19  provided with the statutory authority?

20  A.  Right, what you presented to be your statutory authority.

21  Q.  Okay, sir.

22        MR. LILES:  Your Honor, I'd like to have the witness

23  just identify Joint Exhibit Number 1, if I may.

24        THE COURT:  Yes.

25        MR. LILES:  May I approach?

1    THE COURT:  You may.  You have general leave to

2  approach witnesses as necessary to display evidence.

3    MR. LILES:  May I approach the witness?

4    THE COURT:  I just answered that question, counsel.

5  BY MR. LILES:

6  Q.  Photo identification of Ms. Siemer that you received, is it

7  consistent with what appears in Joint Exhibit 1?

8  A.  Yes, sir.

9  Q.  Were the P&A representatives permitted to access the Polk

10  County Jail infirmary on September 2nd, 2010?

11  A.  Not on September 2nd, yes, sir.

12  Q.  Did you require a Court order to gain access to the

13  infirmary on September 2nd, 2010?

14  A.  Because we were not familiar with who the organization was,

15  neither was our general counsel.

16  Q.  Is that a yes?

17  A.  We weren't familiar with who the organization was and the

18  credentials that were presented were photocopies and not

19  original orders.

20    THE COURT:  The question was, did you require a Court

21  order to permit access, the access that was requested; yes or

22  no?

23    THE WITNESS:  Our general counsel did request that

24  they present a Court order, yes, Your Honor.

25  BY MR. LILES:

1  Q.  Is that a yes?

2         THE COURT:  He answered yes.

3  BY MR. LILES:

4  Q.  All right.

5         Did you contact anyone on September 2nd, 2010, to

6  determine whether there was anyone in the infirmary on

7  September 2nd, who had a mental illness, developmental

8  disability or any other disability?

9  A.  I don't believe I did, not on September 2nd, no, sir.

10 Q.  Okay.  Sir, would you describe the layout of the infirmary?

11 A.  As you enter into the secure vestibule door of the

12 infirmary, straightforward as you proceed in, is a hallway with

13 offices, nurses' stations.  There's a control room directly to

14 the right.  There is a male bay directly in front of that

15 control room, an open bay with isolation cells to the right of

16 that.  As you proceed, would be north, into the bay, there is a

17 secure wall with a door access that enters into the female bay.

18 Q.  The control room, if I start there, is that on the

19 right-hand side?

20 A.  As you enter into the open area of the infirmary bay -- or

21 into the infirmary, not to the infirmary bay.

22 Q.  And can you access the control room from the hallway that

23 you're walking through at that time?

24 A.  As you enter into the secure door?

25 Q.  Yes, sir.

1  A.  Yes, sir, you can.

2  Q.  After you pass the secure door, can you access into the

3  control room from that point?

4  A.  Could you restate the question, please?

5  Q.  I'll try.  After you go through the secure door, can you

6  gain access to the control room on the other side of that door?

7  A.  No, sir.

8  Q.  Is there a wall, curtain or anything on the right-hand side

9  as you're walking down that hallway?

10  A.  Where the offices are?

11  Q.  Well, I want to stay to the right-hand side right now, the

12  side the control room was on.

13  A.  Okay.

14  Q.  I come to the secure door, describe the infirmary from that

15  point forward.  Is there a solid wall, is there a set of doors?

16  How is it constructed?

17  A.  We're standing facing the control room from the -- as you

18  enter from the compound into the infirmary; is that correct?

19  Q.  I would like you to --

20       THE COURT:  What's the relevance of this testimony?

21       MR. LILES:  I believe it's going to show the areas of

22  the infirmary that were made available to the representatives

23  on the date of the visit.

24       THE COURT:  Why don't you just ask him that and work

25  backwards.

1      MR. LILES:  I'm trying to lay the foundation, Your

2 Honor.

3      THE COURT:  What areas of the infirmary were permitted

4 access to -- I'm sorry -- which areas of the infirmary did you

5 permit access to the control room, the male bay, the female bay

6 and the offices or the hallway?

7      THE WITNESS:  They actually had access to everywhere

8 that they said they had authority within their scope of their

9 investigation.  The only place that they --

10      THE COURT:  Which was what, exactly?

11      THE WITNESS:  The female bay.

12      THE COURT:  Did they get access to the control room?

13      THE WITNESS:  They walked in through towards the

14 control room as well as the office areas where all the medical

15 staff were at.

16      THE COURT:  Did they get access to the male bay?

17      THE WITNESS:  They did not ask for access to the male

18 bay.

19      THE COURT:  Was the male bay open or closed?

20      THE WITNESS:  It was open.

21      THE COURT:  Is it closed by a curtain or closed by a

22 door?

23      THE WITNESS:  It was -- there is a door that secures

24 the -- separates the male bay from the female bay, Your Honor.

25      THE COURT:  Is there a window that allows you to look

1  into the male bay when you walk into the infirmary?

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  Was it curtained off or was it open?

4          THE WITNESS:  I believe -- I believe it may have been

5  curtained off, Your Honor, I don't recall specifically.

6          THE COURT:  Is there a window in front of the male

7  bay?

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  Can the control room people look in

10 through the window into the bay?

11          THE WITNESS:  Yes, ma'am.

12          THE COURT:  And then you walk down the hall, that's

13 where the female bay is?

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  And is there also a window that can be

16 accessed and viewed by the control room?

17          THE WITNESS:  Into the female bay, Your Honor, that's

18 -- from the control room area, the female bay can only be seen

19 on a video camera because there is a block wall that separates

20 the male and female bay, but there's a staff member in the

21 female bay.

22          THE COURT:  So they were able to have access to the

23 female bay, but you said is what they asked for, but not the

24 male bay?

25          THE WITNESS:  Correct, Your Honor, we did not escort

1  them to the male bay.

2          THE COURT:  You may continue.

3  BY MR. LILES:

4  Q.  Was Georgia Holloway in the infirmary on September 1st,

5  2010?

6  A.  Yes, sir.

7  Q.  Was she in the infirmary on September 2nd?

8  A.  Yes, sir.

9  Q.  Was she in the infirmary on September 3rd?

10  A.  Yes, sir.

11  Q.  Does Georgia Holloway have some type of mental disability?

12  A.  I do not know.

13  Q.  You recall in your deposition on page 52, Your Honor,

14  starting at page 22 -- excuse me -- page 52, line 22, giving

15  the answer about the question of her disability:

16          I don't know what her specific disability is, but it

17  was very obvious with interactions with Ms. Holloway that she

18  did have some type of mental handicap.

19          Do you remember giving that answer, sir?

20  A.  Yes, sir, but that wasn't the question you asked me.

21  Q.  I asked you if Ms. Holloway had some type of mental

22  disability, did I not?

23  A.  Right, and I don't know, and that's consistent with my

24  deposition.

25  Q.  You make a distinction between disability and handicap,

1  sir?

2  A.  She has a -- her hands are formed up.

3  THE COURT:  You say "mental handicap" in your

4  deposition, you said "mental handicap."

5  THE WITNESS:  I apologize, Your Honor, I'm not

6  understanding.

7  THE COURT:  In your deposition, you said, I don't know

8  her specific disability, what her specific disability is, but

9  it was very obvious with interactions with Ms. Holiday --

10  Ms. Holloway, that she did have some type of mental handicap.

11  THE WITNESS:  I apologize, Your Honor, I thought he

12  asked me what her disability was.

13  THE COURT:  He asked you mental disability.  Do you

14  know what her mental disability is?

15  THE WITNESS:  I don't know what her mental disability

16  is.

17  THE COURT:  Do you know that she has one?

18  THE WITNESS:  When I referred to that, I referred to

19  the way that she interacted and could not interact with my

20  staff as well as her mental deformity, basically, of her hands.

21  MR. LILES:  May I proceed, Your Honor?

22  BY MR. LILES:

23  Q.  You know a gentleman by the name of Jonathan Harvey?

24  A.  I know of Jonathan Harvey, yes, sir.

25  Q.  He was in the infirmary on September 1st, 2010, correct?

1  A.  Yes, sir.

2  Q.  Every inmate that's in the infirmary is in some type of

3  restraint?

4  A.  Yes, sir.

5  Q.  That's policy?

6  A.  Yes, sir.

7  Q.  Indeed, Mr. Harvey was in four-point restraints on

8  September 1st, 2010, correct?

9  A.  I believe he was, yes, sir.

10 Q.  You had a protocol for keeping him in four-point restraints

11 for a period of time; is that correct?

12 A.  Yes, sir.

13 Q.  He had been sent to the hospital at least two times to have

14 objects removed that he had swallowed; is that correct?

15 A.  Yes, sir.  Actually, I think it was three times.

16 Q.  Okay, sir.  You did not identify to the representatives of

17 the P&A that Mr. Harvey was the person with suspected

18 disabilities, did you?

19         MR. CAMPBELL:  Object to the question.

20         THE COURT:  Overruled.

21         THE WITNESS:  Could you repeat your question?

22 BY MR. LILES:

23 Q.  I'll try.  You had never identified Mr. Harvey as a person

24 with suspected disabilities to the representatives of the P&A,

25 correct?

```
 1  A.  I gave the names based off of who our health services
 2  administrator told me.
 3            THE COURT:  So did you identify Mr. Harvey or not?
 4            THE WITNESS:  No, ma'am, because they told me --
 5            THE COURT:  That's all he asked you.  No.
 6            Next question.
 7  BY MR. LILES:
 8  Q.  Mr. Harvey was held in the male portion of the infirmary,
 9  correct?
10  A.  Yes, sir.
11  Q.  And you had received a report when the representatives of
12  the P&A were present that there was a naked male in four-point
13  restraints that had been reported in that infirmary, correct?
14  A.  No, sir.
15  Q.  Never happened?
16  A.  No, sir, not on the day that you and Ms. Siemer initially
17  came in.
18  Q.  You never --
19  A.  The only person you asked to speak to -- to see was Georgia
20  Holloway.
21  Q.  Did you receive a report, sir, that persons with
22  disabilities were being held in restraints in the infirmary?
23  A.  Yes, sir.
24  Q.  You did not permit access to the male infirmary on
25  September 2nd, correct?
```

A.   You didn't ask to go to the male infirmary.

Q.   Sir, my question is, did you permit access to the male
infirmary on September 2nd?

MR. CAMPBELL:  Object, I think the answer was yes.

THE COURT:  Overruled.

MR. CAMPBELL:  Can I --

THE COURT:  He can answer his question, do not coach.
The objection is asked and answered, overruled, have a seat,
answer the question.

Did you permit access to the male infirmary on
September 2nd, now?

MR. LILES:  Yes, that's correct.

THE COURT:  Yes or no?

THE WITNESS:  They did not go to the male infirmary,
no, ma'am.

BY MR. LILES:

Q.   Did you permit access --

THE COURT:  Asked and answered, please move on to the
next question.

BY MR. LILES:

Q.   Did you permit access to the male infirmary on September
3rd?

A.   Yes -- oh, I apologize, no, sir.

MR. LILES:  Nothing further.

One moment, Your Honor.

1    THE COURT:  Yes, sir.

2    (Brief Pause.)

3    MR. LILES:  Tender the witness, Your Honor.

4    THE COURT:  Counsel.

5                    CROSS-EXAMINATION

6  BY MR. CAMPBELL:

7  Q.  Good afternoon, Captain Burke.

8  A.  Good afternoon, sir.

9  Q.  Were you ever asked by representatives of Plaintiff's

10 organization, which has changed names now, to go into the male

11 infirmary?

12 A.  No, sir.

13 Q.  On September 2nd or 3rd?

14 A.  No, sir.

15 Q.  Was a male patient ever identified as a person with a

16 disability who Plaintiff's organization wanted to see?

17 A.  No, sir.

18 Q.  Were you asked if there were other disabled persons in the

19 infirmary?

20 A.  We were specifically asked about a particular individual.

21    THE COURT:  Were you asked if there were other

22 disabled persons in the infirmary; yes or no?

23    THE WITNESS:  I do not recall if we were asked if

24 there were other -- I gave them the names that our Health

25 Services Administrator gave to me, Your Honor, of the people

1 with disabilities who were in the infirmary.

2          THE COURT:  But not Mr. Harvey?

3          THE WITNESS:  I apologize, I can't hear you.

4          THE COURT:  Not Mr. Harvey?

5          THE WITNESS:  No, ma'am.

6          THE COURT:  Because?

7          THE WITNESS:  Whenever I asked our Health Services

8 Administrator, basically asked her the question, who in the

9 infirmary has been diagnosed with a disability, she gave me one

10 individual's name.

11          THE COURT:  You may continue.

12 BY MR. CAMPBELL:

13 Q.  In fact, have you ever learned whether Mr. Harvey has ever

14 been diagnosed with any kind of disability?

15 A.  No, sir.

16 Q.  What kind of problem inmate was Mr. Harvey, based upon your

17 experience with him?

18 A.  He was a management problem.

19          MR. LILES:  Relevance.

20          THE COURT:  Overruled.

21          THE WITNESS:  He was a management problem.  Inmate

22 Harvey continued to swallow objects to try to harm himself.  He

23 had to be sent out to the hospital multiple times to have these

24 objects removed and it was even determined that it was a ploy

25 on his part to try to escape.

1        MR. LILES:  Objection.

2        THE COURT:  Sustained.

3   BY MR. CAMPBELL:

4   Q.  Did his records reflect that he had done this in the past

5   before coming to the Central County Jail?

6   A.  I don't recall that, sir.

7   Q.  Is there a psychiatrist on call at the Central County Jail

8   infirmary to determine mental disabilities?

9   A.  Yes, sir.

10  Q.  In the exhibit book before you, if you would turn to

11  Exhibit 9-O, which should be the last one.

12        Now when we talked about credentials or when you

13  talked about credentials before, that was a driver's license

14  and a name tag of the representatives of Plaintiff's correct?

15  A.  Yes, sir.

16  Q.  Okay.  Did they also present anything else that actually

17  reflected their authority or that purported to be?

18  A.  They presented a photocopy of this Executive Order as well

19  as a piece of paper that had the agency's name and letterhead

20  and provided what they claim to be a description of the

21  organization.

22  Q.  Is there -- did you review Exhibit 9-O to see if you could

23  determine what their authority was?

24  A.  Yes, sir, I did.

25  Q.  Could you determine it?

1  A.  No, sir, I could not.

2  Q.  Did they give you any other Executive Order when they came

3  to the jail, either on September 2nd or September 3rd?

4  A.  No, sir, they did not.

5  Q.  And in particular, if you'll turn to 9-A.  9-A is the

6  original Order of Appointment, it's Executive Order 87-151; is

7  that what you have?

8  A.  Yes, sir.

9  Q.  Okay.  Were you presented that?

10  A.  No, sir.

11  Q.  You mentioned that you were given another document.

12          MR. CAMPBELL:  May I get the Defendant's exhibits and

13  approach the witness?

14          THE COURT:  You may.

15          MR. CAMPBELL:  Your Honor, it will be Exhibit 6.

16  BY MR. CAMPBELL:

17  Q.  Do you see what's been marked as Defendant's Exhibit 6?

18  A.  Yes, sir.

19  Q.  Is that the other document that was provided to you by the

20  Plaintiff as a basis for their authority?

21  A.  Yes, sir.

22  Q.  Did you review that document to try to determine if there

23  was anything in there that gave them the authority they were

24  asserting that day?

25  A.  Yes, sir, I did, and I found none.

1 Q. What did you find?

2 A. I found none.

3 Q. At what point did you determine that you had to call the

4 General Counsel's office?

5 A. When they requested to -- it wasn't that they were asking

6 to see an inmate, it was that they were wanting to go into the

7 infirmary area.

8 Q. And had you also notified your chain of command of the

9 request?

10 A. Yes, sir, I notified my Major.

11 Q. And you testified earlier that the General Counsel's office

12 told you to advise them that unless they had an order they

13 wouldn't be permitted that day to go into the infirmary; is

14 that accurate?

15 A. Yes, sir.

16 Q. If you can --

17 MR. CAMPBELL: And I'm going to approach, again, Your

18 Honor, you said I could do that.

19 THE COURT: Yes, sir.

20 MR. CAMPBELL: Okay.

21 BY MR. CAMPBELL:

22 Q. While this was going on on September 2 and 3, did you

23 prepare a time-line as to what was occurring?

24 A. Yes, sir, I did.

25 Q. And was that an accurate reflection of what you observed

1  and heard and said?

2  A.  Yes, sir, it was.

3  Q.  If you will turn to Exhibit Number 7 in the joint exhibits.

4  Under 1500 hours, you've got a reference there, if you could

5  read that last sentence to yourself first, and let me ask you a

6  question about it.

7  A.  Yes, sir.

8  Q.  And what was it that Mr. Cabrera -- he's with the General

9  Counsel's Office of the Sheriff?

10  A.  Yes, sir, he is a staff attorney.

11  Q.  What was it that he told you, according to your time-line

12  at the time, what was it he told you to advise Plaintiffs?

13  A.  That if -- that they needed to provide a Court order or

14  some other type of authority to present in order for us to

15  grant unannounced access for investigatory purposes.

16  Q.  And is that what you told Plaintiffs?

17  A.  Yes, sir.

18  Q.  And under 1510, it notes you then returned and asked them

19  if they had additional documentation or credentials?

20  A.  Yes, sir.

21  Q.  And did they provide any?

22  A.  No, sir.

23  Q.  Did you provide the information you were given to the

24  General Counsel's Office to review?

25  A.  Yes, sir.

1  Q.  And what did you ask them to do?

2  A.  To make a determination of whether we could allow them to

3  go into the infirmary.

4  Q.  Did Mr. Liles ask you whether or not he was being denied

5  access to the infirmary on September 2?

6  A.  Yes, sir, he did.

7  Q.  And what was your response?

8  A.  No, sir, we're not denying him access, we just would like

9  for them to provide supporting -- other documentation than a

10  photocopy of the Executive Order that they presented.

11  Q.  Whose idea was it to have Mr. Liles and Ms. Siemer meet

12  with Georgia Holloway in an attorney setting?

13  A.  Once Mr. Liles presented his credentials as an attorney, we

14  have a policy in place that allows for that.

15  Q.  And who told him that?

16  A.  I believe myself or Major Allen.

17  Q.  Okay.  Was it Mr. Liles' idea to use the attorney route or

18  was that you all's idea to accommodate his request to see

19  Ms. Holloway?

20        MR. LILES:  Objection, calls for speculation.

21        THE COURT:  Overruled.

22        THE WITNESS:  Mr. Liles returned and presented his Bar

23  card.

24  BY MR. CAMPBELL:

25  Q.  And then who made the suggestion, well then, you can see

1 Ms. Holloway in an attorney setting?

2 A.  We did, the Sheriff's Office did, yes, sir.

3 Q.  According to your time-line, at least, that occurred at

4 what time?

5 A.  Approximately 1550 hours.

6 Q.  Okay.  That was when he was escorted down there?

7 A.  Yes, sir.

8 Q.  What time was he told he could have a professional visit?

9 A.  1530.

10 Q.  And what time did you first meet Mr. Liles when he was

11 escorted to see --

12 A.  Approximately 1450.

13 Q.  How did you leave it or how did the jail in your presence,

14 either you or Major Allen, leave it with Mr. Liles on September

15 2nd?

16 A.  At the conclusion of his visit, is that what you're asking?

17 Q.  Yes, sir.

18 A.  That we were under the impression that everything was fine,

19 they had received everything that they needed for that day and

20 that they were -- Mr. Liles and our legal counsel would be

21 discussing how -- the procedure for them to actually access the

22 infirmary.

23 Q.  Okay.  Did that occur the next day?

24 A.  Yes, sir.

25 Q.  Now, you testified what occurred at that time, including

1  the fact that they were taken to everywhere that they asked to

2  see that they had authority?

3  A.  Yes, sir.

4  Q.  Were they actually asked which areas do you have authority

5  to see or how did that work conversationally?

6  A.  It was actually asked several times who their -- the scope

7  of their investigate -- their investigation and which areas

8  that they needed to see.  And Mr. Liles informed us of

9  basically this particular inmate, Georgia Holloway, and that

10 even after he was asked a couple other times, that was the only

11 area that they had the -- that he stated that they needed to

12 see.

13 Q.  And how was that left with Plaintiff's representatives at

14 the end of the day?  Were they asked, is there anything else

15 you need, anything of that nature?

16 A.  Yes, sir.

17 Q.  And what was their response?

18 A.  That the only thing that they had requested was, they had

19 seen -- I apologize -- they had seen everything that they had

20 needed to see, they saw the inmate and he actually stated in

21 the end of our response that they should probably have -- make

22 it known to other agencies what their authority is because this

23 was very confusing.

24 Q.  Okay.  Talk more about that conversation.  How did that

25 conversation come up and what do you recall Mr. Liles saying?

1          MR. LILES:  Objection, relevance.

2          THE COURT:  Overruled.

3          THE WITNESS:  As we were coming back up to master

4   control, I was apologetic in not being able to facilitate, you

5   know, what they wanted initially because we weren't sure who

6   they were or had never interacted with them before.  At that

7   time, you know, Mr. Liles was very cordial, he understood.

8   They were glad to -- very happy to be able to get that resolved

9   so they could actually see and proceed with their

10  investigation.

11         And he actually even stated to me that they should

12  probably make arrangement to meet at like the Florida Sheriffs

13  Association or some other venue to basically provide their

14  authority to the Sheriffs so when they go to other agencies

15  that people are aware and educated about their authority.

16         MR. CAMPBELL:  That's all I have.

17         Thank you, Your Honor.

18         MR. LILES:   Briefly.

19         THE COURT:  Briefly.

20                     REDIRECT EXAMINATION

21  BY MR. LILES:

22  Q.  The comments you just mentioned are not included in your

23  notes that were in Exhibit 7, correct?

24  A.  May I look at the --

25  Q.  Please do, sir.

1  A.  No, sir, they're not in that time-line.

2  Q.  You were told that there was somebody other than Georgia

3  Holloway for which a complaint had been received, correct?

4  A.  No, sir.

5  Q.  Sir, do you recall your testimony on May 16th?

6          MR. LILES:  I'm looking at page 42, Your Honor,

7          THE COURT:  One second.

8          MR. LILES:  Starting at line 4.

9          THE COURT:  One second.

10  BY MR. LILES:

11  Q.  And you said that you received a complaint with regards to

12  inmates, inmates being treated improperly at the Central County

13  Jail.

14          Do you recall giving that statement at the deposition,

15  sir?

16          MR. CAMPBELL:  Your Honor, I object as far as improper

17  impeachment.  It's not even close to the question he was asked.

18          MR. LILES:  Your Honor.

19          THE COURT:  Overruled as to the objection.

20          Do you recall using the word "inmates" in your

21  deposition?

22          THE WITNESS:  I recall the question, but I also recall

23  that there was a -- had to do with the spell check.  The only

24  person that I was aware of after the organization arrived was

25  that you wanted to see Georgia Holloway.

BY MR. LILES:

Q.  Well, sir, on page 69, starting at page -- line 16, you
said that you had received a complaint that inmates were being
abused with mental -- inmates with mental illnesses were being
abused in the infirmary.

Do you recall giving that answer?

THE COURT:  Counsel, that is improper impeachment if
you read the rest of that page.

MR. LILES:  I understand, I don't mind reading it,
Your Honor.

THE COURT:  It is improper impeachment because he said
what he said, and he said it had to do with the general use of
the word "inmates," and not inmate, so please proceed to
something else.

MR. LILES:  Then I'll go on to -- may I continue
reading, Your Honor?

THE COURT:  You may not, it's improper impeachment.
You may move on to some other thing.

BY MR. LILES:

Q.  Your notes that you took on the 2nd and 3rd, those
mentioned the word "inmates", correct?

A.  I'm sorry?

Q.  The notes that you took on September 2nd and 3rd, they
mentioned multiple inmates, correct?

A.  Yes, they do, but you never asked for multiple inmates.

1           MR. LILES:  One moment, Your Honor.

2           THE COURT:  Yes, sir.

3           MR. LILES:  Nothing further of this witness, Your

4    Honor.

5           THE COURT:  You may step down, sir.

6           Is this witness done?  Are you all done with this

7    witness?

8           MR. LILES:  The Plaintiff is, Your Honor.

9           MR. CAMPBELL:  Your Honor, I'll make it very brief,

10   but I'd like to make a Rule 52(c) motion.

11          THE COURT:  Are you done with this witness?

12          MR. CAMPBELL:  Oh, yes, Your Honor.

13          THE COURT:  All right.

14          You're free to go -- you're free to leave or stay,

15   whichever you prefer, but you may not discuss your testimony

16   with anyone during the pendency of this case.

17          Do you understand that?

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  Thank you.

20          Does the Plaintiff have any other witnesses or

21   evidence that Plaintiff would like to introduce at this time?

22          MR. LILES:  Plaintiff rests at this time, Your Honor.

23          THE COURT:  Counsel.

24          MR. CAMPBELL:  I apologize, I'm not hearing well

25   either, obviously.

1          THE COURT:  Well, I have a cold, you have a cold, so

2     we'll just suffer together.  The microphones are also not

3     working properly.

4          MR. CAMPBELL:  Thank you.

5          THE COURT:  Call Congress and tell them to give us

6     some resources so we can have fixed Courtrooms and Judges can

7     be where they're supposed to be.

8          MR. CAMPBELL:  Yes, Your Honor, although if you come

9     to Bartow, you'd be really impressed with your Courtrooms.

10          THE COURT:  Probably.

11          Let me hear you.

12          MR. CAMPBELL:  I'll be brief, but I'd like to make a

13     Rule 52(c) motion for judgment of partial findings, and as the

14     Court knows, in a bench trial, that's basically a motion for

15     directed verdict or motion for judgment as a matter of law.

16          There is no presumption in favor of Plaintiff.

17     There's no weighing the evidence in favor of Plaintiff, which I

18     didn't know until I researched it last week that you're

19     entitled to weigh the evidence and determine whether the

20     evidence, as a whole, is sufficient to support Plaintiff's

21     claims, and I will simply repeat what you asked during the

22     start and add a little bit to it which is what witness or what

23     evidence in this case has been presented that provides a basis

24     for the declaratory or injunctive relief that's sought.  What

25     basis does the Court have in evidence currently to render a

1  judgment anywhere close to the conclusions of law or findings

2  of fact that Plaintiff has submitted?

3       And I would argue strenuously that there is no such

4  evidence in this case, that although there is conflicting

5  evidence, there is no evidence for which you could base

6  appropriately a declaratory judgment or injunction,

7  respectfully.

8       That's all, thank you.

9       THE COURT:  Thank you.

10      Counsel.

11      MR. LILES:  Your Honor, the evidence before the Court

12  that has been admitted at this stage of the trial absolutely

13  supports a declaration and injunctive relief.  Federal Law

14  guarantees a Protection and Advocacy System the right of access

15  to facilities upon receiving a report.  It is uncontroverted

16  that in this case that the P&A received a report of an

17  allegation of abuse and neglect --

18      THE COURT:  Is that access or reasonable access?

19      MR. LILES:  It's reasonable access to the Polk County

20  Jail and the infirmary.  On September 1st, the evidence that

21  came through at this trial, it's uncontroverted that a

22  confidential informant provided such a report and identified

23  multiple people with disabilities in the infirmary of the Polk

24  County Jail in Bartow.

25      THE COURT:  Multiple being two?

1          MR. LILES:  Two or more.

2          THE COURT:  All right.

3          MR. LILES:  The evidence in this case right now shows

4   that the people from -- the representatives from the P&A went

5   to the Polk County Jail, presented their credentials, the

6   credentials which had their name, which had their photo and

7   which had their statutory authority.  If you take a look at

8   Exhibit 1-A on the front of that document, it shows the

9   statutory authority to 42 USC, 100801 F Sec, 1000 --

10         THE COURT:  The Court is aware that allegations were

11  made, the Court is aware that persons presented themselves and

12  presented credentials seeking access.  Tell me about the

13  reasonableness of the access that was provided or the

14  unreasonableness of the access that was provided within what

15  appears to be a 48-hour period.

16         MR. LILES:  All right.

17         At this point in time, Your Honor, we were doing --

18  the P&A was doing an investigation of a complaint of abuse and

19  neglect.  When you take a look at the regulations that control

20  this, and I'm talking specifically about 42 CFR, 51.42(b), it

21  talks about, upon request of the P&A, if they receive a report,

22  they must be given access, and it's reasonable access.

23         In the case of Equip for Equality which is a 2003

24  decision out of Illinois, the Court looked at the investigatory

25  access and while that Court was looking specifically at a

1  monitoring and an education function, it analyzed all of the

2  various modes that a P&A might be going into.  And they talked

3  extensively about having an unannounced access which is one of

4  the Court's questions.  And that case is what really details

5  the nature of having an immediate access to investigate it.

6       Now they talked about, in that case, during normal

7  business hours, and the testimony in this case is that the

8  representative showed up during normal business hours on

9  September 2nd, and they were denied access.  And they were

10 entitled to go into the infirmary.  They were entitled to go

11 see the witness in the infirmary.

12      It's clear from the testimony that there was not going

13 to be any access to any of the people that were alleged to have

14 been victims of alleged abuse or neglect without a Court order

15 or something else, but it wasn't going to happen.  And it

16 wasn't until the representatives, and the evidence only

17 requires a fair treatment, that it wasn't until a Bar card was

18 presented that any access was given, that it wasn't access to

19 the individual in the infirmary where she was being held in

20 restraints, and there's no dispute about being restrained,

21 everybody is held in restraints in the infirmary, that's their

22 policy.  She is brought to an attorney visitation area, a

23 separate area of the jail, where a visitation is permitted.

24      At that time, Ms. Siemer has testified that she's able

25 to observe the injuries that actually had been sustained.  If

1  you take a look at the evidence that's of record, the booking

2  photo is Exhibit 2-A, you can see that when Ms. Holloway

3  arrived in the jail, she had two good front teeth, they're

4  intact.  But the evidence is that she -- her teeth were broken.

5          There's no incident report, they didn't produce one,

6  they didn't create it, but she's been injured after being in

7  their custody at the Polk County Jail, and that's consistent

8  with the report that we've received.

9          We also get a report of a naked male, and throughout

10 this entire period of time, the evidence is that we were never

11 given access, the P&A was never given access to any part of the

12 male infirmary.  Whether the male who was in the infirmary on

13 the 1st was there on the 3rd or not is not the issue.  The

14 issue is was he there on the 1st.  And Joint Exhibit Number 6

15 shows that Mr. Harvey was there on the 1st, and that was the

16 time of the report.

17         So, the evidence is that there's been allegations of

18 abuse and neglect.  The witness' testimony, Captain Burke's,

19 during his deposition, in his notes that he kept

20 contemporaneously, that's what he alleges, he kept them

21 contemporaneously with the events, he reports that inmates were

22 being requested to be seen.  There were reports of inmates,

23 plural, not just one.

24         Ms. Siemer has testified that the other inmate that we

25 knew specifically about was an inmate who appeared to be with a

1   mental handicap and was in restraint -- four-point restraints.

2   They have a gentleman, Jonathan Harvey, in four-point

3   restraints.  That's consistent with what was reported.

4          Mr. Harvey, based upon the testimony of Captain Burke,

5   is swallowing objects requiring not two, but three

6   hospitalizations prior to September 1st.  He doesn't believe

7   that's a mental handicap, he believes it is a management

8   problem, he's trying to use the system.

9          I don't know, Your Honor, and quite frankly, that

10  would be something that the P&A might be able to determine once

11  we were able to do the investigation.

12         THE COURT:  Where are the documents documenting, as

13  you describe it, the P&A's repeated efforts to get access to

14  Mr. Harvey or to the infirmary or to males; where is that

15  evidence on this record as it now stands?

16         MR. LILES:  Your Honor, go to Joint Exhibit Number 3,

17  page 3 of the exhibit.  Looking at the paragraph below the list

18  of documents that are being requested, the letter states, "In

19  addition to the disclosure of records, pursuant to Federal Law,

20  the Advocacy Center has the authority to investigate incidents

21  of abuse and neglect of individuals with developmental and

22  mental disabilities if the incidents are reported to the system

23  or if there's probable cause to believe the incidents

24  occurred", and then there's citations to the authority.

25         "In order to conduct such an investigation, this

1   authority encompasses access to the facilities," and then

2   citations, "which includes interviews with staffs and

3   individuals," and that individuals is not limited to those

4   people who have disabilities.

5          "Hopefully, the jail will permit the Advocacy Center

6   to complete its investigation without further interruption or

7   delay.  We have previously provided you the legal authority

8   mandating that the jail specifically identify its objections to

9   the Advocacy Center's authority," and we provided this CFR that

10  talks about having a written explanation as to why we aren't

11  getting the access.

12         There's not a scintilla of evidence that any written

13  reason was ever provided as required by the statute.  We

14  specifically asked the jail if they have a contrary position to

15  provide us something in writing as to their position and the

16  specific authority.

17         Exhibit Number 4, Your Honor, is dated almost a month

18  later, October the 21st.  It makes reference and incorporates

19  the prior letter.  The second paragraph, "As we remain hopeful

20  the jail will permit the Advocacy Center to complete its

21  investigation without further interruption or delay, we

22  previously provided you the legal authority", signing it once

23  again and once again asking for them to give us something in

24  writing as to why we could not have access.

25         Joint Exhibit Number 5, Your Honor, it's a letter

dated two weeks later, November 2nd.  This time, it's sent to the Sheriff because the prior letters, which were addressed to the general counsel, we had not yet received any type of written response.

MR. CAMPBELL:  Your Honor, if he's going to testify, that's not in the record, so I would prefer not to have him testify.

MR. LILES:  Your Honor, with regard to the stuff that's in the record, the letters themselves say that there's no written response.  That's all I'm relying upon.

THE COURT:  Overruled as to the objection.

MR. LILES:  The third paragraph says, "We continue to remain hopeful that Polk County Sheriff's Office will permit the Advocacy Center to complete its investigation without further interruption or delay".

These are all evidence of the fact that we have not completed the investigation, it's absolutely inconsistent with the testimony of Captain Burke in this case as to we didn't want anything further, and a lawsuit was filed at the end of November which is before the Court right now.  That is a repeated, consistent effort asking to complete the investigation to allow us to have access.

And all of that is consistent with Ms. Siemer's testimony that, one, we had not received the access to which we sought, we have never received any type of written explanation

1  as to why we weren't going to have access, and we've not seen

2  any of the males, whether they had disabilities or not.  It's

3  inconsistent with Mr. -- with Captain Burke's testimony for him

4  to say that nobody else was asked for when he goes and asks the

5  nurse at the jail infirmary whether there's anybody else that

6  has disabilities.

7       It doesn't make sense for him to ask that question if

8  the only person we asked to go see was Georgia Holloway.  It is

9  consistent with him asking that question if, as Ms. Siemer has

10 testified, that we did ask to see a naked male in restraints

11 and they said you can't see him, which is her testimony.

12       As a result, Your Honor, the evidence before the Court

13 is that, one, there's no dispute that the Disability Rights

14 Florida is the P&A, there's no dispute that they have received

15 a complaint, there's no dispute that they went there and asked

16 for access, they identified themselves, presented the

17 appropriate credentials, and they're not required to say

18 anything other than we received a report.  They're not required

19 to identify anybody.  There's no requirement under the law.

20       And while it might be nice for them to know it,

21 there's no requirement that the visit be announced.  Indeed, in

22 Equip for Equality, that Court recognized there are good

23 reasons not to make the announcement, and this Court should

24 likewise find.

25       As a result, it took seven months before we even

1  learned the identity of any of the individuals because they

2  would not disclose the names of the people that were in the

3  jail.  And that required a Court Order by the predecessor

4  Judge, Judge Lazzara.  And in that list, there were 13

5  individuals that are on the list that were in the infirmary on

6  the 1st of September and we didn't get a chance to interview

7  anybody other than Georgia Holloway.  That was not a choice

8  that we made, it was a limitation imposed upon us by the

9  Sheriff, and that's what the evidence shows.

10          THE COURT:  Is there anything in the record as to

11  where these people were on September the 3rd?

12          MR. LILES:  Yes, Your Honor, with regard to

13  Mr. Harvey, there is.  If you go to Exhibit Number 7, at the

14  bottom of page of the first page of that exhibit, he recognized

15  that inmate Harvey, Jonathan, is currently being housed in the

16  infirmary.  That's Captain Burke's written statement, so we

17  know he was there on the 2nd.

18          THE COURT:  It also says, it is apparent that the

19  Advocacy Center not only had an interest in inmate Holloway but

20  also inmate Harvey.

21          MR. LILES:  He's making a statement from somebody

22  else.  At that point in time, that would be hearsay.

23          THE COURT:  But it's an admitted --

24          MR. LILES:  It's admitted, I'm not going to dispute

25  that, Your Honor.

1    THE COURT:  Well, where is he on the 3rd when you all
2 come back; do we know?

3    MR. LILES:  We don't know, Your Honor.  We weren't
4 able to see and that's what Ms. Siemer testified to.  The only
5 person that we were told we could see was Georgia Holloway.
6 And that every time we asked to see somebody else, we were told
7 there was nobody else.

8    THE COURT:  I'm sorry, I thought Ms. Siemer testified
9 that there was no other inmate in the female bay on September
10 the 3rd.

11    MR. LILES:  That's her testimony, that's correct, Your
12 Honor.

13    THE COURT:  But this list would indicate that on
14 September the 1st, I assume Ledra Capel might be a woman?

15    MR. LILES:  That's a male, Your Honor.

16    THE COURT:  And what about Katherine Sedell?

17    MR. LILES:  I suspect she's a female.

18    THE COURT:  And she was gone from the infirmary?

19    MR. LILES:  We don't know, Your Honor, we weren't able
20 to get any information, and the Court would only authorize the
21 release of the names of the people first --

22    THE COURT:  If Ms. Siemer saw the female bay and
23 Ms. Sedell wasn't in the female bay on the 3rd, then she was
24 removed from the female bay before the 3rd by somebody for some
25 reason.

1        MR. LILES:  That's correct.

2        THE COURT:  And what about Antonelli Young, is that a

3  man?

4        MR. LILES:  Don't know, Your Honor.

5        THE COURT:  Is that a man?

6        MR. CAMPBELL:  I don't know, Your Honor, and I would

7  have objected, but I don't think it's necessary in a bench

8  trial.  He keeps saying that we were never able to find that

9  out.  You won't find anywhere in this record where they ever

10  asked for any of that information.  It wasn't asked, we never

11  checked 'cause it's never been asked.  There's been a dearth of

12  silence since September 3rd without any followup questions.

13        THE COURT:  What about all these letters where they're

14  saying we want to finish our investigation, we told you our

15  authority, we want to finish our investigation?  What did you

16  take that to mean?

17        MR. CAMPBELL:  If you read the letters as to the

18  specifics, it's all about records, Your Honor.

19        THE COURT:  No, it's not all about records.

20        MR. CAMPBELL:  Well, I can't see anywhere where it

21  asks to go into the infirmary, I can't see anywhere where it

22  says that we'd like to go in the men's bay, I can't see

23  anywhere where they ever asked a question about Jonathan

24  Harvey, and we'll provide you the testimony if necessary in our

25  case as to why they suspected that they also were talking about

1  Jonathan Harvey.  By the way, there's no evidence anywhere that

2  Jonathan Harvey was mentally or developmentally disabled before

3  this Court.

4       MR. LILES:  Your Honor, even if Mr. Harvey doesn't

5  have any type of mental disability, we were still entitled to

6  speak with him because he was in the infirmary at the time of

7  the alleged abuse and neglect.  He is consistent with a person

8  who was alleged to have been subject to abuse or neglect and

9  suspected of having a disability.  That is the scope of our

10  access, that's what we're looking for, not what ultimately we

11  determined.

12       When we go in to do an investigation, and we're trying

13  to get access, and it's important that the Court focus on we're

14  just trying to get in, the access, is so that we can determine

15  whether what is being done is correct or incorrect.  We may

16  determine, after doing a full investigation, that the Sheriff

17  has got policies and procedures that are the gold standard for

18  the world, and that they are indeed following those things and

19  therefore there's nothing to be said of it.

20       But right now, Judge, we've not been able to get in to

21  make that investigation.  We've not been able to complete it

22  because at every step, we've been either prevented or they've

23  stonewalled the P&A from giving the information.

24       This case is about access; what is the right of our

25  access, what is the scope of our access when investigating a

complaint of abuse or neglect of an inmate with disabilities at

the Polk County Jail in the infirmary.

THE COURT:  All right.

I'll hold -- yes, sir.

MR. CAMPBELL:  No, I'm sorry.

THE COURT:  I will hold counsel's motion under advice

until we go forward with the rest of the taking of the

testimony.  And you're free to renew at that time and I will be

reading back through this record in the interim and we'll hear

the rest of the testimony.  All right.

Please call your next witness or call your first

witness as the case may be.

MR. MCKINLEY:  Your Honor, at this time, we'll be

calling Major Michael Allen.

THE COURT:  Please come forward to be sworn, sir.

Thereupon,

MICHAEL ALLEN,

having first been duly sworn to tell the truth, the whole

truth, and nothing but the truth, was examined and testified as

follows:

THE WITNESS:  I do.

THE CLERK:  Please take a seat in the witness box.

Please state your name and spell your last name for

the record.

THE WITNESS:  Michael Allen, A-L-L-E-N.

1       THE COURT:  Sir, you are under oath, you must give

2  truthful answers to the questions that are asked.  If you give

3  false answers, you face penalties of perjury, false statement

4  and obstruction of justice.

5       You understand that?

6       THE WITNESS:  Yes, ma'am.

7       THE COURT:  If you hear counsel questioning you, wait

8  until his questions are completed before you start your

9  response so you are not talking over him.  And if you see

10  opposing counsel stand to object, wait until I rule on the

11  objection before you answer.

12       Do you understand?

13       THE WITNESS:  Yes, ma'am.

14       THE COURT:  You may proceed, counsel.

15                    DIRECT EXAMINATION

16  BY MR. MCKINLEY:

17  Q.  Good afternoon.  Major Allen, how long have you been

18  employed with the Sheriff's Office?

19  A.  A little over 18 years.

20  Q.  All right.

21       And how long have you been involved with the Central

22  County Jail facility there in Bartow.

23  A.  A good portion of that time, off and on, probably 12 to 15

24  years.

25  Q.  All right.

1       And in terms of your responsibilities, can you talk

2 about your areas of responsibility at the jail?

3 A.  I'm the Security Division Major which there are two

4 facilities, Central County Jail and South County Jail, there

5 are two captains that run those facilities on a day-to-day

6 operation.  So my responsibility is to oversee both of the

7 facilities, I act as a liaison between the Chief, the Sheriff

8 and the jails.

9 Q.  What level of involvement do you have with the infirmary at

10 the Central County Jail?

11 A.  On a day-to-day basis, I don't, but I do visit both

12 facilities and I come in contact with, through the captains and

13 the lieutenants, with the people that are there.

14 Q.  When inmates are in the infirmary, is there a protocol for

15 interacting with the inmates in that area of the jail?

16 A.  For staff or for visitors?

17 Q.  Yes, for staff?

18 A.  Yeah, I mean, it's kind of an open bay design, so yes, we

19 have limited staff that are in there.  We try to keep the

20 traffic down, but typically the deputies that are in there 24/7

21 and inmates are in an open bay, so they have that one-on-one

22 interaction with them quite often.

23 Q.  What level of knowledge do you have of inmates' physical or

24 mental conditions that are in the infirmary?

25 A.  I don't have intimate knowledge of that.  If there's an

1  issue with their behavior or whatnot, then we get involved, but

2  typically medical determines who is in there, medical

3  determines who comes out and they deal with the situation.

4  Unless it's a security issue, I really wouldn't know their

5  condition.

6  Q.  Okay.  Prior to your interaction that's the subject matter

7  of this lawsuit, did you have any knowledge or familiarity with

8  the Advocacy Center for Persons with Disabilities?

9  A.  No.

10  Q.  Or with Disability Rights Florida?

11  A.  Never heard of them.

12  Q.  Okay.  Now, on September 2nd, 2010, did you have any

13  interaction with someone from that organization?

14  A.  Yes, I did, Paul Liles and Linda Siemer.

15  Q.  All right.

16         And if you could, just what time, approximately, or

17  when did you first become aware of their presence there at the

18  jail?

19  A.  Captain Burke came to me, I was in the administrative area,

20  and he said we had two individuals that were in the lobby that

21  requested some access to the facility, and he needed my

22  assistance to find out how he wanted to handle it.

23  Q.  Had anyone else been involved with the jail prior to

24  Captain Burke coming to you to mention that there was someone

25  at the jail from the Plaintiffs.

A.   I understood that the receiving person there did have some

contact with them and then Lieutenant Galloway.

Q.   So there's a receiving person, Lieutenant Galloway, Captain

Burke and then yourself?

A.   Yes.

Q.   Where did you meet with the personnel from the Advocacy

Center?

A.   Initially, it was in the lobby which is the public area,

and then we brought them into Captain Burke's office.

Q.   Okay.  Who -- do you know who the persons were with the

Advocacy Center that were there that day?

A.   It was Paul Liles and Linda Siemer.

Q.   All right.

         When you met with them, what did they ask of you or

what were you aware was their purpose in being there?

A.   They wanted to have access to the infirmary, to interview

someone or see something there.  We weren't -- I didn't know

exactly what they wanted, but from the request, it was they

wanted to have access to the infirmary to see people and the

infirmary.

Q.   Okay.  And at that point in time, did you know that either

one of these people was an attorney?

A.   No, sir.

Q.   Did you have any idea from anything else you saw or heard

about any specific inmate, whether they told you or you saw

1  anything?

2  A.  Not at that time I did not.

3  Q.  Okay.  From there, what happened next?  What steps did you

4  take so that you could -- so that you could work with the

5  Plaintiff?

6  A.  I believe Captain Burke at the time made a phone call and

7  Mr. Liles and Ms. Siemer stepped back out into the lobby so we

8  could discuss how we were going to accommodate their request to

9  be in the infirmary, to see whatever it was that they wanted to

10  see or whoever it was they wanted to see.

11  Q.  Okay.  What basis did you think they might have had to go

12  into the infirmary; any?

13  A.  No, that's not a request that we get, it's not something we

14  normally do, but at our agency, we've been -- we try to meet

15  everyone's need.  We realize the facility that we run is a

16  secure facility, but when people come with a legitimate concern

17  or request, we try to do what we can do.  But obviously, with

18  the amount of time I've worked there and knowing what I know

19  about the security, you know, people can't just walk in.

20        So we had to go through the proper protocols and get

21  our attorneys involved which is who we called to say, how do we

22  handle this, how do we do this.

23  Q.  Who contacted -- when you say "contact our attorneys," who

24  contacted legal counsel?

25  A.  Captain Burke.

1  Q.  Okay.  Were you involved in those conversations?

2  A.  I don't think I was in the room at the time, it was more of

3  a we looked at each other, we discussed it, he said I'll do

4  this, I said, okay, and I believe at the time I escorted them

5  back to the lobby, Mr. Liles and Ms. Siemer.

6  Q.  Okay.  What was your next contact with regard to this

7  situation?

8  A.  A little bit of time passed, I don't know the exact amount,

9  but basically, we understood from our legal and the advice they

10  gave us was to inform them that if they wanted access to that

11  area, that they would do it through a Court Order, and so

12  Captain Burke and I went back out to the lobby and addressed

13  that with them.

14  Q.  Okay.  And what was their response?

15  A.  I was questioned as to am I denying them access, and

16  repeatedly asked that.  I said, no, you can have access, but

17  this is the way we're going to do it, this is how we've been

18  informed and this is the way we're going to operate.

19  Q.  And at that point, did you know anything more about their

20  organization?

21  A.  There was a piece of paper that they presented that I got

22  from Captain Burke.  I don't know the exact -- it had the old

23  name that was -- I don't know if it was the Advocacy Center,

24  but it was just a one-sheet piece of paper explaining something

25  about their organization, and from what I recall, it had

1  language in there about schools and having access to schools

2  and so forth.

3       And so I really, at the time, didn't think it

4  pertained to jails considering there was nothing in there

5  pertaining to us.

6       MR. MCKINLEY:  Can I approach, Your Honor?

7       THE COURT:  Yes, sir.

8  BY MR. MCKINLEY:

9  Q.  I'd like for you to look at the document in front of you

10  that's been marked as Defendant's Exhibit 6.

11       Is that the document which you're referencing?

12  A.  That is the document.

13  Q.  Okay.  Was there any other documentation that you saw that

14  provided a basis for you to provide access to the Advocacy

15  Center?

16  A.  No, I did not see any other documentation.

17  Q.  All right.

18       After the contact with them in the lobby where you

19  said you needed some, I think you mentioned a Court Order, when

20  you said Court order, what did you mean by that, what did you

21  understand that to mean?

22  A.  Well, when we talked to our legal section and they say

23  Court Order, that makes me think they're going to go to the

24  Courts and get some kind of authorization to enter the

25  facility.

1  Q.  Okay.  At some point, did you come to understand that

2  Mr. Liles was an attorney?

3  A.  Not initially.  After we said that, I recall that they left

4  the facility, but they just went out into the parking lot area.

5  And I believe a little bit later they came back, and I don't

6  know where we went after that, but it was the second time that

7  I came in contact with them when he made mention of wanting to

8  see Georgia Holloway.  And I said, well, we would allow that,

9  you know, on professional visits, and I said, if you were an

10  attorney, and he said, well, I'm an attorney, and I said, okay,

11  if you'll show me your credentials and so forth, we'll set up a

12  professional visit in our visitation area.

13  Q.  All right.

14        An so he did produce a Bar card at that time?

15  A.  Yes.

16  Q.  All right.

17        And then a professional visit was set up?

18  A.  Yes.

19  Q.  Did you have any involvement with that?

20  A.  Not other than granting it in the sense that we had the

21  conversation and the documentation was shown to us after that.

22  It's pretty much standard practice for us to allow those

23  visits.

24        THE COURT:  Did you intend to move Exhibit 6 into

25  evidence?

1    MR. MCKINLEY:  Yes, Your Honor, we would like to move

2  Exhibit 6 into evidence.

3          THE COURT:  Any objection?

4          MR. LILES:  Object to relevance.

5          THE COURT:  Overruled, be received.

6      (Thereupon, Defendant's Exhibit 6 was so designated for

7  EVIDENCE.)

8  BY MR. MCKINLEY:

9  Q.  Okay.  Now, did you have further contact with the Advocacy

10 Center during that day on the 2nd?

11 A.  No further contact, no.

12 Q.  You didn't.  All right.

13         Did you have any contact with them on the 3rd at all?

14 A.  No, I did not.

15 Q.  Okay.  Let's see.

16         THE COURT:  You don't have to make up questions if you

17 don't have any.

18         MR. MCKINLEY:  No, Your Honor.  Thank you, Your Honor.

19 BY MR. MCKINLEY:

20 Q.  Major Allen, do you have involvement with the policies and

21 procedures there at the jail facility?

22 A.  Yes, sir.

23 Q.  I'd like you to look at what's been marked as Defendant's

24 Exhibit 1.  Are you familiar with the document that's in front

25 of you?

1  A.  Yes, that's our Medical Detention Directive.

2          MR. LILES:  Object, Your Honor.

3          THE COURT:  On what grounds?

4          MR. LILES:  It's not relevant.  The document that's

5  been submitted for exhibit is dated effective January 20, 2011.

6  The events that take place here are on September 2nd and 3rd,

7  2010, so this document is not effective for the time period at

8  issue.

9          MR. MCKINLEY:  Your Honor, we would argue that it is

10 relevant in this instance, that changes to this document, which

11 we can confirm with the witness, would not be such that it

12 would affect the facts.

13         THE COURT:  Why don't you voir dire the witness as to

14 the exhibit and then we'll make the determination whether to

15 admit it based on that foundational inquiry and then revisit

16 the motion.

17         MR. MCKINLEY:  Thank you, Your Honor.

18 BY MR. MCKINLEY:

19 Q.  Major Allen, as you've already heard, if you look at this

20 document, the document notes that it's effective January 20,

21 2011.  And if you look below that, rescinds an earlier version.

22 Can you -- are you familiar with the changes that were made to

23 this document?

24 A.  Not specifically the changes, no, I don't know.

25 Q.  All right.

1           With regard to inmates, if you look at page 10 of the

2   document, housed in the infirmary, Point A to Item H and Item

3   I, are you familiar with those areas in the document?

4   A.  Yes, I am.

5   Q.  Are you aware of any changes to those areas of this policy

6   and procedure?

7   A.  I am not aware of any changes to that?

8           THE COURT:  Do you know whether they were changed or

9   not?

10          THE WITNESS:  No, ma'am.

11          MR. MCKINLEY:  Thank you, Your Honor.

12          MR. LILES:  Your Honor, I renew my objection.

13          THE COURT:  Sustained.

14  BY MR. MCKINLEY:

15  Q.  Turn to what's been marked as Defendant's Exhibit 2.  All

16  right.

17          MR. MCKINLEY:  Your Honor, we don't have anything

18  further in regard to documentation.  I'd like to check with

19  counsel for a moment.

20          THE COURT:  Yes, sir.

21          (Brief Pause.)

22  BY MR. MCKINLEY:

23  Q.  Major Allen, at some point on September 2nd, did you become

24  aware that the Advocacy Center was interested in a particular

25  male inmate?

A.  No, I was not aware of any male inmate.  The only inmate I

knew on the 2nd was Georgia Holloway.

Q.  Did you see any documentation that they might have had that

referred to a particular inmate in the jail?

A.  There was a file, it wasn't presented to me, but I

remembered seeing a picture of one of the male inmates at our

facility in that file.

Q.  And what was that inmate's name, if you know?

A.  I believe it was -- I can't think of his name right now?

Q.  Jonathan Harvey?

A.  I believe that is who it was, yes, Jonathan Harvey.

Q.  During your interaction with the Advocacy Center, did you

understand that they wanted to see any specific inmate other

than Georgia Holloway?

A.  No, I was not, not aware.

Q.  All right.

          And in terms of your --

          THE COURT:  I'm sorry, you were looking over someone's

shoulder when you saw the picture?  How did you come to see the

picture?

          THE WITNESS:  No, ma'am, I was standing in front of

Mr. Liles, he was seated in our lobby, and he was flipping

through some documentation that was in a Manila envelope, he

opened it and the picture was sitting there.

          THE COURT:  All right.

1  BY MR. MCKINLEY:

2  Q.  All right.

3       On September 2nd, did you have -- did they ask of you

4  or did they mention Georgia Holloway to you on September 2nd?

5  A.  Yes, Georgia Holloway they did mention on the 2nd.

6  Q.  Okay.  And in terms of your knowledge of whether someone

7  might have a mental disability or not who is in the infirmary,

8  how would you know that?

9  A.  The only way I would know that is if I specifically asked

10 our mental health people who work that area and that is their

11 primary responsibility.

12 Q.  What basis might they have for some determination like

13 that, if you know?

14 A.  Through their training and the methods that they determine

15 that.  I don't know exactly how they do it because we contract

16 our medical services, so they're trained in that field.  I

17 really don't know how they do that.

18       MR. MCKINLEY:  All right.

19       I have nothing further for this witness, Your Honor.

20       MR. LILES:  No questions, Your Honor.

21       THE COURT:  This witness is free to go?

22       MR. MCKINLEY:  Yes, Your Honor.

23       THE COURT:  You may step down.  If you wish or need to

24 leave or stay at your pleasure, but you cannot discuss your

25 testimony with anyone during the pendency of this case.

1    You understand that?

2    THE WITNESS:  Yes.

3    THE COURT:  Thank you.

4    Please call your next witness.

5    MR. MCKINLEY:  At this time, Your Honor, we'd like to

6    call Mario Cabrera,

7    THE COURT:  Please come forward to be sworn.

8    Thereupon,

9                    MARIO J. CABRERA,

10   having first been duly sworn to tell the truth, the whole

11   truth, and nothing but the truth, was examined and testified as

12   follows:

13   THE WITNESS:  I do.

14   THE CLERK:  Please take a seat in the witness box.

15   Please state your name and spell your last name for

16   the record.

17   THE WITNESS:  Mario J. Cabrera, C-A-B-R-E-R-A.

18   THE COURT:  Mr. Cabrera, you're under oath, you have

19   to give truthful answers to the questions asked.  If you give

20   false answers, you face penalties of perjury, false statement

21   and obstruction of justice.

22   Do you understand that?

23   THE WITNESS:  Yes, Your Honor.

24   THE COURT:  Also, wait for counsel to complete his

25   question before you start your answer so you don't talk over

1  him.  If you see counsel stand to object, wait until I rule on

2  the objection before you complete your answer.

3          You understand that?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  Counsel.

6                    DIRECT EXAMINATION

7  BY MR. MCKINLEY:

8  Q.  Good afternoon.

9  A.  Good afternoon.

10 Q.  What is your position -- or do you work with the Sheriff's

11 Office?

12 A.  I'm a staff attorney with the Sheriff's Office in Polk

13 County.

14 Q.  All right.

15          What are your general duties there with the Sheriff's

16 Office.

17 A.  I handle litigation matters, forfeitures for the Sheriff's

18 Office, research public records, contracts, just about any

19 legal issue that comes up is handled by myself and another

20 attorney.

21 Q.  Okay.  How long have you been an attorney?

22 A.  I've been an attorney since 1994, so 18 years, I think.

23 Q.  All right.

24          How long -- I apologize.  How long have you been an

25 attorney with the Sheriff?

```
 1  A.  With the Sheriff's Office, I've been there a year -- close
 2  to a year and a half.
 3  Q.  All right.
 4        Prior to September 2nd, 2010, were you familiar with
 5  what's been called here the P&A --
 6        THE COURT:  So when did you start with the Sheriff's
 7  Office?
 8        THE WITNESS:  Pardon, Your Honor?
 9        THE COURT:  When did you start with the Sheriff's
10  Office.
11        THE WITNESS:  April of 2010.
12        THE COURT:  All right.
13  BY MR. MCKINLEY:
14  Q.  Thank you.
15        Prior to September, 2010, were you familiar with PAIMI
16  or P&A Acts?
17  A.  No.
18  Q.  Are you familiar with the Plaintiff, the Advocacy Center
19  for Persons with Disabilities or Disability Rights Florida?
20  A.  No.
21  Q.  Part of your duties involve making sure that the Sheriff is
22  complying with the Federal and State statutes and regulations
23  that the Sheriff has to comply with?
24  A.  We have a Compliance Department, we do research for the
25  Compliance Department when requested to do so.  So I would say
```

1 sometimes part of our duties in conjunction with the Compliance

2 Department is to make sure that we're abiding by rules and

3 regulations.

4 Q.  All right.

5      When did you -- I'm going to go to the events of

6 September 2nd, 2010.  Do you recall learning about the Advocacy

7 Center for Persons with Disabilities at that time?

8 A.  Yes.

9 Q.  Okay.  When did you hear something about the Advocacy

10 Center?

11 A.  I received a telephone call from Captain Burke who works in

12 our Detention Facility, regarding a group wanting access to our

13 infirmary within our facility.

14 Q.  Okay.  Do you know about what time, approximately, that

15 was?

16 A.  It was close to 3:00 o'clock, 10 minutes till 3:00 or 3:00

17 o'clock, sometime around there in the afternoon.

18 Q.  What was the substance of your conversation with Captain

19 Burke?

20 A.  Captain Burke -- I was informed that a group wanted access.

21 I inquired as to who they were, was given the name.  I was

22 unfamiliar with the group and at that time instructed Captain

23 Burke to wait till I did some further research on the group

24 before we made a decision as to allowing them into our secured

25 facility.

1  Q.  All right.

2         Did you get some information from Captain Burke about

3  the group?

4  A.  I got -- I believe I received the name of the group and

5  that they were acting under an Executive Order from the

6  Governor, and that was all the information over the phone that

7  I received from --

8  Q.  Okay.  And did you know whether or not they had identified

9  a particular person in the infirmary at that time?

10 A.  No.

11 Q.  Okay.

12         THE COURT:  No, you don't know, or no, they had not?

13         THE WITNESS:  I'm sorry, Your Honor.  No name was ever

14 mentioned to me as to who they wanted to see.

15         THE COURT:  Okay.

16 BY MR. MCKINLEY:

17 Q.  Was there a reason for not disclosing that at that time or

18 do you know?

19 A.  We didn't know who they wanted to see.  What I was told by

20 Captain Burke is that they were not disclosing who the person

21 was they were wanting to see in the infirmary.

22 Q.  Okay.  At that point, did you receive or somewhere close to

23 that time, did you receive any information, written information

24 about the Advocacy Group?

25 A.  I received a FAX shortly after my discussion with Captain

1  Burke, I instructed him to send me the Executive Order and I

2  received a FAX from Captain Burke which was an Executive Order

3  signed by then Governor Crist.

4  Q.  Okay.  Was there any other Executive Order than that one

5  you received?

6  A.  No.

7  Q.  Your understanding of who these people were at the jail,

8  did you understand them to be investigators or what did you

9  understand them to be?

10  A.  The original discussion I had with Captain Burke shortly

11  before 3:00 o'clock in the afternoon was that they were, at the

12  time, believed to be investigators wanting access to our

13  facility.

14  Q.  All right.

15       What did you do next after you received this

16  information?

17  A.  I went ahead and started doing some research on the group

18  to try to determine who they were and what authority they had

19  under State and Federal law to be able to access our facility.

20  Q.  Okay.  Did you contact anyone else in the legal area of the

21  Sheriff's Office?

22  A.  I contacted, shortly after receiving the FAX, I contacted

23  the Director, Anne Gibson, of our office and who was in South

24  Florida and told her over the phone of what was transpiring at

25  the Detention Facility with the group wanting access to our

1  infirmary.

2  Q.  Okay.  Did you, at some point, get some information

3  determining who the Advocacy Center was or who they might be

4  based on the information you had?

5  A.  After doing some research and looking at the Executive

6  Order, I was able to locate the Federal Statute and locate some

7  cases from other states and circuits that actually had an

8  equivalent group who had litigated some matters and discovered

9  who they were and what their purpose was.

10  Q.  At that point, did you make contact with Captain Burke, did

11  he call you --

12      THE COURT:  Counsel, we really are going to finish

13  this today, so can you ask a direct and quick question?

14  BY MR. MCKINLEY:

15  Q.  Did you receive further contact from Captain Burke?

16  A.  At 3:30, or around that time in the afternoon, I got a

17  phone call back from Captain Burke who informed me at that time

18  that one of the two individuals had -- it was determined to be

19  an attorney, had disclosed that they were an attorney with the

20  organization and wanted access into our facility in order, as

21  an attorney, to talk to an inmate by the name of Georgia

22  Holloway.

23  Q.  All right.

24      Did you speak with Anne Gibson anymore during that

25  day?

1  A.  I spoke to her again, informed her of the new information

2  regarding the access to the facility by the attorney and the

3  fact they're wanting to talk to a Georgia Holloway, and gave

4  her a recap of what I had discovered in doing research as to

5  what I had found and determined who the group was.

6  Q.  Did she provide you any instruction as the Director?

7  A.  At that time, when I spoke to her, she instructed me to --

8          MR. LILES:  Objection, hearsay.

9          THE COURT:  Overruled.

10          THE WITNESS:  She instructed me to contact the

11  attorney, a Mr. Paul Liles, who had produced a Bar card, and I

12  had -- I believe I also had that information FAX'ed to me which

13  was the identification cards for the group of the two

14  individuals and the Bar card of Mr. Paul Liles.

15          I made -- I then made contact with Mr. Liles and spoke

16  to him and informed him of the reason why we did not allow him

17  access into our facility because of liability and security

18  reasons and that we needed to research who their group was and

19  what authority they had and that we were going to go ahead and

20  allow them access on Friday, if they would come back on Friday,

21  we would comply.

22  BY MR. MCKINLEY:

23  Q.  At some point, you contacted Mr. Liles based on those

24  instructions and told him you were going to let him come back

25  into the infirmary?

1  A.  Yes, that evening of September 2nd.

2  Q.  All right.

3       Were you instructed anything about access, to deny

4  them access or give them access?

5  A.  I was instructed to relay the message that we were, after

6  determining who they were and what authority they had, that we

7  would give them access and that they would come back on Friday.

8  Q.  Okay.  When you spoke with Mr. Liles, did he have any

9  objection to your -- to the arrangements that you were making

10 with him to come back the following day?

11 A.  No, it was a completely cordial conversation him and I had.

12 Q.  Was he polite on the phone?

13 A.  Yes, he actually told me what -- there was a brief

14 description about --

15       THE COURT:  That's all he asked you, was he polite,

16 and the answer is yes.  Please ask the next question.

17       MR. MCKINLEY:  Thank you, Your Honor.

18 BY MR. MCKINLEY:

19 Q.  On the following day, on the 3rd, were you involved at all

20 with the visit to the jail by the Advocacy Center?

21 A.  No.

22 Q.  Did you work at all with Ms. Gibson in any way in support

23 of the visit they made on that day?

24 A.  We had discussions in the morning, on Friday, September

25 3rd, regarding the research.  I showed her the statute and the

1  cases and we discussed the authority of the group to go into

2  the facility.

3  Q.  Okay.  Did you -- were you involved in preparing any

4  documentation with regard to their visit or not?

5  A.  I believe Ms. Gibson was going to prepare a probable cause

6  statement to have the individuals sign, and I basically

7  proofread the statement and discussed it with Ms. Gibson.

8  Q.  Did it name any inmates?  Do you know if it named any

9  inmates?

10  A.  I can't remember what the statement said.  The only inmate

11  name we -- we had an assumption was Georgia Holloway because

12  that's the person who was requested to be seen in the attorney

13  booth the day before.

14  Q.  All right.

15        Did Ms. Gibson set aside any time on the 3rd for the

16  Advocacy Center to come to the jail; do you know?

17  A.  She had set aside the whole entire day because she wanted

18  to be present at the Detention Facility when the Advocacy

19  Center arrived.

20  Q.  Subsequent to the events of September 3rd, did you have any

21  contact with the Advocacy Center?

22  A.  No, I did not.

23  Q.  Did -- just to -- did you have any interaction with

24  Mr. Liles or Ms. Siemer subsequent to September 3rd with regard

25  to records, for example?

1  A.  On September 3rd?

2  Q.  No, after September 3rd?

3  A.  Oh, after September 3rd, I had -- the next contact was with

4  Mr. Liles in November of 2011, that first week regarding

5  records.

6  Q.  Okay.  And what did Mr. Liles tell you to do after you

7  contacted him?

8         MR. LILES:  Objection, records isn't an issue.

9         THE COURT:  Sustained.

10  BY MR. MCKINLEY:

11  Q.  Did Mr. Liles say that he needed anything else other than

12  records?  Did he ask for access to the facility or for further

13  investigative assistance?

14  A.  On which date?

15  Q.  When you contacted him in November?

16  A.  In November?

17  Q.  Yes.

18  A.  No.

19         THE COURT:  What about in September, at the end of the

20  September 3rd meeting, did he ask for anything else?

21         THE WITNESS:  I wasn't present at the September 3rd

22  meeting.  The September 2nd meeting was the only conversation I

23  had with him.

24         THE COURT:  Did Ms. Gibson tell you that he wanted

25  something else after the September 3rd meeting?

1          THE WITNESS:  There was discussions that they have

2    requested copies -- medical -- copies of the medical records

3    that our correction facility provider for medical services has.

4          THE COURT:  Anything else besides records?

5          THE WITNESS:  That was all that was requested on

6    September the 3rd.

7          THE COURT:  Anything else requested any other time

8    between September the 3rd and November of 2011?

9          THE WITNESS:  There was a request for records, medical

10   records and also procedural records from our facility as to the

11   way we handle different aspects of securing our inmates.

12         THE COURT:  Were these oral requests or written

13   requests?

14         THE WITNESS:  Written requests

15         THE COURT:  Were they letters addressed to you?

16         THE WITNESS:  They were addressed to Ms. Gibson.

17         THE COURT:  And she sent them to you?

18         THE WITNESS:  She -- I was first made aware of the

19   requests in November when she assigned me the task of

20   collecting these records.

21         THE COURT:  2010 or 2011?

22         THE WITNESS:  2010.

23         THE COURT:  There are several letters in the record

24   dated September and October and November of 2010 from the

25   Advocacy Center to Ms. Gibson.  Were those letters sent to you

1  or were you copied on them by Ms. Gibson?

2  THE WITNESS:  No, I was not.  I did not receive a copy

3  from Ms. Gibson.  I received a copy in November of 2010 from

4  the Advocacy Center.

5  THE COURT:  So the previous testimony you said about

6  11, you meant that was 2010?

7  THE WITNESS:  Yes, Your Honor, I apologize, I made a

8  mistake.

9  THE COURT:  So is this a letter to Grady Judd that you

10  received in November of 2010 or was it addressed to you or do

11  you know?

12  THE WITNESS:  It was a letter addressed to Ms. Gibson

13  requesting documents.  That was dated in October, I believe.

14  THE COURT:  Can you show the witness Exhibit 4?

15  MR. MCKINLEY:  Yes, Your Honor.

16  THE COURT:  This is joint Exhibit 4.

17  MR. MCKINLEY:  Yes, Your Honor.

18  I'm showing the witness Exhibit 5, Your Honor.

19  THE COURT:  I want him to see Exhibit 4, that's the

20  one he says he received.

21  MR. MCKINLEY:  Yes, Your Honor.  He has Exhibit 4.

22  THE WITNESS:  I received a copy of this letter from

23  Linda Siemer who works with the Advocacy Center in November of

24  2010.

25  THE COURT:  What did you understand the second

1  paragraph to mean?

2          (Brief pause.)

3          THE WITNESS:  In reading the paragraph, it seems to me

4  that they're asking for permission to be able to complete their

5  investigation without any interruption.

6          THE COURT:  I'm sorry, go ahead.

7          THE WITNESS:  And that they previously provided legal

8  authority mandating to us what authority they have.

9          THE COURT:  And what did that authority give them?

10          THE WITNESS:  Access to our facility to be able to

11  conduct an investigation, that they have reasons or cause to

12  believe that there's an individual with developmental

13  disabilities that is in need of services or protection under

14  the Act.

15          THE COURT:  Do you know whether they were granted

16  additional access to the facility after this letter was sent?

17          THE WITNESS:  I do not know, Your Honor.

18          THE COURT:  Do you know whether a written statement of

19  reasons was submitted to them in compliance with 42 CFR

20  1386.22(i) concerning a denial of access?

21          THE WITNESS:  I did not write a letter responding

22  under that portion of the CFR, so to my knowledge, I have no

23  knowledge whether that was done.

24          THE COURT:  And then if you'll turn to Exhibit 5.

25  Have you ever seen that letter?

1        THE WITNESS:  No, Your Honor, I've never seen this
2    letter.
3        THE COURT:  Did you get a copy of the lawsuit when it
4    was filed?
5        THE WITNESS:  I reviewed a copy of the lawsuit.
6        THE COURT:  Did you understand it to be a request for
7    access to the jail facility?
8        THE WITNESS:  I believe -- my understanding of the
9    lawsuit was that it was a -- not a continuing request for
10   access, but a denial of access on September 2nd of 2010.
11       THE COURT:  Okay.  Counsel.
12       MR. MCKINLEY:  I have nothing further for this
13   witness, Your Honor.
14       THE COURT:  Yes, sir.
15       MR. LILES:  No questions, Your Honor.
16       THE COURT:  All right.
17       We're going to take a 15 minute recess, we'll see you
18   back at 3:15.
19       Sir, as far as I understand it, we're done with this
20   witness?
21       MR. MCKINLEY:  That's right.
22       THE COURT:  You're free to stay or go at your
23   pleasure, but you cannot discuss your testimony with anyone
24   until the case is completed.
25       Do you understand that?

1           THE WITNESS:  Yes, Your Honor.

2           THE COURT:  Till the trial is completed.

3           We stand in recess.

4           (Brief Pause.)

5           Apologize for the delay.

6           Please call your next witness.

7           MR. CAMPBELL:  Anne Gibson.

8           THE COURT:  Please come forward to be sworn.

9   Thereupon,

10                          ANNE GIBSON,

11  having first been duly sworn to tell the truth, the whole

12  truth, and nothing but the truth, was examined and testified as

13  follows:

14          THE WITNESS:  I do.

15          THE CLERK:  Please take a seat in the witness box.

16          Please state your name and spell your last name for

17  the record.

18          THE WITNESS:  Anne Gibson, G-I-B-S-O-N.

19          THE COURT:  Ms. Gibson, you're under oath, you must

20  give truthful answers to the questions that are asked.  If you

21  give a false answer, you face penalties of perjury, false

22  statement and obstruction of justice.

23          Do you understand that?

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  Also, wait until counsel completes his

1  question before you start your response.  If you see counsel

2  object, wait until I rule on the objection before you begin

3  your answer.

4         For the record, Ms. Gibson, have you discussed with

5  your counsel or with any witnesses any material or any

6  information that's occurred in this trial since you've been

7  sequestered?

8         THE WITNESS:  No, ma'am.

9         THE COURT:  Have you had any discussions about the

10  trial with your lawyers since you've been sequestered?

11         THE WITNESS:  No, ma'am.

12         THE COURT:  Counsel, you may proceed.

13         MR. CAMPBELL:  Thank you, Your Honor.

14                    DIRECT EXAMINATION

15  BY MR. CAMPBELL:

16  Q.  What's your position with Sheriff Judd?

17  A.  I'm his Director of Legal Affairs.

18  Q.  And how long have you been Director of Legal Affairs?

19  A.  I've been Director of Legal Affairs since July of 2010.

20  Q.  In September of 2010, do you recall being contacted by

21  Mario Cabrera regarding some investigators from the Advocacy

22  Center being at the jail?

23  A.  Yes.

24  Q.  Where were you at the time?

25  A.  At the time, I was down in Hollywood, Florida, I was at a

1 meeting with the Seminole Tribe of Florida.

2 Q.  Okay.  And regarding Sheriff Judd business?

3 A.  Yes.

4 Q.  Okay.  What were you first told by Mr. Cabrera?

5 A.  When I was first called by Mario Cabrera, he told me that

6 there were some investigators, some people from a group called

7 the Advocacy Center that wanted to basically walk through our

8 jail, just walk through our jail and I guess with nobody with

9 them.  We traded phone calls back and forth, so the information

10 kept evolving, but that was the first thing I heard.

11 Q.  Okay.  And what did you instruct Mr. Cabrera to do?

12 A.  I asked him to find out what authority they were wanting to

13 do that under because I wasn't aware of any authority they had

14 to do that.

15 Q.  And did he do that?

16 A.  My understanding is he did.

17 Q.  Did he share that information with you?

18 A.  Yes.

19 Q.  And what was your role that night as you came back from

20 South Florida?

21 A.  As I was coming back from South Florida, we traded multiple

22 phone calls back and forth, Mr. Cabrera and I did as the

23 information kept evolving.  At some point, I found out that

24 Mr. Liles was an attorney and was wanting to, as we understood

25 it, wanting to see an inmate in his capacity as an attorney,

1  which, as I understood, Mr. Cabrera told the detention folks to

2  go ahead and do that and I authorized it as well.

3  The information evolved from there that they handed --

4  somehow we got ahold of an Executive Order, Amended Executive

5  Order for that Center, and we were trying, at that point, to

6  try to figure out what their authority was, trying to figure

7  out what we needed to do.

8  Mr. Cabrera was researching as I was driving from the

9  East Coast and we were up to date with what he had found and

10  what more information kept coming out from Detention that they

11  kept receiving from Mr. Liles.  And at the end of that, we

12  figured out -- we finally found, you know, the PAIMI Law, and

13  we were trying to wrap our heads around that and I felt like

14  they were entitled to some reasonable access.

15  And my direction to Mr. Cabrera and to Detention was

16  to let them know, due to how late it was in the day, we

17  couldn't wrap it up that night, but we were going to give them

18  access the next day and that we were going to comply with the

19  law.

20  Q.  Okay.  And what did you do then that next day as far as

21  providing access?

22  A.  The next day, we had arranged a time for them to come at

23  their convenience, and we ended up meeting in the afternoon.

24  We met at the Central County Jail, and I was with Captain Craig

25  Burke.  We had a meeting with them before we went into the

1  facility, the guts of the facility, we were already in Captain

2  Burke's office.

3  Q.  Okay.  And did you advise them at that time what type of

4  access was authorized?

5  A.  Yes, sir.  Well, in my opinion, we hashed everything out.

6  I asked them what are you wanting to see or who are you wanting

7  to see, because I was prepared to give them quite a bit of

8  access.  And we had a back and forth about what they wanted to

9  see.

10       I knew -- they told me they wanted to see Georgia

11  Holloway and where she was being kept, who was an inmate there,

12  and they told me at one point that they wanted her medical

13  records.  I don't recall if they wanted her booking records or

14  not.  And at that point, that stopped that part of it.

15       Then when we were hashing through everything, they

16  asked if they could go through the men's infirmary bay as well.

17  And I told them you can see anything and talk to anybody if you

18  meet the test under PAIMI to see.

19       So I had drawn up a paper that said they were asking

20  -- everything they were asking to see, if it fell in compliance

21  with PAIMI, and they were asking -- they were doing their

22  official investigation, they were acting within the scope of

23  that investigation and they had to sign it.  So I told them

24  whatever they asked for, if they believed it met the test and

25  they signed the paper, we would go do it.

1  Q.  Okay.  And did you deny them access to anywhere that they

2  said they had authority?

3  A.  No.

4  Q.  Did they ask to go anywhere that they said they had

5  authority that they were not allowed to see?

6  A.  No.

7  Q.  Were they -- did they ask for any records that they were

8  not allowed to see that day?

9  A.  No.

10  Q.  And this is on September 3rd?

11  A.  September 3rd.

12  Q.  Did they ask to see any other inmates that day?

13  A.  No.

14  Q.  At some point, was there a question as to whether or not

15  there were other mentally disabled inmates in the infirmary?

16  A.  I don't recall if that was on the 3rd or if that happened

17  later.

18  Q.  Okay.  After the access was granted, were you present

19  during all that time?

20  A.  Yes, I was.

21  Q.  Did you have further conversations with Mr. Liles about the

22  adequacy of the access, whether he needed anything else,

23  anything like that?

24  A.  Yes.

25  Q.  What was that conversation?

A.   After we had gone through the women's bay of the infirmary

and seen Georgia Holloway, and we, Captain Burke and I, stepped

back while they were speaking to Georgia Holloway, as much as

she could converse, they asked to see -- it was CMS at the

time, but it's now Corizon, our medical provider, they asked to

see their policies and procedures and asked to see Georgia

Holloway's records -- medical records as well.

       We went into a room there in the infirmary where the

records were and they went through the procedures.  I asked

multiple times through that process is there anything else you

would like to see, anyone you would like to speak to that you

haven't seen.  And they said no.  I asked more than once and

was told each time no.

Q.   Do you recall a discussion as to the amount of information

that was given to the Sheriff's personnel on September 2nd and

it being deficient as far as the authority of the Plaintiff

with Mr. Liles?

A.   Yes, I do.

Q.   What was the discussion?

A.   After we wrapped everything up, I tend to be a pretty

candid person, and I like to work with people, and so I said to

him as we were walking out from the infirmary back to master

control and out, there's a long stretch there, and Captain

Burke and Ms. Siemer were with us, and I said, quite candidly,

as we've told you, we're not trying to play -- we're not trying

to hide the ball, we're transparent here, however, you have to

understand I didn't know who you were, and we really had to

work hard to figure out what your authority was.  If you had

just told us from the beginning, mentioned PAIMI to us, this

could have gone a whole lot quicker and if we don't know who

you are, I guarantee there's other agencies that don't know who

you are, and it would be a lot simpler to help you get what you

need if maybe you all do some education.

Q.   After September 3rd, has anyone that you are aware of from

Plaintiff ever contacted you or anyone else at the Sheriff's

Office and requested further access to the facility or to

individuals in the facility?

A.   Not for this case; for other cases, yes.

Q.   Okay.  So you have had contact with them, but not regarding

the problem calls or the complaint of abuse or neglect in

September?

A.   Correct.

Q.   Since September 2 -- so after September 2, has any access

to individuals, facility or records been denied by the Sheriff

to Plaintiff?

A.   No.

          MR. CAMPBELL:  That's all.

          Thank you, Your Honor.

          MR. LILES:  May I have a moment, Your Honor?

          THE COURT:  Yes, sir.

1           (Brief Pause.)

2           MR. LILES:  May it please the Court?

3           THE COURT:  Yes, sir.

4                        CROSS-EXAMINATION

5  BY MR. LILES:

6  Q.  Good afternoon, Ms. Gibson.

7  A.  Good afternoon, Mr. Liles.

8  Q.  You still have the joint exhibit book in front of you

9  there, it's a white notebook?

10  A.  It's been left up here, yes.

11  Q.  Would you open that up to Tab Number 3, please.  You have

12  that document?

13  A.  I have what's -- I'm sorry, I'm in 2-B.  Yes, there is a

14  letter here.

15  Q.  And the address that's on this letter, is that consistent

16  with the address that you have as a business address?

17  A.  It is.

18  Q.  Did you get a copy of this letter?

19  A.  I'm sure I did.

20  Q.  Did you ever file a written response to this letter?

21  A.  I don't have my file in front of me, so I'm not a hundred

22  percent certain.

23  Q.  You don't have a specific memory of giving a response?

24  A.  No, I don't.

25  Q.  Okay.  I want to now have you turn to the next tab, Exhibit

Number 4, a letter dated October 21st.  Once again, that's your
name and address?

A.  It is.

Q.  You received this letter?

A.  We received these letters, yes.

Q.  Did you ever respond in writing to this letter?

A.  I don't recall.

Q.  Okay.  Go to Exhibit Number 5.  Have you ever seen this
letter before?

A.  I have.

Q.  Did you ever respond to this letter on behalf of the
Sheriff?

A.  I don't recall.

      MR. LILES:  One moment Your Honor.

      (Brief Pause.)

      I have no further questions, Your Honor.

      THE COURT:  Ms. Gibson, you said, well, we hashed
everything -- after we hashed everything, I asked them are you
wanting to see -- are you wanting to see anyone.  I was
prepared to give them quite a bit of access, and we had a back
and forth about what they wanted to see.  I know they told me
they wanted to see Georgia Holloway and where she was being
kept, who was an inmate there, and they told me -- I think that
says, at some point, they wanted to see her medical records,
and at some point -- I'm sorry -- when we were hashing through

1  everything, they asked if they could go see the men's infirmary

2  bay as well, and he told me -- I think you told him he could

3  see anything and talk to anybody if you meet the test under

4  PAIMI to see.  So I had drawn the paper and so forth and so on,

5  and then you didn't answer what happened with that discussion.

6          THE WITNESS:  Yes, ma'am.  When we were going through

7  everything, again in the beginning before we went anywhere,

8  'cause I wanted to understand --

9          THE COURT:  You mean before you went anywhere out of

10 the room?

11         THE WITNESS:  Out of Captain Burke's office, yes,

12 ma'am.  I wanted to try to understand what their expectations

13 were and what their needs were.  So we talked it out and I

14 said, well, what do you want to see, who all do you want to see

15 so I knew where we were going.  When we had the conversation

16 about the men's bay, and I said, if you meet the test,

17 absolutely, you can see it.  And Mr. Liles told me actually he

18 did not meet the test regarding the men's bay.

19         So my conversation with him was, so I'm understanding

20 now you're not wanting to go to the men's bay.  And he said,

21 yes, he did not want to go there.

22         As we were going through the tour and seeing

23 everything they wanted to see, seeing inmate Holloway, the

24 records, the women's facility, at two other points I asked, is

25 there anything else you would like to see or anyone else you

want to speak to, and I was told each time no.  I did it at the

conclusion as well to make sure there was nothing else they

were leaving there wanting to see.

THE COURT:  Did this document you created ever get

finalized and signed by anyone?

THE WITNESS:  Yes, ma'am.  Ms. Siemer signed one, and

Mr. Liles signed one, and they signed it after we had decided

collectively what they were going to see.  And I left the

conversation believing they had seen everything they wanted to

see.

THE COURT:  Is that document in evidence?

MR. CAMPBELL:  No, Your Honor, we do have it, but it's

not in evidence.

THE COURT:  Any objection to it being placed in

evidence?

MR. LILES:  Yes, Your Honor.  We object, one, it's

never been disclosed to be submitted at trial.  This isn't new

to them.  This is information they had.  I would have altered

my entire trial presentation if I knew about this document

being used in this trial in this proceeding.

THE COURT:  Well, did you sign it?

MR. LILES:  I signed it at the time, but it was never

disclosed as being a record for trial.  I prepared for trial

based upon the exhibits that they disclosed.  I prepared my

exam and cross-exam based upon records disclosed.

1          THE COURT:  The exhibit is not on the exhibit list?

2          MR. CAMPBELL:  No, Your Honor, and the only time I

3     recall it being discussed is at Ms. Siemer's deposition.  I'll

4     be glad to mark it for identification.

5          THE COURT:  Is it privileged?

6          MR. LILES:  I cannot attach a privilege to it, it was

7     between opposing parties, Your Honor, there's no privilege I

8     know that attaches --

9          THE COURT:  Let me see it.

10         (Brief pause.)

11         You can take it.

12         I'm not going to introduce it in evidence, it's not

13    helpful or providing any further explanation of what happened.

14         So then they never mentioned the male facility again

15    and everybody walks past the men's bay and go hence without

16    day?

17         THE WITNESS:  Yes, ma'am.

18         THE COURT:  And then you started getting letters from

19    them?

20         THE WITNESS:  We started getting letters --

21         THE COURT:  You don't know what you said in response

22    to these letters, even if you said anything at all?

23         THE WITNESS:  I don't recall if I wrote letters back

24    or Mr. Cabrera did.  I know that there was an issue with

25    getting photocopies of the records they had viewed on site

1  'cause we were trying to get them from CMS and their legal

2  counsel hadn't released them.  But my recollection is the

3  controversy was about getting photocopies of the records that

4  they viewed on the 3rd.

5           THE COURT:  Will you turn to Exhibit 4?

6           THE WITNESS:  Yes, ma'am.

7           THE COURT:  You're Mr. Cabrera's supervisor?

8           THE WITNESS:  I am.

9           THE COURT:  Exhibit 4 is a letter dated October 21,

10 which says on September 28, we sent you a letter expressly

11 advising the jail of our authority and the request for both

12 access and records.  As of this date, we have not been provided

13 with copies nor received any word as to when such documents

14 might be available.  We remain hopeful that the jail will

15 permit the Advocacy Center to complete its investigation

16 without further interruption or delay.  They set forth their

17 legal authority and they tell you that if the System is denied

18 access to facilities and programs, it shall be -- no written

19 notice has to be provided.  And you don't know whether you

20 responded to that?

21          THE WITNESS:  I don't know if I responded in writing.

22 I know we had, either Mr. Cabrera or I, had a conversation when

23 we got the first letter calling up Paul Liles saying, when we

24 left, everything was hunky-dory, I don't understand this

25 letter.

1      THE COURT:  Well, I want to know what conversation you

2  had 'cause I've already heard from Mr. Liles -- I mean,

3  Mr. Cabrera.

4      THE WITNESS:  Yes, ma'am.  I don't remember if I spoke

5  to Mr. Liles -- I mean, Mr. Liles or if I had Mr. Cabrera speak

6  to him, but when we got the letter, we were baffled and I just

7  don't recall if I made the phone call or if he did, but --

8      THE COURT:  You were three times asked to give your

9  explanation in writing and you didn't write anything?

10      THE WITNESS:  I don't recall if we -- I don't have our

11  whole file, Your Honor, I don't know if I did or didn't.

12      THE COURT:  Did you look at these exhibits in

13  preparation for your testimony today?

14      THE WITNESS:  No, Your Honor.  My understanding was I

15  was going to be asked a -- limited to items on September 2nd

16  and 3rd.

17      THE COURT:  So you were baffled and you had a

18  discussion with Mr. Cabrera and you don't recall responding

19  personally to Mr. Liles about this letter?

20      THE WITNESS:  I don't remember writing him a letter,

21  Your Honor, and I don't recall if I made the phone call with

22  Mr. Cabrera or if he made it to Mr. Liles asking about the

23  letter.

24      THE COURT:  So, therefore, you don't know what

25  Mr. Liles said except for maybe for what Mr. Cabrera told you

1  he said?

2          THE WITNESS:  Correct.

3          THE COURT:  Counsel, you have a question?

4          MR. CAMPBELL:  Yes, a few, Your Honor.

5                    REDIRECT EXAMINATION

6  BY MR. CAMPBELL:

7  Q.  In that paragraph at the end of the first page of Exhibit

8  Number 4, it says, "in the event you take a contrary position",

9  in other words, in the event if you're denying access; had

10  there been any denial of access that you're aware of?

11  A.  There had not been any denial of access.  We gave them

12  every bit of access they ever asked for and nobody ever asked

13  us for any -- specifically to come back to the jail.

14  Q.  And this Exhibit 4, it actually references back to the

15  prior letter in that first paragraph.  If you can turn back to

16  Exhibit 3.

17  A.  Yes.

18  Q.  Since you haven't reviewed it, let me give you a moment to

19  review it.  And what I'm asking you to review is, I want you to

20  find in there if you see anything that you understood to mean

21  that Mr. Liles wanted anything other than the records that had

22  been requested such as access to an individual or access to the

23  facility?

24  A.  I did not see anything in here that led me to believe nor

25  do I in reading it again that they were asking for anything

1 other than records.

2       THE COURT:  You're looking at Exhibit 3?

3       MR. CAMPBELL:  Yes, Your Honor, that's the September

4 28th letter.

5       THE WITNESS:  Yes, ma'am.

6       THE COURT:  You see page 3 of 4, last line of the last

7 full paragraph on Exhibit 3?

8       MR. CAMPBELL:  The last four, I'm sorry?

9       THE COURT:  The last sentence on page 3 of the full

10 paragraph that says, "in order to conduct such an

11 investigation, this authority encompasses access to the

12 facilities which includes interviews with the staff and

13 individuals reference all these regs.  Hopefully the jail will

14 permit the Advocacy Center to complete its investigation

15 without further interruption or delay."

16       THE WITNESS:  I'm not seeing that.

17       MR. CAMPBELL:  Page 3, after the records request, it's

18 paragraph 21, that next paragraph, the last line is where the

19 Judge was reading.

20       THE WITNESS:  The part that starts, "in addition to

21 the disclosure of records"; that paragraph?

22       THE COURT:  Yes.

23       THE WITNESS:  I read that paragraph where they're

24 talking about that they're entitled to access including quoting

25 the CFRs and that also includes interview with the staff and

1    individuals, and when I read the next paragraph, "hopefully the

2    jail will permit the Advocacy Center to complete its

3    investigation without further interruption or delay," I only

4    knew that they wanted the photocopies of the records they

5    viewed.  I did not take this in any way to mean, especially

6    based upon my conversations with them on the 3rd, that there

7    was any access, physical access issue outstanding whatsoever.

8    And it was -- and also the beginning of the thing referenced

9    regarding Polk County Jail records in their letter.

10         THE COURT:  So what did you think this sentence meant

11   about, "in order to conduct such an investigation, the

12   authority encompasses access to facilities and interviews of

13   staff and individuals;" you just thought that was in there as

14   boiler plate?

15         THE WITNESS:  I knew that at this point we had had

16   conversations.  We would have one conversation with Mr. Liles

17   and then we would get followed up with a letter that said the

18   exact opposite of what had happened.  And we kept trying to

19   work with him saying, you know, what else are you wanting.  And

20   to our knowledge, he only wanted the photocopies.

21         He had told me at the end of the day on the 3rd that

22   he was prepared to sue us no matter how we reacted on the 2nd

23   or 3rd, and quite honestly, with no specific request for

24   further physical access to the facility, I thought he was only

25   speaking as to the photocopies.

1    And I've never until today understood that they wanted

2  access to our facilities in some other fashion other than what

3  we gave them, other than they initially told us they wanted to

4  walk through with nobody there through the entire facility and

5  they indicated to me that they understood that they could not.

6    THE COURT:  Okay.

7  BY MR. CAMPBELL:

8  Q.  Still in that sentence, the last phrase where it talks

9  about including interviews with staff and individuals in that

10  what I call boiler plate, I know the Judge wasn't calling it

11  that, but she suggested that, is that what you thought, did

12  they ever request interview with any staff person?

13  A.  Just Gene Murray on the 3rd, and Gene spoke to them and

14  answered their questions and  --

15  Q.  Did they ever ask for an interview with any other

16  individual other than Georgia Holloway?

17  A.  No, and we were prepared to let them speak to people.

18  Q.  You mentioned there was a problem with the medical records,

19  getting those from CMS through their counsel, and we talked

20  about this non-exhibit, the acknowledgement that you got to

21  sign.  What were the concerns of the legal department, beyond

22  just security at the jail, having to do with the request to see

23  patients, patient records and walk through the infirmary?

24  A.  I was really on a high wire act trying to balance all the

25  HIPPA concerns, all the privacy concerns and still comply with

PAIMI, which I understood to be incredibly, you know, let them

have reasonable access.  I was not going to question them what

it was, I didn't want to know what they were investigating

unless they wanted to tell me.  If they signed the paper that I

felt like covered our facility saying they were acting within

the scope and everything they were asking for was within the

scope of their investigation and met the test under PAIMI, I

was going to give it to them.

MR. CAMPBELL:  That's all.

Thank you, Your Honor.

THE COURT:  Thank you.

Anything else from this witness?

MR. LILES:  No further questions, Your Honor.

THE COURT:  You may step down.  You're free to stay or

go.  Do not discuss this discussion with anyone who may

testify.

MR. MCKINLEY:  I'd like to call Norma Jean Murray,

Your Honor.

THE COURT:  Please come forward to be sworn.

Thereupon,

NORMA JEAN MURRAY,

having first been duly sworn to tell the truth, the whole

truth, and nothing but the truth, was examined and testified as

follows:

THE WITNESS:  Yes.

 1          THE CLERK:  Please take a seat in the witness box.

 2          Please state your name and spell your last name for

 3   the record.

 4          THE WITNESS:  Norma Murray, M-U-R-R-A-Y.

 5          THE COURT:  Ms. Murray, you are under oath, you have

 6   to give truthful answers to what is asked in this hearing.  If

 7   you give false answers, you face penalties of perjury, false

 8   statement and obstruction of justice.

 9          You understand that?

10          THE WITNESS:  Yes.

11          THE COURT:  Wait until counsel completes his question

12   before you start answering so you are not talking over him.

13   And if you see someone stand to object, wait until I rule on

14   the objection and instruct you about whether to answer or not.

15          You understand that?

16          THE WITNESS:  Yes.

17          THE COURT:  Counsel, you may proceed.

18                     DIRECT EXAMINATION

19   BY MR. MCKINLEY:

20   Q.  Good afternoon, Ms. Murray.

21   A.  Hi.

22   Q.  Ms. Murray, how long have you been in nursing?

23   A.  Since 2000.

24   Q.  Okay.  And how long have you been involved with corrections

25   facilities in nursing in those environments?

1  A.  Since 1998.

2  Q.  Okay.  And what is your nursing capacity; are you an RN?

3  A.  Yes, I am.

4  Q.  Okay.  And what is your position with -- sorry -- who's

5  your employer?

6  A.  Corizon Health Services.

7  Q.  Was that formally known as CMS?

8  A.  Correctional Medical Services, yes.

9  Q.  Okay.

10         THE COURT:  Can you spell Corizon?

11         THE WITNESS:  C-O-R-Z -- C-O-R-I-Z-O-N.

12         THE COURT:  Thank you.

13  BY MR. MCKINLEY:

14  Q.  And what does Corizon do for the Sheriff at the jail?

15  A.  We provide health services.

16  Q.  Okay.  And what is your role with Corizon with regard to

17  the jail?

18  A.  I'm the Health Service Administrator.

19  Q.  Okay.  How long have you been the Health Service

20  Administrator at the jail?

21  A.  Since May of 2008.

22  Q.  Okay.  Now, with regard to the organization called the

23  Advocacy Center for Persons with Disabilities, are you familiar

24  with that organization at all?

25  A.  No.

1  Q.  Okay.  Did you ever have a meeting with anyone from an

2  organization who wanted to come into the infirmary and see

3  individuals with mental disabilities?

4  A.  Yes.

5  Q.  Do you recall the names of people who came into the

6  infirmary to visit with you?

7  A.  No, not right off the top of my head.

8  Q.  All right.

9        The name -- does the name Paul Liles ring a bell?

10  A.  Yes.

11  Q.  Okay, thank you.

12        Was that one of the people?

13  A.  That was one of the people.

14  Q.  Linda Siemer?

15  A.  I believe so.

16  Q.  All right.

17        What did you understand that Mr. Liles and Ms. Siemer

18  wanted when they came to the infirmary on September 3rd, 2010?

19  A.  My understanding initially is that they wanted to see one

20  of the inmates that was in the infirmary.

21  Q.  Okay.  And were they allowed to see that inmate as far as

22  you know?

23  A.  Yes.

24  Q.  Okay.  Did they ask to see anything else that day when they

25  were there?

A.   They did.

Q.   What did they ask to see?

A.   They asked to see my Policy and Procedure Manual.

Q.   Did you let them see your Policy and Procedure Manual?

A.   Yes, I did.

      MR. MCKINLEY:  May I approach, Your Honor?

BY MR. MCKINLEY:

Q.   Ms. Murray, I've put before you what's been marked as Defendant's Exhibit Number 4.

      You have that in front of you?

A.   Yes.

Q.   Ms. Murray, do you recognize that document?

A.   Yes, it's part of my Policy and Procedure Manual.

Q.   Would you tell the Court what that procedure has to deal with?

A.   The title is Use of Clinical Therapeutic Restraints and Seclusion.

Q.   Okay.  And in your terms, what do you understand that policy covers?

A.   The main use of this is to give direction to us as to how, the reason for and the procedures that we need to follow if restraints and seclusion is required for a patient.

Q.   Okay.  Are restraints used in the infirmary on inmates?

A.   If you want to call it restraints, but yes, everyone in the infirmary does have a leg shackled to the bed.

1  Q.  Okay.  What is the material of the leg shackle if you can

2  describe it?

3  A.  Well, one side of my infirmary is female, divided by a

4  door, and the other side of my infirmary is male and that is to

5  insure that no one gets up and intermingles in the other side.

6  Q.  Yes, ma'am.  And what are the shackles made of; do you

7  know?

8  A.  Leather.

9  Q.  Okay.  I'd also like you to look at --

10      MR. MCKINLEY:  At this time, I'd like to move Exhibit

11  4, Defendant's Exhibit 4 into evidence, Your Honor.

12      MR. LILES:  Objection, relevance.

13      THE COURT:  Sustained.

14  BY MR. MCKINLEY:

15  Q.  I'd also like for you to --

16      MR. MCKINLEY:  Your Honor, these are the procedures

17  that they looked at when they came to the Defendant's facility

18  and I think that it is actually relevant to the inquiry that

19  they were making while they were there.  This is what they

20  asked to look at.

21      THE COURT:  Relevant to show what they saw?

22      MR. MCKINLEY:  What they saw and what policies and

23  procedures this particular facility was operating under.  They

24  were interested in it and they got to see it.

25      THE COURT:  Counsel, is this the policy you saw?

1　　　　MR. LILES:  I'm not disputing that, Your Honor, but

2　we've dismissed the records part of this case.  This would be

3　relevant to the records part of the case.  It's not an issue at

4　this trial.

5　　　　MR. MCKINLEY:  If I may, Your Honor, it is relevant to

6　their assertion that restraint and/or seclusion is abusive to

7　the inmates who are housed in the infirmary.

8　　　　THE COURT:  That's not relevant, so my ruling stands.

9　　　　MR. MCKINLEY:  Thank you, Your Honor.

10　　　　Given your ruling, I'll move forward with regard to

11　Exhibit 5.

12　BY MR. MCKINLEY:

13　Q.  Ms. Murray, at the end of the review of the policies and

14　procedures, did you have an understanding that they wanted

15　copies of those documents?

16　A.  They did ask for copies.

17　Q.  Okay.  And did they mark particular pages?

18　A.  They did, as they were going through the book, they put

19　stickies on certain parts of the book and then they asked for

20　copies.

21　Q.  Okay.  Did you have some concerns about sharing your

22　policies and procedures with Mr. Liles and Ms. Siemer?

23　A.  Yes.

24　Q.  Why was that?

25　A.  I don't normally give out copies of my policies and

1   procedures to people I don't know.  So I ended up calling my

2   Legal Department for guidance.

3   Q.  Okay.  Now, did you understand you were going to provide

4   copies to them or were you still checking to see if you could?

5   A.  I was still checking, and I did not have a problem until I

6   was given guidance from my Legal Department, but I could not

7   give them copies that particular day.

8        THE COURT:  Counsel, the records as to the case is

9   resolved.  They were given access to the documents or not to

10  the extent that they demanded it, but the parties have resolved

11  any issue with respect to that.

12        MR. MCKINLEY:  Thank you, Your Honor.

13  BY MR. MCKINLEY:

14  Q.  When Mr. Liles and Ms. Siemer were present in the

15  infirmary, did they ask about other people other than Georgia

16  Holloway?

17  A.  If I remember correctly, they wanted to know if I had

18  anyone else in the infirmary that may have been classified

19  mentally challenged.

20  Q.  Okay.  And what was your response to that?

21  A.  That was the only person I had in the infirmary.

22  Q.  Okay.  Was that the only person you had in the female bay

23  of the infirmary or the only person in the entire infirmary?

24  A.  In the entire infirmary.

25  Q.  Okay.  How would you understand that someone was mentally

1  disabled in the infirmary; how would you come to know that?

2  A.  Not able to make their own decisions, not capable of taking

3  care of their ADLs or able to feed themselves.

4          THE COURT:  What's an ADL?

5          THE WITNESS:  Activity of daily living.

6  BY MR. MCKINLEY:

7  Q.  Is there a psychiatrist on staff in the infirmary?

8  A.  Yes, I do have a psychiatrist on staff.

9  Q.  Are people who are in the infirmary occasionally seen by

10 the psychiatrist?

11 A.  Yes.

12 Q.  Okay.  There's been some -- are you familiar with an inmate

13 named Jonathan Harvey?

14 A.  Yes.

15 Q.  Why are you familiar with an inmate named Jonathan Harvey?

16 A.  Mr. Harvey comes to memory because he was sent out several

17 times, and in coming back, he had a habit of swallowing

18 objects.

19 Q.  And do you know if the psychiatrist saw Mr. Harvey at any

20 point?

21 A.  Yes, he did.

22 Q.  Do you understand -- do you know what the psychiatrist

23 found with regard to Mr. Harvey?

24          MR. LILES:  Objection, calls for hearsay.

25          THE COURT:  Sustained.

1    BY MR. MCKINLEY:

2    Q.  Did you understand Mr. Harvey to be mentally disabled?

3         THE COURT:  Same objection, she can't answer that

4    unless she got it from the psychiatrist.

5         MR. MCKINLEY:  Do you know whether -- and maybe I've

6    asked this question already, Your Honor.

7         Do you know whether the psychiatrist saw Mr. Harvey?

8         THE COURT:  Asked and answered.

9         MR. MCKINLEY:  All right.

10        Why did the psychiatrist see Mr. Harvey?

11        MR. LILES:  Objection, speculation.

12        THE COURT:  Sustained.

13        MR. MCKINLEY:  Your Honor, she operates this facility,

14   she would be familiar with why a psychiatrist on staff at the

15   facility would go and look at a particular inmate or patient.

16        THE COURT:  Lay a foundation for it.

17   BY MR. MCKINLEY:

18   Q.  Okay.  Do you know whether or not -- you've already stated

19   -- testified that you know that this psychiatrist saw

20   Mr. Harvey; is that correct?

21   A.  Yes.

22   Q.  Okay.  And in doing that, did you refer the psychiatrist to

23   Mr. Harvey?

24   A.  I may have.

25   Q.  Okay.  And why would you have done that?

A.   After several objects being swallowed, he needed to be
evaluated by the psychiatrist.

Q.   When you were asked whether or not there were other
mentally disabled people other than Georgia Holloway in the
infirmary, your answer was there weren't?

A.   (Indicating affirmatively)  Exactly.

THE COURT:  Answer.

BY MR. MCKINLEY:

Q.   There have been some mention -- do you know of any
incidents in the infirmary of people being in the infirmary
without their clothing?

A.   No.

Q.   Okay.  Do you know any incidents of people in multi-point
restraints without their clothing?

A.   No.

MR. MCKINLEY:  All right.

I have nothing further, Your Honor.

THE COURT:  Thank you.

MR. LILES:  Just a moment, Your Honor.

(Brief pause.)

No questions, Your Honor.

THE COURT:  Thank you, you may step down.

THE WITNESS:  Thank you.

THE COURT:  Is this the final witness or we have
another one?

1    MR. LILES:  That's it.

2    THE COURT:  You're free to go or stay at your

3  pleasure.

4    MR. CAMPBELL:  Can I ask the Court, just for the

5  record, Exhibit 5, he didn't actually offer it, but your ruling

6  on Exhibit 5, it's another policy of CMS that you found

7  irrelevant.

8    THE COURT:  You've moving it in evidence?

9    MR. CAMPBELL:  Yes, Your Honor.

10   MR. LILES:  Objection, relevance.

11   THE COURT:  Sustained.

12   MR. CAMPBELL:  Thank you.

13   THE COURT:  Any rebuttal from the Plaintiff?

14   MR. LILES:  No, Your Honor.

15   THE COURT:  Does the defense have anything else you

16  want to introduce?

17   MR. CAMPBELL:  I'm sorry?

18   THE COURT:  You have anything else you want to

19  introduce?

20   MR. CAMPBELL:  No, Your Honor.

21   THE COURT:  The evidence in the case is closed, the

22  testimony as well as the documentary evidence has been

23  determined in accordance with the Court's rulings.  This

24  concludes the evidentiary portion of the trial.

25   Anything further from the defense or the Plaintiff?

1      MR. LILES:  Your Honor, we would request a ruling to

2  amend the pleadings to conform with the evidence at trial.

3  We'd like to renew all our objections made at trial and we'd

4  also request a judgment as a matter of law based upon the

5  evidence that was presented here today.

6      THE COURT:  What pleadings need to be amended to

7  conform to what evidence, specifically?

8      MR. LILES:  I'd like to have -- I can't put my finger

9  on it.  I'll withdraw the request, Your Honor.

10      THE COURT:  All right.

11      Request is withdrawn.

12      And does the defense have anything to present?

13      MR. CAMPBELL:  I would renew my prior motion, but

14  other than that, no.

15      THE COURT:  Do the parties need a moment to gather

16  their thoughts for closing or do you want to make a closing

17  argument at all?

18      MR. CAMPBELL:  Unless the Court were to request one, I

19  do not need to do a closing.

20      MR. LILES:  I had not anticipated doing a closing

21  based upon the Court's request for proposed findings and

22  conclusions.  I would request, however, the opportunity, based

23  upon the actual testimony that came out at trial today, for us

24  to have an opportunity to amend our proposed findings and

25  conclusions.

1    THE COURT:  This will be that time.  What do you want

2    to amend?

3    MR. LILES:  We would ask for five days after we

4    receive the transcript, Your Honor.

5    THE COURT:  Yes, sir.

6    MR. CAMPBELL:  I have no objection.  I would like a

7    chance to respond if the Court determines that's appropriate.

8    THE COURT:  I know you all think your case is the only

9    one I have to resolve, but it's not.

10   If you'll turn to your proposed findings of fact.

11   Proposed Finding Number One is not objected to I don't assume,

12   nor is Two, nor is Three, nor is Four, nor Five, query re Six,

13   no question as to Seven, I don't think there's a question as to

14   Eight, that someone told them there was such a person 'cause

15   there's no one to challenge the testimony of Ms. Siemer in that

16   respect.  Any objection to Eight?

17   MR. CAMPBELL:  That such a person was identified?

18   THE COURT:  That another person was identified as a

19   naked male?

20   MR. CAMPBELL:  No, I have no objection to that, she

21   was told that.

22   THE COURT:  Okay.  Nine is not objected to, Ten is not

23   objected to, 11 is not objected to, nor 12, 13 and 14.

24   MR. CAMPBELL:  Your Honor, I do, if you want me to, I

25   do have to 12 and 14.

1    THE COURT:  Ms. Siemer didn't tell you she was

2  conducting an investigation because they had received the

3  report of abuse or neglect?

4    MR. CAMPBELL:  The actual testimony from our side, I

5  believe, is that she had probable cause.  And, in fact, that's

6  consistent with her interrogatory answers.  That later changed

7  to a report, and I believe the evidence is clear they did both,

8  but -- so if it said a report or probable cause, which is the

9  statutory language, I wouldn't have any objection to 12.  And

10  14, I think we clarified it, and on the time-line, it's

11  clarified.  It was a Court Order or other authorization.

12    THE COURT:  If 12 says on September 2, 2010, Siemer

13  was conducting an investigation pursuant to a report of abuse

14  or neglect or probable cause concerning abuse or neglect

15  occurring in the infirmary, you have no objection to it?

16    MR. CAMPBELL:  That's correct, Your Honor.

17    THE COURT:  Any objection to that change by the

18  Defendant?

19    MR. LILES:  Your Honor, we tried to limit the scope

20  and the Court, I understood, had entered a ruling that probable

21  cause wasn't an issue for this trial.  That's why we don't have

22  it in there, we don't believe it's necessary for the Court's

23  determination.  We only need the report to get our access

24  authority.  That's why we would object to including it now.

25    THE COURT:  We can eliminate it.  She was conducting

1  an investigation pursuant to a report of abuse or neglect

2  occurring at the infirmary, was she not?

3         MR. CAMPBELL:  I'm sorry?

4         THE COURT:  She was conducting an investigation

5  pursuant to a report of abuse or neglect occurring at the

6  infirmary?

7         MR. CAMPBELL:  Well, the point is, she says she

8  reported that to us.

9         THE COURT:  I'm taking the report part out of the

10 findings.

11        MR. CAMPBELL:  Oh, then I have no problem, yes, Your

12 Honor.

13        THE COURT:  Then as to 14, any objection to "or other

14 authority" being added to that finding?

15        MR. LILES:  I understand that that is what they've

16 said at the trial today, and I don't believe that that's what

17 was said at the time, and so I would object.

18        THE COURT:  Do you have any evidence that it wasn't

19 said at the time?

20        MR. LILES:  Ms. Siemer testified we needed the Court

21 Order, that was her testimony.

22        MR. CAMPBELL:  Their exhibit, the time-line from

23 Captain Burke, specifically states Court Order or other

24 authorization and I had him testify to that today.

25        THE COURT:  And I so find, so that will stay in "or

1  other authority."

2          15 is not supported by the record, 18 is not supported

3  by the record.

4          MR. LILES:  Your Honor?

5          THE COURT:  Yes, sir.

6          MR. LILES:  I believe that Captain Burke testified on

7  direct that he had not done anything on September the 2nd.  I

8  believe that's his testimony.  I specifically asked him that

9  question and he acknowledged that he had not made any inquiry

10  on the 2nd.

11          MR. CAMPBELL:  Your Honor?

12          THE COURT:  Well, I thought the testimony was that

13  someone inquired of Nurse Murray and some report was offered as

14  to who was there, he doesn't remember the content of the report

15  or what it was, and then he made his subsequent inquiry after

16  that.

17          MR. LILES:  He did not make any inquiry on the 2nd,

18  that's his testimony, and I had for impeachment purposes

19  deposition testimony in the event that he testified to the

20  contrary here today.

21          THE COURT:  Okay.  I'll check that one.

22          19 is not objected to.

23          MR. CAMPBELL:  If you were to find at the bare minimum

24  that he made no effort was accurate after September 2, 2010,

25  that was not asked today, it was not testified to because there

1 were no other individuals reported. Captain Burke was very

2 clear the only person we were told about was Georgia Holloway.

3 So the finding that he failed to make an effort to check on the

4 other people is contrary to his testimony.

5 THE COURT: Well, the only statement in the finding is

6 as of September 2nd, there's no discussion about any other

7 time.

8 MR. CAMPBELL: Right. No, it's just that including

9 those reported to be abused or neglected by confidential

10 informant. He states he never had any clue about any other

11 such person. So a finding he made no effort to identify them

12 or determine whether they were in the infirmary when he had no

13 clue they existed, he was never told about them.

14 THE COURT: Thank you.

15 19 is not objected to?

16 MR. CAMPBELL: No, Your Honor, it is not objected to.

17 THE COURT: 20 is not objected to?

18 MR. CAMPBELL: It's either Defendant's representatives

19 or CMS's representative, but that was said, that's correct.

20 THE COURT: And CMS is not a Defendant's

21 representative insofar as medical care is concerned in this

22 facility for this case?

23 MR. CAMPBELL: I tell you, I've had a couple of cases

24 involving that and whether they are. They've been found to be

25 an independent contractor, so as long as the record is clear

1  that that would include CMS, I have no objection to it.

2          THE COURT:  What about on September 3rd, 2010, the

3  Defendant's representatives stated that the only person in the

4  infirmary known to Defendant to be suspected was Holloway.

5          MR. CAMPBELL:  That would be fine, Your Honor.

6          THE COURT:  21 is disputed.  22?

7          MR. CAMPBELL:  Your Honor, I've heard your reading of

8  it, but I have to object to that one because --

9          THE COURT:  Let me hear your reading of it.

10         MR. CAMPBELL:  I don't think it ever expressly --

11         THE COURT:  Let me hear you're reading of it.  Why

12  don't you read the sentence to me and read it differently than

13  I read it.

14         MR. CAMPBELL:  I'm not arguing with your reading.  If

15  you want to know my reading with rose-colored glasses or

16  whatever, I'll be glad to tell you.  Everything relates back to

17  the September 28th letter.

18         THE COURT:  Which on that third page references access

19  to the facility.

20         MR. CAMPBELL:  And references access to staff which

21  they haven't even claimed they requested, and requests access

22  to other individuals which they haven't even suggested they

23  ever requested other than the unnamed patient.  And so, I

24  probably wouldn't have thought up boiler plate, but that's

25  exactly what this is, and it appears in other letters.  It just

1  gets popped in in other letters.  This is a statement of the

2  law.

3          If you look at the memos in this particular case, the

4  trial brief, you'll see this exact language popping in there.

5  This does not, to me, and I think Anne Gibson's testimony was

6  clear it was not to her, any suggestion that they had requested

7  and had been denied access to staff, individuals or the

8  facilities.

9          THE COURT:  Counsel?

10          MR. CAMPBELL:  I mean --

11          THE COURT:  Mr. Liles, Mr. Liles?

12          MR. CAMPBELL:  I'm sorry.

13          MR. LILES:  Well, we're here because the parties

14  cannot agree as to what access was permitted and not permitted.

15  We sent the letter specifically trying to identify so that

16  there would not be any confusion.  Neither Ms. Gibson nor

17  anyone else from the Sheriff's Office ever gave anything in

18  writing to us.  That's her testimony.  She doesn't know, she

19  doesn't recall it.  And the Defendant has not produced a single

20  document in evidence to show that any response was made to the

21  September 28th letter, to the October 1st letter -- 21st

22  letter, to the November 2nd letter.

23          THE COURT:  A written response?

24          MR. LILES:  No written response.  The letter

25  specifically requests a written response.  If there was any

1  question whatsoever, there ought to be something documenting

2  the question that the Defendant had and nothing has been

3  produced in this case to show that they've ever made any type

4  of written response.

5       If there had been a written response, maybe we

6  wouldn't be here today, but we were forced to go into a trial

7  and I don't know how anybody can read this -- I mean, I can

8  work on my penmanship and try to change things.  We were

9  attempting to say, here's the legal authority for what we're

10  asking for, we want you to provide it, we don't want to go to

11  Court, we want to resolve this amicably and no response, and

12  each letter says there's been no response and if not responded

13  to that if indeed there had been an oral response.

14       THE COURT:  Counsel?

15       MR. CAMPBELL:  The subject of this -- did you say I

16  could go ahead, Your Honor?

17       THE COURT:  Yes, sir.

18       MR. CAMPBELL:  The subject of this, which I think is

19  records, I mean, it's got three pages of records requests and

20  then it has the boiler plate.  They were provided the records.

21  They were told we're waiting on the CMS authority from their

22  general counsel.  There was no reason to write and say you're

23  not entitled to those.

24       We said in September that they were entitled to those.

25  We were not denying that they had a right of access.  It was

1   our position that we asked them what they wanted to see and we

2   gave them complete access.  There was no reason to write a

3   letter denying that you have the authority to access the

4   facility.

5          Ms. Gibson testified they figured that out on the

6   first night.  And to say they had to file suit, come in here

7   and file suit in a case where they show up some 30 some hours

8   after they get a report, they give us misleading information,

9   he looked at the exhibit, that supposedly is their authority,

10  it's their authority to go into schools.  Now they planned --

11         THE COURT:  Use your microphone, please.

12         MR. CAMPBELL:  I'm sorry.

13         THE COURT:  And refer only to what is in the record.

14         MR. CAMPBELL:  It is in the record that they planned

15  this the day before what they were going to give.  If you look

16  at what we gave, Your Honor, it's a continuation of an

17  Executive Order.  It says nothing about their powers.  They

18  didn't give the Executive Order that actually delineates their

19  powers.  They gave a school notification that we have

20  authorization to come into schools to do investigations and

21  FERPA does not apply, which is, you know what FERPA is, I don't

22  actually, except it's a Federal Educational Records Protection

23  Act.

24         THE COURT:  You do pretty well.

25         MR. CAMPBELL:  I was pretty sure I was making it up.

1  But they come in there on that day, give us misleading

2  information, they don't give anymore, which is fine, if that's

3  the position they want to take, that's fine.  But within 24

4  hours, in less time than it took them to get to our jail --

5          THE COURT:  I thought you didn't want a golden

6  argument.

7          MR. CAMPBELL:  Well, I was responding to the argument

8  that said we had to file suit because of this reading of the

9  letter that we never denied anything.  Our position from day

10 one is we're opening the doors.  September 2nd, we're opening

11 the doors to your access, please come in.  And if you look at

12 this letter, if I were writing a letter to say I need access to

13 records, I would specify them, and they did in the letter.  If

14 I was writing a letter to say I need access to a naked

15 four-point restrained man in the infirmary, that would be in

16 that letter, it takes about six words.  If I were saying you

17 didn't let me have adequate access to the facility, it's very

18 easy to say, you didn't give me that.

19         Their complaint is we don't have copies of the

20 records.  And by the way, they don't complain they weren't

21 given access to the records.  Both the statutes, the regs and

22 the case law all talk about access to records, facilities and

23 persons.  And they don't even complain in this letter that they

24 haven't had access to the records which Ms. Siemer agreed

25 today, other than the non-existent incident report that they

1  wanted, that they were given everything.

2       So this -- these letters, at least again it may be my

3  rose-colored glasses, this letter is very clear we want the

4  copies of the records.  And if you are saying we don't get

5  them, then you need to give us a writ of reply.

6       Thank you, Your Honor.

7       (Brief pause.)

8       Your Honor, we were talking about 22, we were talking

9  about 22, Your Honor, and what it means and what it should be

10 as far as a finding.  The Plaintiff's own characterization of

11 that letter, I would submit, is consistent with my rose-colored

12 reading because it says, we expressly advised the Defendant our

13 authority.  That's what that paragraph is doing.  It's advising

14 of our authority.  The next, and its continued request for both

15 access to the facility and the inmates.  That's what is not in

16 that letter.

17      I can find nowhere in that letter other than where it

18 delineates its authority where it requests access to anything

19 other than the copies of records it's already seen.

20      THE COURT:  Thank you.  I'll resolve that dispute in

21 my findings.

22      28 is not disputed -- I'm sorry -- 25 is not disputed,

23 26 is not disputed.  And how did Siemer identify the naked man

24 as Harvey?

25      MR. LILES:  I believe her testimony -- my recollection

1  is that her testimony is that we subsequently learned that the

2  naked man was Jonathan Harvey.

3          THE COURT:  From what competent evidence?

4          MR. LILES:  From the latter part of the trial.  I may

5  be wrong, Your Honor.  I had to prepare this in advance of

6  trial without knowing, which is one of the reasons I requested

7  permission to amend the proposed findings.  My expectation was

8  that that would come out in the testimony.  My belief today is

9  that I thought she had testified to it,

10         THE COURT:  But where would she have received that

11 information from other than from somebody mentioned by the

12 Defendant?

13         MR. LILES:  It was -- well, the Joint Exhibit 6, which

14 is the affidavit of Craig Burke, and there's Jonathan Harvey.

15         THE COURT:  One second, one second.

16         MR. LILES:  The 6th which is the affidavit of Captain

17 Craig Burke.

18         THE COURT:  That just says that these were the people

19 who were in the infirmary.

20         MR. LILES:  On the 1st and then, Exhibit Number 7,

21 which is Captain Burke's memo that he created indicated that

22 Harvey was the person in four-point restraints.

23         THE COURT:  Yes, sir.

24         MR. CAMPBELL:  Jonathan Harvey has never been

25 identified as the naked male and if they attempted to do so, we

1 would have rebutted that. There was no testimony or evidence

2 whatsoever that identified Harvey as the naked male. He was

3 there, he was in four-point restraints. That's in the record.

4　　　　　THE COURT: Any objection to 28 then?

5　　　　　MR. CAMPBELL: I don't know what it means by "kept him

6 in it," but there was a protocol that he be placed in

7 four-point restraints.

8　　　　　THE COURT: While in the infirmary?

9　　　　　MR. CAMPBELL: I'm sorry?

10　　　　　THE COURT: Kept him in four-point restraints while he

11 was in the infirmary?

12　　　　　MR. CAMPBELL: Yes, and if we could renew our request

13 to admit Exhibits 4 and 5, you will see where the protocol is

14 based in the rules, so apparently, the fact part is a relevant

15 piece of information for Plaintiffs. The protocol is required

16 and developed as part of Exhibits 4 and 5 which the Plaintiffs

17 came into copies of.

18　　　　　MR. LILES: May I respond?

19　　　　　THE COURT: Yes, sir.

20　　　　　MR. LILES: On Exhibit Number 7, on page 2, Captain

21 Burke --

22　　　　　THE COURT: Page 2; which time reference?

23　　　　　MR. LILES: Joint exhibits.

24　　　　　THE COURT: Which time reference on page 2?

25　　　　　MR. LILES: It's above the 9/3/10, it's the large

1  paragraph.

2          THE COURT:  All right.

3          MR. LILES:  Toward the bottom of it, the second or

4  third to the bottom, "due to his own actions, detention medical

5  staff have established specific restraint protocols for

6  inmates."  That's what that --

7          THE COURT:  For inmate Harvey?

8          MR. LILES:  Right, and that is -- what the protocol is

9  is not described.  The testimony --

10         THE COURT:  They're not disputing he was in four-point

11  restraints.

12         MR. LILES:  Right.

13         THE COURT:  So what is the dispute now?

14         MR. LILES:  Well, they were talking about protocols.

15  It doesn't say that they were using them once that had --

16         THE COURT:  I've already ruled on the protocol

17  documents.

18         MR. LILES:  Okay.

19         THE COURT:  And it is accurate to say that the

20  Defendant never provided the P&A with a written response to the

21  letters of October 21, November 2nd or September 28th, correct?

22         MR. CAMPBELL:  The testimony I heard is she didn't

23  recall.

24         THE COURT:  There's no evidence on this record that a

25  written response was provided.

1        MR. CAMPBELL:  That would be correct.  She said there

2   was no evidence on the record of a written response.  As long

3   as it doesn't say delineating why we failed to provide access.

4        THE COURT:  And 30 is disputed.

5        So Mr. Liles, why didn't we hear your testimony in

6   this case today?

7        MR. LILES:  Your Honor, my testimony would have been

8   cumulative.  It was unnecessary to the decision of the trial on

9   the merits of this case.

10       Ms. Siemer was the representative, she was the

11  advocate investigator assigned to this case for the purpose of

12  conducting the investigation.  Limited to the scope of the

13  access for which we were seeking and the right of access,

14  Ms. Siemer was sufficient to promote the facts that were at

15  issue and anything that would otherwise be testified would be

16  cumulative.

17       THE COURT:  So anything she doesn't know concerning

18  what you may have said or not said, the only source of that

19  knowledge would have to be the testimony of the defense

20  witnesses concerning a need or desire to see the men's wing or

21  an abandonment of such a need or desire on September 3rd?

22       MR. LILES:  I would say that if the Court only had

23  that testimony, but that's not consistent with what the

24  testimony is.  There are joint exhibits that have been admitted

25  without objection by opposing counsel that shows that there is

1 a distinction between what those witnesses said and the

2 position of the P&A.  And the P&A's position was --

3           THE COURT:  Those exhibits, you mean the letters?

4           MR. LILES:  The letters on September 28th, October

5 21st and November 2nd.

6           THE COURT:  So is this case about what happened on the

7 3rd of September or the 2nd and 3rd of September or is it about

8 such additional access as the P&A may request or desire?

9           MR. LILES:  This case is about a report of an alleged

10 abuse and neglect on September 1st for which the P&A sought

11 access on September 2nd and was denied access to the infirmary

12 and to the people in the facilities at the infirmary.

13           It's about access on September 3rd to which the P&A

14 was denied access to all of the other people in the infirmary

15 based upon Ms. Siemer's testimony.

16           It's based upon the continued failure to provide

17 access and respond to the request for access on every occasion

18 since that time until a suit was filed because it was clear

19 that the only way that we were going to be able to get access,

20 which is what they told us in the first place, is get an order.

21 And that's the avenue that we sought.

22           THE COURT:  If it is true that your agency is

23 interested in the safety and well-being of disabled

24 individuals, and if it is true that you reasonably believe that

25 someone was at risk of abuse and neglect, what is the

explanation for why Ms. Siemer just walked off the face of the

universe in regard to this investigation after the 3rd of

September?  She never made any additional efforts in her

capacity as an investigator to pursue this.  She doesn't even

know what happened after the 3rd, and according to her

testimony, she wasn't part of the correspondence, she wasn't

part of the inquiry, she doesn't know what you told them or

what they told you, what documents were or weren't provided.

Why would that occur in that fashion if the focus was the

disabled individuals versus some other focus?

MR. LILES:  Your Honor, at the point where the refusal

to grant our investigator the access became apparent, we

dispute the allegations that were made in the Courtroom today

by Ms. Gibson.  Ms. Siemer's testimony was that we requested to

see it and they would not let us see additional people.  We

never got to go into the men's infirmary and see them.  That is

a disputed fact the Court is going to have to resolve based

upon credibility.

The point is, at that certain point, it becomes a

legal issue and Ms. Siemer was already thwarted from trying to

do the things she was going to do, and it became a legal matter

and it was handled up through the legal channels.  We tried to

-- the P&A, through its legal section of the office, made what

we thought were legitimate efforts to do an amicable resolution

for this.  And we proposed it and we kept telling the Defendant

1  that we don't want to go to Court, we will use the legal

2  authority that we have, but we don't want to do this, we just

3  want to get in and they just did not respond.

4        At some point in time, when they tell you, no, you

5  need an order, they don't respond to your requests, and after

6  you show them the authority repeatedly, and those letters

7  always incorporated the past letters to show what was going on,

8  and that's why it was upgraded to the Sheriff because the

9  general counsel wasn't responding to the letters and we wanted

10  to make sure the Sheriff knew.

11        And the Sheriff didn't respond, and still it took four

12  weeks before a lawsuit was filed from the November 2nd letter.

13  The only avenue that we have, we don't possess --

14        THE COURT:  Thank you.

15        MR. LILES:  Yes.

16        THE COURT:  Yes.

17        MR. CAMPBELL:  I'm assuming my desire to jump up and

18  rebut a bunch of that is not necessary?

19        THE COURT:  Your desire is what it is.  You can't do

20  it, though.

21        MR. CAMPBELL:  Thank you, Your Honor.

22        THE COURT:  I'm trying to go through and read through

23  Ms. Siemer's testimony,

24        MR. CAMPBELL:  That was what I was going to suggest

25  what my notes reflect, but my recollection is she thought it

1  had to be positive, but she didn't know what he said, and so,

2  it would be our position that Ms. Gibson's testimony is

3  completely unrebutted.

4  THE COURT:  She thought it had to be positive?

5  MR. CAMPBELL:  Right.  Do you still want access.  And

6  I asked a very poor question, but it had to do with positive

7  and negative.  And my recollection is she said it had to be

8  positive, and you said, no, not what it had to be, what do you

9  recall it being or something like that.  And then her answer

10  was I don't recall.

11  THE COURT:  Court stands in recess for a few minutes.

12  I'm staying here for a minute, you may go or stay, but you can

13  talk and breathe and all that.

14  (Brief pause.)

15  Let's take a brief break.

16  (Thereupon a brief recess was taken.)

17  This is not a mystery novel.  So I don't have to hold

18  anybody in suspense, I will tell you that I am going to find

19  that the access afforded by Grady Judd in his official capacity

20  as the Sheriff of Polk County, Florida, the Defendant in this

21  case, was sufficient to meet the standards of the statute, and

22  that there was no denial of access as is claimed in this case.

23  And thus, the Plaintiff would not prevail on its claim which

24  remains which is a claim for failure to meet the requirements

25  of the Act in the denial of access to a facility to consider

1  and investigate potential abuse and neglect by disabled

2  individuals.

3  And I'll tell you why now, now that you know what the

4  ruling is.  The evidence in this case is that the Plaintiff

5  obtained or received a complaint of abuse and neglect or

6  possible abuse or neglect at the facility through Ms. Siemer

7  and Ms. Siemer did what you would expect someone to do in her

8  capacity as an investigator, she looked into it when she could

9  get to the facility and made a way on her calendar to get there

10 as soon as she could, and within 24 hours of receiving that

11 information, she found her way with her counsel to the facility

12 to undertake that investigation, arriving with credentials and

13 documents, albeit not the best, most conclusive documents, she

14 arrived with the documentation.

15 Legal scholars have a difficult time figuring out what

16 the rights and duties are under the statute, and the Sheriff's

17 Office, which has more to do than answer requests under the

18 statute, was requested to provide what they perceived to be

19 something quite unusual, which was to allow people to access

20 their facility in a more unfettered way than they're accustomed

21 to having people trapes through their facility.

22 And initially, they balked, as you might expect, given

23 their sort of notion of how jails are to be run.  But within a

24 very short period of time, an hour or so, the wheels started

25 turning, people started opening books and papers and concluded

1  that there was more to this than just these people showing up

2  unannounced and with no authority, and that they, in fact, did

3  have some authority to do some sort of review, we're not sure

4  what, but let's just use a stopgap method and use a Bar card to

5  get them in to see this woman so that they can at least be

6  assured of her current physical condition, Ms. Galloway [sic],

7  and so, rather than on the authority of the P&A and on the

8  authority of Mr. Liles' Bar card, they were afforded access to

9  this suspected abused or neglected individual, Ms. Galloway,

10  [sic] in a room, not in the infirmary, but in a separate room,

11  and that was not sufficient access under the statute at that

12  time.

13        But, of course, Ms. Gibson was off at a program away

14  from the facility, Mr. Cabrera was relatively new to his job,

15  and before the evening wore in, everyone had figured out they

16  made a mistake and done the wrong thing, and so they called

17  Mr. Liles and his people and said you can come back tomorrow

18  and we'll grant you the access that you're asking for.

19        They come back the next day, in about as much time as

20  it took Ms. Siemer to fill out what she was going to do, and

21  they afforded access to this individual in the infirmary as

22  demanded.

23        Now, all of us are accustomed to having our mom come

24  visit, and if you give us a day's notice, we can shove all the

25  dirty clothes under the bed and wash the dishes and throw

everything else behind the dishwasher, whatever we have to do,

and maybe that happened here in that short period of time, and

everybody that was previously in the infirmary was no longer in

the infirmary and the only one left with any level of

disability was Ms. Galloway [sic].

But there has to be some expectation of some

reasonable evaluation of authority, and in this case, I think

that the Sheriff's Office acted expeditiously, consistent with

their obligations, both to their inmates, to the security of

their facility and to the requirements of the statute to

provide reasonable, unaccompanied access within a reasonable

period of time of a demand.

And then the question becomes, was the access

adequate.  There was an access to Ms. Galloway [sic], both in

the attorney conference room the day before, September 2nd, and

access to her again on September 3rd, in the infirmary, in

essentially the same condition as it was described she was in,

shackled by hand and foot to a facility bed with two-point

restraints.

And that was what they were able to see.  And insofar

as we know from this evidence in this record, there was no

other disabled person in the infirmary on that day or on the

1st because we don't know who else was disabled.

But the case law doesn't appear to require the

Plaintiff to prove that people were disabled, but just that

they had a complaint that disabled persons were being neglected and abused, and then they get to go and look and see for themselves.

So, there is a dispute in this record about the extent to which the P&A demanded and persisted in the demand to see Mr. Harvey or the other unnamed individual who lay naked in four-point restraints on a bed in the infirmary.

The only witness who testified to know whether there was any such person meeting that description was Ms. Murray, the nurse, and she says there is no person in the infirmary in that condition. No one is available to contest that contention.

And then there's the testimony of Ms. Siemer concerning what persistence was held with respect to the demand to see the male facility, because Ms. Gibson is emphatic that Mr. Liles was given full access to anything he wanted to see on the 3rd, and that he denied any authority under the P&A, despite what curiosity he might have had, to be able to go in to the male infirmary.

Ms. Siemer was asked:

"Do you recall the jail personnel asking Mr. Liles whether or not there was a complaint of abuse or neglect that reflected the authority of your organization to see male prisoners?

ANSWER: Yes.

1           And do you recall Mr. Liles' response?

2           ANSWER:  No, I don't.

3           Do you recall conversations between Ms. Gibson and

4   Captain Burke and Mr. Liles at the conclusion of the inspection

5   of the records, the inspection of the facility and the second

6   meeting with Georgia" -- is it Holloway or Galloway?

7           MR. CAMPBELL:  Holloway.

8           THE COURT:  " -- Holloway where he was asked is there

9   anything else within your authority that we can do for you

10  today?

11          ANSWER:  I think at that point, I recall that

12  Mr. Liles asked if we could see the naked man who was in

13  four-point restraints.

14          Right, and isn't that when the question came up, well,

15  do you have authority to see a naked man pursuant to a

16  complaint and what was asked of him or was that asked of him?"

17          And she said, "It was within our authority".

18          I'm sorry.

19          "Okay, do you recall his response to the jail

20  personnel?

21          Not word-for-word, sir.

22          QUESTION:  Do you recall whether it was positive or

23  negative, meaning, yes, it's within our authority to see this

24  man, or no, it's not within our authority.

25          ANSWER:  It would have been positive, we should be

1  able to see him".

2      The Court's question, "No, the question is, do you

3  recall his answer, not what his answer should have been.

4      WITNESS:  No, I don't recall his answer".

5      And then the question goes on.

6      "I think I got an answer, but let me make sure.  Do

7  you recall the question at the end of the day; is there

8  anything else we can do within your authority for you?

9      ANSWER:  And I think that we asked for the incident

10  report and that we asked to see the naked man and any other

11  person that was in the infirmary that may have a disability.

12      Okay.  And then there's a conversation with Mr. Liles,

13  and then do you recall, is there anything else that was the

14  final conversation?

15      We still needed the records and we were still putting

16  that request out there".

17      And so, I don't have any doubt that there was an

18  inquiry concerning this alleged naked man in four-point

19  restraints, it's reflected in Burke's time-line, it's reflected

20  in everybody's recollection, but when it comes to the question

21  of what authority under the P&A there was to do this, the only

22  person who testified about that conclusively was Ms. Gibson who

23  said that Mr. Liles disclaimed any such authority.

24      Mr. Liles says I didn't testify because I found it to

25  be cumulative.  Mr. Liles had an opportunity to testify in

theory, he didn't testify, and Ms. Siemer candidly could not

recall and maybe wasn't part of that conversation, it's not

clear.

But in any event, access to this individual, whether

it was Mr. Harvey or someone else, is the only access that

anyone was claiming was requested that was denied.  And the

evidence does not bear that out that that request was denied in

violation of the P&A because there was a disclaimer of

authority under the P&A to assert such a demand.

And then there are the letters, the subsequent

letters.  I agree with the Defendant that the letters set forth

the claimed authority and the letters sought documents and the

Plaintiffs sought documents.  The Plaintiff was clear and

concise and persistent, and then when it came to access, the

Plaintiff said, and, oh, we also have authority for access.

But if Ms. Gibson is to be believed, there would be no

requirement for a response to a written demand for notice of a

reason for denial where no such denial had occurred in response

to a legitimate P&A authorized demand.

And so I believe that the level of access was both

timely, consistent with the law and reasonable under the

circumstances.  I am not authorized nor do I purport to try to

divine to every detail of what's supposed to happen at a prison

when a P&A shows up.  What I can do is evaluate what happened

in this circumstance under the facts presented before this

1 Court, and in this circumstance, a 24-hour turn-around is like

2 lightning speed in any State procedure, and they turned this

3 around as quickly as they reasonably could, provided the access

4 that was demanded and they were supposed to do.

5      Whether they did so with respect to the documents is

6 an entirely different issue which has been resolved by all

7 parties' stipulation and admission and is not now before this

8 Court and not subject to this aspect of this trial presented to

9 this Court this day.

10      That is my ruling, that is the judgment of this Court,

11 judgment is for the Defendant.  This case is resolved.

12      Anything from the defense?

13      MR. CAMPBELL:  No, Your Honor.

14      THE COURT:  Anything from the Plaintiff?

15      MR. LILES:  We ask for a rehearing on the Court's

16 ruling, but --

17      THE COURT:  The Court will grant you authority under

18 the law to file a motion for retrial, a new trial, or request

19 for reconsideration of any aspect of the Court's ruling upon

20 your reasonable review of the record.  If the rules don't

21 provide you adequate time to conduct that review and request

22 that relief, feel free to file a motion after consulting with

23 counsel for an extension of time which would be freely granted

24 to the extent not limited by this Court's jurisdiction.

25      MR. LILES:  Thank you, Your Honor.

1    THE COURT:  Is there anything further from the

2 Plaintiff?

3    MR. LILES:  No, Your Honor.

4    THE COURT:  From the defense?

5    MR. CAMPBELL:  No, Your Honor.

6    THE COURT:  Thank you for your indulgence of this cold

7 that I'm suffering from, and for your professional deportment

8 in the conduct of this trial.  God speed to you, hope to see

9 the lawyers again real soon, hope never to see the litigants,

10 if possible.  You are dismissed.

11    MR. LILES:   Thank you.

12    MR. CAMPBELL:  Thank you.

13    (Thereupon, the proceedings concluded.)

14                    *******

1                              INDEX

2                                                        Page
  EXAMINATION:

3
  LINDA SIEMER
4       BY MR. WHITE                                      26
        BY MR. CAMPBELL                                   39
5       BY MR. WHITE                                      61
  CRAIG BURKE
6       BY MR. LILES                                      65
        BY MR. CAMPBELL                                   81
7       BY MR. LILES                                      90
  MICHAEL ALLEN
8       BY MR. MCKINLEY                                  108
  MARIO CABRERA                                          122
9       BY MR. MCKINLEY                                  122
  ANNE GIBSON
10      BY MR. CAMPBELL                                  137
        BY MR. LILES                                     144
11      BY MR. CAMPBELL                                  151
  NORMA JEAN MURRAY
12      BY MR. MCKINLEY                                  156

13                          * * * * *

14                          EXHIBITS

15

16      Joint Exhibits 1 through 9
        EVIDENCE                                          24
17      Defendant's Exhibit 6
        EVIDENCE                                         116

18                          * * * * *

19

20

21

22

23

24

25

1                           CERTIFICATE

2

3    STATE OF FLORIDA          )
                                  SS
4    COUNTY OF HILLSBOROUGH    )

5

6         I, CLAUDIA SPANGLER-FRY, Official Court Reporter for

7    the United States District Court, Middle District, Tampa,

8    Division,

9         DO HEREBY CERTIFY, that I was authorized to and did,

10   through use of Computer Aided Transcription, report in

11   shorthand the proceedings and evidence in the above-styled

12   cause, as stated in the caption hereto, and that the foregoing

13   pages numbered 1 to 197 inclusive, constitute a true and

14   correct transcription of my shorthand report of said

15   proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand

17   in the City of Tampa, County of Hillsborough, State of Florida,

18   this 6th day of February, 2012.

19

20       CLAUDIA SPANGLER-FRY, Official Court Reporter

21

22

23           BY: /s/CLAUDIA SPANGLER-FRY

24

25

## A

abandonment 182:21
abiding 124:2
ability 34:13
able 15:22 18:8 28:10,17 30:10
33:24,24 34:13 37:2 48:17 53:11
62:8 69:9 75:22 90:4,8 97:24
99:10,11 104:4,19 105:8 106:20
106:21 126:19 127:6 134:4,10
163:2,3 183:19 189:20 190:18
192:1
above-styled 197:11
absolutely 95:12 101:17 146:17
abuse 6:23 7:4 10:16,18,18,20
11:3 13:6,15 15:1,4 19:17 24:10
27:7,7,9 28:3,4,5 29:6,7 34:24
37:18 42:19 45:21 46:25 52:15
57:17,19 62:5 66:25 69:5 95:17
96:18 97:14 98:18 99:21 106:7,8
107:1 143:15 169:3,13,14 170:1
170:5 183:10,25 187:1,5,6
190:22
abused 92:4,5 172:9 188:9 190:2
abusive 161:6
accessed 75:16
accommodate 87:18 112:8
accompanied 31:5 36:1,3
accompany 18:25
accompanying 7:16
accomplished 18:21 50:15
accredited 11:1
accurate 42:22 51:7 85:14,25
171:24 181:19
accustomed 187:20 188:23
acknowledged 171:9
acknowledgement 154:20
act 12:24 109:7 134:14 154:24
176:23 186:25
acted 10:10 189:8
acting 55:12 140:22 155:5
action 13:1
actions 9:19 181:4
Activity 163:5
Acts 123:16
actual 167:23 169:4
add 94:22
added 8:14 170:14
addition 21:18 99:19 152:20
additional 21:18 55:2 86:19 134:16
183:8 184:3,15
address 15:23 63:22 144:15,16,16
145:2
addressed 4:3 101:2 113:12
132:15,16 133:10,12
adequacy 141:22
adequate 6:7 12:13 18:16 24:4
177:17 189:14 194:21
ADL 163:4
ADLs 163:3
administrative 68:7 110:19
administrator 79:2 81:25 82:8
157:18,20
admission 194:7
admit 117:15 180:13
admitted 24:19 95:12 103:23,24
182:24
adopt 11:14
advance 23:14 58:24 179:5
advice 107:6 113:9
advise 85:12 86:12 140:3
advised 178:12
advising 149:11 178:13
advisory 11:7
Advocacy 66:12 95:14 99:20 100:5
100:9,20 101:14 103:19 110:8
111:6,11 113:23 114:14 116:9
118:24 119:12 123:18 124:6,9
125:24 127:3 129:20 130:16,18
130:21 132:25 133:4,23 137:21
138:7 149:15 152:14 153:2
157:23
advocate 26:21 27:4,6 31:8 182:11
advocates 31:10
Affairs 137:17,18,19
affect 117:12
affidavit 17:24 179:14,16
affidavits 23:2
affirmatively 165:6
afforded 186:19 188:8,21
afoul 16:25
afternoon 40:11 46:7,9 47:1 51:21
81:7,8 108:17 122:8,9 124:17

126:11 127:16 139:23 144:6,7
156:20
agencies 89:22 90:14 143:6
agency 4:16,23 5:11 8:13 69:17
112:14 183:22
agency's 83:19
ago 9:17
agree 8:17 174:14 193:11
agreed 24:17 177:24
ahead 40:18 126:17 128:19 134:6
139:2 175:16
aid 139:4
Aided 197:10
albeit 187:13
allegation 14:21 66:25 69:5 95:17
allegations 7:6 15:1,4 96:10 98:17
184:13
alleged 3:24 6:23 7:4,4 27:7 28:18
29:7 34:24 37:18 97:13,14 106:7
106:8 183:9 192:18
allegedly 4:23
alleges 98:20
alleging 69:4
Allen 32:4 36:14 87:16 88:14
107:14,17,25 108:17 116:20
117:19 118:23 196:7
Allen's 32:2 36:11,13
allow 7:2 16:8,14 70:11 87:2
101:22 115:8,22 128:16,20
187:19
allowed 17:22 21:7 48:20 49:1,2,7
141:5,8 158:21
allowing 32:9 124:24
allows 74:25 87:14
all's 87:18
altered 147:18
alternatively 22:16
amenable 25:6
amend 167:2,24 168:2 179:7
amended 139:4 167:6
amicable 184:24
amicably 175:11
amount 7:17 112:18 113:8 142:14
analyzed 97:1
and/or 161:6
angle 34:2
Anne 2:1 3:19 126:23 127:24 136:7
136:10,18 174:5 196:9
announced 102:21
announcement 102:23
anonymous 4:24 5:2
answer 8:18 27:19 42:6,8,15 52:9
52:11 53:14,14,15,17 54:1 60:17
60:18,19,20,21,24 69:1,3,6 70:8
76:15,19 80:4,7,9 92:6 108:11
121:25 122:2 129:16 136:21
137:3 146:5 156:14 164:3 165:5
165:7 186:9 187:17 190:25
191:2,11,25 192:3,3,4,6,9
answered 71:4 72:2 80:8,18
154:14 164:18
answering 156:12
answers 26:2,3 64:17,18 108:2,3
121:19,20 136:20 156:6,7 169:6
anticipated 44:11 167:20
anticipating 43:7
Antonelli 105:2
anybody 102:5,19 103:7 140:17
146:3 175:7 186:18
anymore 127:24 177:2
apologetic 90:4
apologize 3:15 13:22 23:6 41:17
55:19 56:12 57:11 77:5,11 80:23
82:3 89:19 93:24 122:24 133:7
136:5
apparent 103:18 184:12
apparently 4:23 180:14
appear 169:24
appearances 1:12 3:8
appeared 29:18,24 34:14 98:25
appears 5:6 71:7 96:15 173:25
applicable 3:25
apply 21:8 176:21
appointment 45:10 84:6
approach 25:11 41:11,13 67:19
70:12,25 71:2,3 84:13 85:17
114:6 159:6
appropriate 10:3,22 11:9 12:10,16
19:24 102:17 168:7
appropriately 11:6 95:6
approval 54:12
approved 11:1

approximately 27:12 88:5,12
110:16 124:14
April 17:23 18:10 39:10 123:11
Aranda 1:22
arbiter 11:24
area 28:15 33:17 37:9 38:4 72:20
75:18 85:7 89:11 97:22,23
109:15 110:19 111:8 113:11
115:4,12 120:10 126:20
areas 32:11 73:21 74:3,4,14 89:4,7
109:2 118:3,5
aren't 100:10
argue 44:5 59:16 95:3 117:9
arguing 43:13 173:14
argument 9:12 24:6 167:17 177:6
177:7
arm 30:8 34:5 36:22
arms 30:7 34:6,6,7
arrange 31:1
argued 139:22
arrangement 90:12
arrangements 129:9
arrest 49:8
arrival 66:20
arrived 31:11 66:16,21 91:24 98:3
130:19 187:14
arrives 18:19
arriving 187:12
Arrow 26:23
Article 11:12
Ashley 1:14
aside 5:5 130:15,17
asking 6:11,13 8:1 12:2,19 13:17
16:3,6,13,15 17:4 19:6,12,13
20:9 52:7,14 54:7,7 64:22 85:5
88:16 100:23 101:21 102:9
134:4 140:19,20,21 150:22
151:19,25 155:6 175:10 188:18
190:21
asks 14:23 16:18 63:16 102:4
105:21
aspect 5:16 12:6 194:8,19
aspects 132:11
assert 22:15 193:9
assert 9:16
asserting 84:24
assertion 161:6
assigned 132:19 182:11
assistance 102:12 131:13
Association 33:20 90:13
assume 63:2 104:14 168:11
assuming 185:17
assumption 130:11
assured 188:6
attach 148:6
attached 69:24
attaches 148:8
attempt 11:13 29:2 48:12
attempted 18:10 179:25
attempting 175:9
attention 23:1 68:9
attorney 32:8 33:17 35:14 36:15
50:16 54:9,12 66:24 86:10 87:12
87:13,17 88:1 97:22 111:22
115:2,10,10 122:12,20,21,22,25
127:19,19,21 128:2,11 130:12
138:24,25 189:15
attorneys 9:8,10 13:17 14:12,15
110:19 30:1 46:3 51:14 61:20
112:21,23
attorney/client 43:19,24
authorization 31:17 114:24 169:11
170:24 176:20
authorize 104:20
authorized 49:1 139:2 140:4
193:19,22 197:9
available 5:21 73:22 149:14 190:11
avenue 2:3 183:21 185:13
average 62:3
avoid 6:9
awaited 35:16
aware 51:19 55:11,14,16,18 59:23
60:1 90:15 91:24 96:10,11
110:17 111:15 118:5,7,24 119:1
119:15 132:18 138:13 143:9
151:10
A-L-L-E-N 107:25
a.m 1:7

## B

B 1:21
back 6:11 9:20,21,24 12:2,8,23

16:8,14 35:4,14 44:6 51:18
54:24 67:9 90:3 104:2 107:9
112:7 113:5,12 115:5 127:17
128:20,24 129:7,10 135:18
138:9,19,21,22 140:8 142:3,22
145:20 148:23 151:13,14,15
163:17 173:16 188:17,19
backed 17:16
backwards 73:25
badges 31:14
baffled 150:6,17
balance 154:24
balked 187:22
ball 143:1
Bar 23:20 62:10 87:22 97:17
115:14 128:11,14 188:4,8
bare 171:23
Bartow 29:3 31:12 35:17 65:19,23
94:9 95:24 108:22
base 95:5
based 6:19 13:11 79:1 82:16 99:4
117:15 127:4 128:23 147:24,25
153:6 167:4,21,22 180:14
183:15,16 184:17
basically 10:4 77:20 82:8 89:9
90:13 94:14 113:9 130:6 138:7
basis 11:20 84:20 94:23,25 109:11
112:11 114:14 120:2
bay 72:14,15,16,17,20,21 74:5,5,11
74:16,18,19,24,24 75:1,7,10,13
75:17,18,20,21,23,24 76:1 104:9
104:22,23,24 105:22 109:18,21
140:16 142:1 146:2,16,18,20
148:15 162:22
bear 193:7
bed 29:24 36:20 37:9 159:25
188:25 189:18 190:7
beds 30:6
beginning 43:5 143:4 146:7 153:8
begs 24:7
behalf 3:11,17 145:11
behavior 110:1
belief 179:8
believe 6:17 7:1,13,15 8:24 9:1,2
9:12,23 10:9,16 11:22 14:3
19:19 21:21 24:4 35:25 39:10,15
44:12 46:25 56:10 58:9 60:16
60:18 61:1 62:18 69:23 70:1
72:9 73:21 75:4,4 78:9 87:16
99:6,23 112:6 113:4 115:5 119:9
119:11 125:4 128:12 130:5
133:13 134:12 135:8 151:24
158:15 169:5,7,22 170:16 171:6
171:8 178:25 183:24 193:20
believed 48:13 126:12 140:24
193:16
believes 99:7
believing 147:9
bell 158:9
bench 1:10 3:22 94:14 105:7
best 187:13
better 4:22 46:21 61:6 69:10
beyond 5:17,20 19:11 154:21
Bill 3:17
binding 5:4
bit 94:22 113:8 115:5 140:7 145:20
151:12
block 75:19
bluntly 5:23
Bob 65:23
bodies 8:10
boiler 153:14 154:10 173:24
175:20
book 83:10 144:8 161:18,19
booking 34:18,20 98:1 140:13
books 187:25
booth 50:16 130:13
bottom 103:14 181:3,4
bounds 8:15
box 1:23 25:22 64:12 107:22
121:14 136:15 156:1
break 63:19 186:15
breathe 186:13
brief 4:1 24:12 20:3 39:6 41:5
56:23 60:6 70:14 81:2 93:9
94:12 118:21 129:13 134:2
136:4 144:1 145:15 148:10
165:20 174:4 178:7 186:14,15
186:16
briefly 13:7 14:7 61:13 90:18,19
briefs 20:2
bring 13:25 19:15

**broad** 20:8
**broken** 98:4
**brought** 29:23 36:11 97:22 111:9
**building** 23:8
**bunch** 185:18
**Burke** 25:5 31:24 32:4 35:5 36:11 36:14 37:5 52:4,21 63:11,24 64:7,15 81:7 99:4 101:18 110:19 110:24 111:4 112:6,25 113:12 113:22 124:11,19,20,23 125:2 125:20 126:1,2,10 127:10,15,17 139:25 142:2,24 170:23 171:6 172:1 179:14,17 180:21 191:4 196:5
**Burke's** 18:1 98:18 102:3 103:16 111:9 140:2 146:11 179:21 192:19
**business** 15:20 18:23,23 20:8 31:14 36:6 66:4,11,16 97:7,8 138:2 144:16
**B-U-R-K-E** 64:15
**b.mckinley@vcttalawyers.com** 1:25

---

**C**

**C** 1:17 3:1
**Cabrera** 86:8 121:6,9,17,18 137:21 138:4,5,11,22 139:1,8,15 148:24 149:22 150:3,5,18,22,25 188:14 196:8
**Cabrera's** 149:7
**calendar** 30:19,25 46:5 187:9
**call** 3:4 20:13 21:14,14,15,17 25:10 29:9,10,12,14,16 30:17 35:16 40:18 52:8 56:18 62:4 63:11,22 63:24 83:7 85:3 94:5 107:11,11 112:6 121:4,6 124:11,17,17 136:6 150:7,21 154:10 155:17 159:24
**called** 22:11 35:20 54:19,22,24 55:7 112:21 123:5 138:5,6 157:22 188:16
**calling** 4:9 20:14 107:14 149:23 154:10 162:1
**calls** 25:12 47:10 51:23 52:8 58:11 87:20 138:9,22 143:15 163:24
**camera** 75:19
**candid** 142:21
**candidly** 142:24 193:1
**can't** 5:23 12:23 22:19 60:12 63:5 70:8 82:3 102:11 105:20,21,22 112:19 119:9 130:10 164:3 167:8 185:19
**capable** 163:2
**capacity** 138:25 157:2 184:4 186:19 187:8
**Capel** 104:14
**Captain** 18:1 25:5 31:24 32:4 35:5 36:11,14 37:5 52:4,20 63:11,24 81:7 98:18 99:4 101:18 102:3 103:16 110:19,24 111:3,9 112:6 112:25 113:12,22 124:11,18,20 124:22 125:2,20,25 126:2,10 127:10,15,17 139:24 140:1 142:2,23 146:11 170:23 171:6 172:1 179:16,21 180:20 191:4
**captains** 109:5,12
**caption** 197:12
**card** 33:20 62:10 87:23 97:17 115:14 128:11,14 188:4,8
**cards** 31:14 36:6 128:13
**care** 4:25 50:25 163:3 172:21
**case** 1:3 3:4,6 5:2,7 10:7 11:6 12:2 12:4,6,10 19:25 20:4 22:14,25 25:7 30:19 42:1 47:18 55:11 57:14 62:7 67:15 93:16 94:23 95:4,16 96:3,23 97:4,6,7 101:18 105:25 106:24 107:12 120:25 135:24 143:13 161:2,3 162:8 166:21 168:8 172:22 174:3 175:3 176:7 177:22 182:6,9,11 183:6,9 186:21,22 187:4 189:7 189:24 194:11
**cases** 10:23 23:3 31:2 127:7 130:1 143:13 172:23
**case-by-case** 11:20
**cause** 5:6,8,10 6:6 8:14 10:14,15 10:17,21 11:2,21 22:19 23:18 24:2 45:20 58:20,22 99:23 105:11 130:5 134:11 146:8 149:1 150:2 168:14 169:5,8,14 169:21 197:12

**cells** 72:15
**Center** 66:12 99:20 100:5,20 101:14 103:19 108:3 111:7,11 113:23 114:15 116:10 118:24 119:12 123:18 124:7,10 127:3 129:20 130:16,19,21 132:25 133:4,23 137:22 138:7 139:5 140:15 152:14 153:2 157:23
**Center's** 100:9
**Central** 65:18,21 68:7,19,20 69:20 83:5,7 91:12 108:21 109:4,10 139:24
**cerebral** 29:19 34:6,9
**certain** 17:2 45:8 144:22 161:19 184:19
**certainly** 45:17
**CERTIFICATE** 197:1
**certified** 18:24
**CERTIFY** 197:9
**cetera** 14:25
**CFR** 8:14 98:20 100:9 134:19,22
**CFRs** 152:25
**chain** 85:8
**challenge** 168:15
**challenged** 162:19
**chance** 103:6 168:7
**change** 8:20 169:17 175:8
**changed** 9:10 118:8 169:6
**changes** 17:7 10,22,24 118:5,7
**channels** 184:22
**characterization** 178:10
**charges** 34:22
**check** 34:22 91:23 118:18 171:21 172:3
**checked** 105:11
**checking** 162:4,5
**Chief** 109:7
**choice** 22:21 103:7
**Christopher** 1:13 3:12
**Circuit** 5:4 19:21,22
**circuits** 127:7
**circumstance** 193:25 194:1
**circumstances** 16:11 18:14 24:8 193:3,13
**citations** 99:24 100:2
**cite** 11:10
**cited** 20:2
**City** 197:17
**claim** 10:13 13:11,12 16:9 57:3 83:20 186:23,24
**claimed** 173:21 186:22 193:12
**claiming** 193:6
**claims** 3:24,24 13:24 94:21
**clarified** 169:10,11
**classified** 162:18
**CLAUDIA** 1:27 2:2 197:6,20
**clear** 9:1 10:2 11:9,14 21:24 30:19 30:25 34:19 67:2 97:12 169:7 172:2,25 174:6 178:3 183:18 193:3,13
**clearing** 46:5
**CLERK** 3:5 25:22 64:12 107:22 121:14 136:15 156:1
**client** 28:17 42:25
**Clinical** 159:16
**close** 91:17 95:1 123:1 124:16 125:22
**closed** 74:19,21,21 166:21
**closer** 14:18,19
**closing** 167:16,16,19,20
**clothes** 188:25
**clothing** 165:11,14
**clue** 10:12 172:10,13
**CM** 2:2
**CMS** 50:25 51:2 54:8,11 56:3 142:4 149:1 154:19 157:7 166:6 172:20 173:1 175:21
**CMS's** 172:19
**coach** 80:7
**Coast** 139:9
**Code** 8:18 11:11
**cold** 94:1,1 195:6
**collaborate** 28:20
**collecting** 132:20
**collectively** 147:8
**come** 9:20,21,24 16:8,14 17:20 25:15 48:5 64:3 73:14 89:25 94:8 104:2 107:15 109:12 112:16 115:1 119:19 121:7 128:20 129:1 130:7,10 130:16 136:8 139:22 151:13 155:19 158:2 163:1 176:6,20 177:1,11

**comes** 15:16 110:3 122:19 163:16 192:20
**coming** 40:23 68:9,13 83:5 90:3 110:24 138:21 139:10 163:17
**command** 85:8
**Commander** 65:18
**comments** 90:22
**communicate** 34:14
**competent** 179:3
**complain** 177:20,23
**complaint** 4:17,24 24:3,4,10 28:4 38:25 52:15 53:4 59:25 62:15 91:3,11 92:3 96:18 102:15 107:1 143:15 177:19 187:5 190:1,22 191:16
**complete** 48:17 62:14 100:6,20 101:14,21 106:21 121:24 122:2 134:4 149:15 152:14 153:2 176:2
**completed** 30:17 38:24 101:17 108:8 135:24 136:2
**completely** 129:11 186:3
**completes** 26:7 64:23 136:25 156:11
**completing** 35:2
**compliance** 123:24,25 124:1 134:19 140:20
**complied** 11:5
**comply** 10:13 11:8 17:14 123:23 128:21 139:18 154:25
**complying** 123:22
**comport** 22:12
**composite** 24:18
**compound** 73:18
**Computer** 197:10
**concern** 57:17 58:3 112:16
**concerned** 22:10 73:2
**concerning** 3:23 4:3,24 16:9 19:10 19:23 59:2 134:20 169:14 182:17,20 190:14 192:18
**concerns** 54:11 154:21,25,25 161:21
**concise** 193:14
**concluded** 63:2 187:25 195:13
**concludes** 166:24
**conclusion** 19:9,23 52:21 88:16 147:2 191:4
**conclusions** 15:11 95:1 167:22,25
**conclusive** 187:13
**conclusively** 192:22
**condition** 58:2 110:5 188:6 189:17 190:11
**conditions** 109:24
**conduct** 16:14 28:10 37:2 99:25 134:11 152:10 153:11 194:21 195:8
**conducted** 27:10,23
**conducting** 28:12 169:2,13,25 170:4 182:12
**confer** 39:3
**conference** 189:15
**confidential** 18:4 29:9 38:10,17 95:22 172:9
**confirm** 117:11
**confirmed** 60:18
**conflicting** 90:3
**conform** 167:2,7
**confusing** 89:23
**confusion** 2:5 174:16
**Congress** 8:12,15 94:5
**conjunction** 124:1
**connected** 34:7
**connection** 4:5
**consider** 10:22 186:25
**considering** 114:4
**consistent** 9:23 14:21 71:7 76:23 98:7 99:3 101:21,23 102:9 106:7 144:15 169:6 178:11 182:23 189:8 193:21
**consists** 28:15
**constitute** 197:13
**constituted** 30:2
**constitutes** 5:5 58:22
**constructed** 73:16
**construction** 20:9
**construe** 20:7
**consulting** 66:23 194:22
**contact** 32:8 72:5 109:12 111:2 112:23 113:6 114:18 115:7 116:9,11,13 126:20 127:10,15 128:10,15 130:21 131:3 143:14

**contacted** 8:19 67:8 112:23,24 126:22,22 128:23 131:7,15 137:20 143:10
**contain** 69:21,24 70:2
**contemplated** 5:8,17 24:12
**contemporaneously** 98:20,21
**content** 15:4 171:14
**contention** 190:12
**contest** 190:11
**context** 8:11
**contexts** 11:17
**continuation** 176:16
**continue** 63:20 76:2 82:11 92:15 101:12
**continued** 61:2 82:22 178:14 183:16
**continues** 12:21
**continuing** 135:9
**contract** 54:8 120:15
**contractor** 172:25
**contracts** 122:18
**contrary** 9:12 10:19 100:14 151:8 171:20 172:4
**control** 4:7 72:13,15,18,22 73:3,6 73:12,17 74:5,12,14 75:9,16,18 90:4 96:19 142:23
**controversy** 10:8 11:7 149:3
**convenience** 139:23
**conversation** 28:25 31:25 34:25 53:23,25 54:18 89:24,25 115:21 124:18 129:11 131:22 141:25 146:15,19 147:9 149:22 150:1 153:16 192:12,14 193:2
**conversationally** 89:5
**conversations** 51:19,20 52:3,8,20 113:1 141:21 153:6,16 191:3
**converse** 14:2
**cookiefry@aol.com** 2:5
**copied** 133:1
**copies** 54:4,7,10,15 56:2,6,6 132:2 132:2 149:13 161:15,16,20,25 162:4,7 177:19 178:4,19 180:17
**copy** 13:25 41:6,14,20 67:18 133:2 133:3,22 135:3,5 144:18
**cordial** 90:7 129:11
**Corizon** 142:5 157:6,10,14,16
**correct** 16:17 20:10 21:16 40:14 44:23 45:3,11,18,22 47:24 50:16 50:25 51:3 54:12,13,16 56:3 57:19 58:7 61:4,5 73:18 75:25 77:25 78:8,11,14,25 79:9,13,25 80:12 83:14 90:23 91:3 92:21,24 104:11 105:1 106:15 143:17 151:2 164:20 169:16 172:19 181:21 182:1 197:14
**correction** 132:3
**Correctional** 157:8
**corrections** 156:24
**correctly** 162:17
**correspondence** 6:12 9:18,19 56:11 184:6
**corroborate** 22:10
**costs** 13:17
**cot** 36:22
**couldn't** 9:7 11:10 15:20 139:17
**counsel** 1:13,21 2:1 3:8,9,18 4:16 9:4,13 12:11,14 20:22,24 21:9 22:3 24:17 25:3 26:7,9,13 33:7 39:3,21 44:17 51:9 55:21 57:6 64:24 67:8,18 68:3 71:4,15,23 81:4 88:20 92:7 93:23 95:10 101:3 108:7,10,14 112:24 118:19 121:24 122:1,5 127:12 135:11 136:25 137:1,5,12 149:2 151:3 154:19 156:11,17 160:25 162:8 174:9 175:14,22 182:25 185:9 187:11 194:23
**counsel's** 51:22 85:4,11 86:9,24 107:6
**County** 13:14 29:3,8,18 30:14 31:3 31:11,15 35:17 42:4 43:22 46:20 59:24 65:12,13,18,22 66:1,13 68:7,19,20 69:5,20 71:10 83:5,7 91:12 95:19,24 96:5 98:7 101:13 107:2 108:22 109:4,4,10 122:13 139:24 153:9 186:20 197:4,17
**couple** 89:10 172:23
**course** 23:8 188:13
**Courtroom** 21:3,11,13 63:6 184:13
**Courtrooms** 94:6,9
**Courts** 8:23 12:25 19:20 114:24
**Court's** 5:21 97:4 166:23 167:21

169:22 192:2 194:15,19,24
**covered** 155:5
**covers** 159:19
**co-counsel** 3:11
**Craig** 63:11,24 64:7,15 139:24
179:14,17 196:5
**create** 98:6
**created** 147:4 179:21
**credentials** 69:18,21 70:16 71:18
83:12,13 86:19 87:13 96:5,6,12
102:17 115:11 187:12
**credibility** 184:18
**criminal** 5:9
**Crist** 126:3
**criteria** 30:1
**cross-exam** 147:25
**CROSS-EXAMINATION** 39:23 81:5
144:4
**cuffs** 36:22
**cull** 23:25
**cumulative** 182:8,16 192:25
**curiosity** 190:18
**current** 8:21 188:6
**currently** 19:14 65:7 94:25 103:15
**curtain** 73:8 74:21
**curtained** 75:3,5
**curtains** 38:3
**custody** 98:7
**C-A-B-R-E-R-A** 121:17
**C-O-R-I-Z-O-N** 157:11
**C-O-R-Z** 157:11

**D**

**D** 3:1
**daily** 65:21 68:11 163:5
**danger** 28:22
**date** 14:13 66:10 73:23 131:14
139:9 149:12
**dated** 10:17 101:1 117:5 132:24
133:13 145:1 149:9
**day** 35:24 45:13 47:21 48:23 50:9
50:12 53:18 79:16 84:24 85:13
88:19,23 89:14 111:11 116:10
127:25 129:10,19,23 130:13,17
139:16,18,20,22 141:8,12
148:16 153:21 158:24 162:7
176:15 177:1,9 188:19 189:15
189:22 192:7 194:9 197:18
**days** 11:16 22:2 23:1 168:3
**day's** 188:24
**day-to-day** 109:5,11
**DD** 56:18
**deal** 13:3 110:3 159:14
**dealing** 28:21
**deals** 20:4 70:18
**dearth** 105:11
**decided** 45:13 147:7
**decision** 96:24 124:24 182:8
**decisions** 47:13 163:2
**declaration** 95:13
**declaratory** 3:22 10:7 94:24 95:6
**declare** 8:1,4,7 10:2 15:12 16:3
57:8
**declined** 9:15 11:19
**Defendant** 1:8,21 3:16 14:22,23
15:1 16:1 32:14,22,25 33:3 38:8
38:12 169:18 173:4 174:19
175:2 178:12 179:12 181:20
184:25 186:20 193:11 194:11
**Defendant's** 84:12,17 114:10
116:6,23 118:15 159:9 160:11
160:17 172:18,20 173:3 196:17
**defense** 3:14 4:4 14:21 63:15 64:1
166:15,25 167:12 182:19 194:12
195:4
**defer** 5:25 6:1
**deficient** 142:16
**define** 12:15
**definition** 10:20
**deformity** 77:20
**delay** 100:7,21 101:15 136:5
149:16 152:15 153:3
**delineates** 176:18 178:18
**delineating** 182:3
**demand** 189:12 190:5,14 193:9,17
193:19
**demanded** 162:10 188:22 190:5
194:4
**demands** 23:24
**denial** 134:20 135:10 151:10,11
186:22,25 193:18,18
**denied** 7:18 9:2 27:17,24 40:6 87:4

97:9 143:19 149:17 174:7 177:9
183:11,14 190:17 193:6,7
**dental** 50:1,11
**deny** 129:3 141:1
**denying** 38:16,21 87:8 113:15
151:9 175:25 176:3
**department** 8:17,20 123:24,25
124:2 154:21 162:2,6
**depending** 62:6 63:16
**deportment** 195:7
**deposition** 9:23 42:1,16,17 44:7
51:5 67:15,17 68:23 69:7 70:5,9
76:13,24 77:4,7 91:14,21 98:19
148:3 171:19
**deputies** 109:20
**deputy** 58:8
**describe** 37:25 72:10 73:14 99:13
160:2
**described** 181:9 189:17
**description** 83:20 129:14 190:9
**design** 109:18
**designated** 24:24 116:6
**designation** 4:4
**desire** 182:20,21 183:8 185:17,19
**desk** 31:16
**despite** 8:3 190:18
**detail** 193:23
**detailed** 30:2
**details** 97:4
**detention** 117:1 124:12 126:25
130:18 139:1,10,15 181:4
**determination** 5:7 87:2 117:14
120:12 169:23
**determine** 5:19 10:11,12 11:7 72:6
83:8,23,25 84:22 85:3 94:19
99:10 106:14,16 120:14 126:18
172:12
**determined** 19:20 44:13,14,25
66:24 67:10 82:24 106:11
127:18 128:5 166:23
**determines** 21:6 110:2,3 168:7
**determining** 127:3 129:6
**developed** 180:16
**developmental** 72:7 99:21 134:12
**developmentally** 106:2
**diagnosed** 82:9,14
**didn't** 9:21 11:25 15:18 16:21 17:5
17:17,18 33:7 43:19 44:9,10
51:6 58:3 60:20 80:1 94:18 98:5
98:6 101:18 103:6 111:17 114:3
116:12 125:19 143:2 146:5
150:9,11 155:3 166:5 169:1
176:18 177:5,17,18 181:22
182:5 185:11 186:1 192:24
193:1
**different** 5:9 11:17 59:12,15,18
132:11 194:6
**differently** 17:8 173:12
**difficult** 187:15
**dire** 117:13
**direct** 13:2 26:15 60:21 61:24,25
65:5 108:15 122:6 127:13
137:14 156:18 171:7
**directed** 94:15
**direction** 139:15 159:20
**Directive** 117:1
**directly** 72:13,14
**Director** 126:23 128:6 137:17,18
137:19
**dirty** 188:25
**disabilities** 3:25 33:5 62:21 66:13
78:18,24 79:22 82:1 83:8 95:23
99:22 100:4 102:2,6 107:1 110:8
123:19 124:7 134:13 157:23
158:3
**disability** 1:3,14 3:6,11 7:11 12:17
13:13 26:19 27:1,11 28:7 29:19
32:21 35:10 38:22 53:22 72:8,8
76:11,15,16,22,25 77:8,8,12,13
77:14,15 81:16 82:9,14 102:13
106:5,9 110:10 120:7 123:19
189:5 192:11
**disabled** 4:6,25 10:24 19:18 24:7
40:2,7 60:14,25 61:4 81:18,22
106:2 141:15 163:1 164:2 165:4
181:20 184:10 187:1 189:22,23
189:25 190:1
**disclaimed** 192:23
**disclaimer** 193:8
**disclose** 103:2
**disclosed** 127:19 147:17,23,24,25
**disclosing** 125:17,20

**disclosure** 99:19 152:21
**discovered** 127:8 128:4
**discovery** 55:11
**discuss** 20:21,22,24 33:25 42:18
44:7,9,10,12 58:24 63:5 93:15
112:8 120:24 135:23 155:15
**discussed** 40:20,22 41:1 42:7
44:20 113:3 130:1,7 137:4 148:3
**discussing** 42:12 43:14 88:21
**discussion** 32:3,6 35:11,15 43:16
43:21,24 44:1 46:12,16 125:25
126:10 142:14,19 146:5 150:18
155:15 172:6
**discussions** 129:24 132:1 137:9
**dishes** 188:25
**dishwasher** 189:1
**dismiss** 13:24
**dismissal** 13:11
**dismissed** 12:6 13:10 57:4 161:2
190:13
**display** 71:2
**dispute** 8:2 97:20 102:13,14,15
103:24 178:20 181:13 184:13
190:4
**disputed** 173:6 178:22,22,23 182:4
184:17
**disputing** 161:1 181:10
**distinction** 76:25 183:1
**District** 1:1,11 197:7,7
**divided** 38:3 160:3
**divine** 193:23
**Division** 1:2 109:3 197:8
**docket** 13:19,21
**document** 13:23 14:3,4 38:15,20
39:17 84:11,19,22 96:8 114:9,11
114:12 116:24 117:4,7,10,20,20
117:23 118:2,3 144:10 147:4,11
147:19 159:12 174:20
**documentary** 166:22
**documentation** 45:8 86:19 87:8
114:13,16 115:21 118:18 119:3
119:23 130:4 187:14
**documenting** 99:12 175:1
**documents** 31:16 56:10 99:12,18
133:13 149:13 161:15 162:9
181:17 184:8 187:13,13 193:12
193:13 194:5
**doesn't** 10:14 16:20,23 18:15,18
19:5 52:8 59:14,14 99:6 102:7
106:4 171:14 174:18,19 181:15
182:3,17 184:4,7 189:24
**doing** 20:15 42:12 96:17,18 106:16
126:17 127:5 128:4 140:21
164:22 167:20 178:13
**door** 72:11,17,24 73:12,14 74:22
74:23 160:4
**doors** 7:2,8 73:15 177:10,11
**doubt** 192:17
**drawn** 140:19 146:4
**Drive** 1:14
**driver's** 31:13 36:6 83:13
**driving** 139:8
**due** 139:16 181:4
**duly** 25:18 64:8 107:18 121:10
136:11 155:22
**duplicative** 23:4
**duties** 65:16,20 122:15 123:21
124:1 187:16
**duty** 66:8

**E**

**E** 1:13 3:1,1
**earlier** 58:19 59:22 85:11 117:21
**East** 139:9
**easy** 177:18
**educated** 90:15
**education** 97:1 143:8
**Educational** 176:22
**effective** 117:5,7,20
**effort** 6:8 9:24 16:24 101:21 171:24
172:3,11
**efforts** 8:3,9 99:13 184:3,24
**eight** 21:17 168:14,16
**either** 12:10 13:16 15:18 16:2
20:25 22:18 27:17,25 52:4 57:21
60:10 84:3 88:14 93:25 106:22
111:21 149:22 172:18
**elements** 5:21
**Eleventh** 5:4 19:21,22
**eliminate** 169:25
**emphatic** 190:15
**employed** 26:18 65:7,9,11 108:18

**employer** 157:5
**encompasses** 100:1 152:11
153:12
**ended** 35:15 139:23 162:1
**enforce** 5:5
**enjoined** 14:24
**enter** 16:7 72:11,20,24 73:18
114:24
**entered** 23:17 169:20
**entering** 36:4
**enters** 72:17
**entire** 98:10 130:17 147:19 154:4
162:23,24
**entirely** 194:6
**entitled** 9:9,25 13:16 15:13 28:16
45:24 69:13 94:19 97:10,10
106:5 139:14 152:24 175:23,24
**envelope** 119:23
**environments** 156:25
**Equal** 96:23 102:22
**Equip** 96:23 102:22
**equivalent** 127:8
**escape** 82:25
**escort** 75:25
**escorted** 28:15 88:6,11 113:4
**especially** 153:5
**ESQUIRE** 1:13,13,21,21
**essentially** 189:17
**establish** 10:7 43:25
**established** 181:5
**et** 14:25
**evaluate** 16:9 193:24
**evaluated** 165:2
**evaluation** 189:7
**evening** 129:1 188:15
**event** 13:5 151:8,9 171:19 193:4
**events** 98:21 117:6 124:5 130:20
**everybody** 97:21 148:15 189:3
**everybody's** 192:20
**everyone's** 112:15
**evidence** 7:23 19:9 24:14,19,25
56:13 69:12 71:2 93:21 94:17,19
94:20,23,25 95:4,5,5,11,20 96:3
97:16 98:1,4,10,17 99:15 100:12
101:16 102:12 103:9 106:1
115:25 116:2,7 147:11,13,15
148:12 160:11 166:8,21,22
167:2,5,7 169:7 170:18 174:20
179:3 180:1 181:24 182:2 187:4
189:21 193:7 196:16,17 197:11
197:15
**evidentiary** 166:24
**evolved** 139:3
**evolving** 138:10,23
**exact** 9:13 20:25 113:8,22 153:18
174:4
**exactly** 37:7 42:18 74:10 111:18
120:15 165:6 173:25
**exam** 50:1 147:25
**EXAMINATION** 26:15 61:15 65:5
90:20 108:15 122:6 137:14
157:15 156:18 196:2
**examined** 25:19 64:9 107:19
121:11 136:12 155:23
**example** 130:25
**exceeded** 14:14,16
**excuse** 10:9 20:22 21:9 23:9 41:4
76:14
**excused** 20:21
**Executive** 83:18 84:2,6 87:10
125:5 126:1,2,4 127:5 139:4,4
176:17,18
**exhibit** 24:18,18 69:11,13 70:23
71:7 83:10,11,22 84:15,17 86:3
90:23 96:8 98:2,14 99:16,17
100:17,25 103:13,14 114:10
115:24 116:2,6,24 117:5,14
118:15 133:14,16,18,19,21
134:24 144:8,25 145:8 148:1,1
149:5,9 151:7,14,16 152:2,7
159:9 160:10,11 161:11 166:5,6
170:22 176:9 179:13,20 180:20
196:17
**exhibits** 24:17,17,24 59:23 84:12
86:3 147:24 150:12 180:13,16
180:23 182:24 183:3 196:14,16
**existed** 172:13
**expect** 41:18 61:6 187:7,22
**expectation** 179:7 189:6
**expectations** 146:12
**expected** 12:24 20:20
**expecting** 63:13

**expedite** 25:7
**expeditiously** 189:8
**experience** 28:12 45:17 47:16
  82:17
**expert** 4:4 24:6
**explain** 45:5,6,9,14 46:3,21
**explained** 30:7 31:14 32:7
**explaining** 113:24
**explanation** 100:10 101:25 148:13
  150:9 184:1
**expressly** 149:10 173:10 178:12
**EXT** 1:16
**extension** 194:23
**extensive** 66:23
**extensively** 97:3
**extent** 11:20 24:1 162:10 190:4
  194:24
**extreme** 10:10

**F**

**F** 96:9
**face** 26:3 64:18 108:3 121:20
  136:21 156:7 184:1
**facilitate** 90:4
**facilities** 6:22 7:3,6 13:14,15,16
  15:3 20:4,6 23:7 27:8,13,17,24
  27:25 28:13 62:11,12 95:15
  100:1 109:4,5,7,12 149:18
  152:12 153:12 154:2 156:25
  174:8 177:22 183:12
**facility** 5:1,16 6:10,11,18 7:10,21
  8:8,11 13:6 16:8,11 17:1 19:2,7
  19:8,16,24,25 20:1,5 28:19,23
  46:1,7 52:22 56:14 59:9 65:18
  68:17,18,20 108:22 110:21
  112:15,16 114:25 115:4 116:21
  119:7 124:12,13,25 126:13,19
  126:25 127:20 128:2,17 130:2
  130:18 131:12 132:3,10 134:10
  134:16 135:7 140:1,1 143:11,12
  143:19 146:24 148:14 151:23
  153:24 154:4 155:5 160:17,23
  164:13,15 172:22 173:19 176:4
  177:17 178:15 186:25 187:6,9
  187:11,20,21 188:14 189:10,18
  190:15 191:5
**facing** 73:17
**fact** 9:22 11:19 12:5 15:11 22:1
  39:13 43:15,17 44:1 54:11 56:1
  82:13 89:1 95:2 101:16 128:3
  168:10 169:5 180:14 184:17
  188:2
**facts** 5:13 9:12 10:9 22:9,11
  117:12 182:14 193:25
**factually** 22:15
**failed** 172:3 182:3
**failing** 16:1
**failure** 49:14 183:16 186:24
**fair** 97:17
**false** 26:3,3 64:18,18 108:3,3
  121:20,20 136:21,21 156:7,7
**familiar** 71:14,17 116:24 117:22
  118:3 123:4,15,18 157:23
  163:12,15 164:14
**familiarity** 110:7
**far** 14:16 45:20 57:17 91:16 135:19
  139:20 142:16 158:21 178:10
**fashion** 154:2 184:9
**faster** 10:10
**favor** 94:16,17
**FAX** 125:25 126:2,22
**FAX'ed** 128:12
**February** 197:18
**Federal** 4:1 8:18 10:20 11:11 14:25
  95:13 99:19 123:22 126:19
  127:6 176:22
**fee** 9:8
**feed** 163:3
**feedback** 4:18,19
**feel** 194:22
**feet** 9:10 13:17 14:12,15
**fell** 140:20
**felt** 139:13 155:5
**female** 30:12 72:17 74:5,11,24
  75:13,17,18,20,21,23 104:9,17
  104:22,23,24 160:3 162:22
**FERPA** 176:21,21
**field** 120:16
**fight** 4:14
**figure** 136:6 143:3
**figured** 139:12 176:5 188:15
**figuring** 187:15

**file** 12:22 62:17,18 119:5,7 144:20
  144:21 150:11 176:6,7 177:8
  194:18,22
**filed** 6:14 14:20 101:19 135:4
  183:18 185:12
**fill** 188:20
**final** 11:24 53:24 165:24 192:14
**finalized** 147:5
**finally** 25:3 66:24 139:12
**find** 9:17,19 11:10 13:23 14:1
  152:24 105:8,9 110:22 138:12
  151:20 170:25 171:23 178:17
  186:18
**finding** 6:20 16:3 168:11 170:14
  172:3,5,11 178:10
**findings** 15:11 30:20 94:13 95:1
  167:21,24 168:10 170:10 178:21
  179:7
**fine** 23:11 25:8 41:12 48:5 88:18
  173:5 177:2,3
**finger** 167:8
**finish** 105:14,15 127:12
**finished** 54:20 55:8
**finishes** 6:2
**first** 4:3 9:25 17:15 20:13,14 22:10
  22:14,19,23 23:5 25:10,18 46:19
  64:8 67:25 86:5 88:10 103:14
  104:21 107:11,18 110:17 121:10
  131:4 132:18 136:11 138:4,5,10
  149:23 151:7,15 155:22 176:6
  183:20
**five** 63:19 168:3,12
**fixed** 94:6
**flipping** 119:22
**Floor** 2
**Florida** 1:1,3,6,14,15,17,19,23 2:3
  2:4 3:6,11 7:12 12:17 20:2 26:19
  26:23 27:2,11 65:24 90:12
  102:14 110:10 123:19 126:24
  137:25 138:1,20,21 186:20
  197:3,17
**Florida's** 13:13 15:13
**focus** 106:13 184:9,10
**folder** 34:18
**folks** 29:25 61:1 139:1
**follow** 15:9 16:7,13,19 18:17 19:6
  159:21
**followed** 9:16 153:17
**following** 13:12 56:5 106:18
  129:10,19
**follows** 25:20 64:10 107:20 121:12
  136:13 155:24
**followup** 43:4 105:12
**foot** 189:18
**force** 13:1
**forced** 12:21 18:11 175:6
**foregoing** 197:12
**forfeitures** 122:17
**formally** 157:7
**format** 2
**forth** 15:6 114:2 115:11 138:9,22
  140:8 145:21 146:4 149:16
  193:11
**forward** 25:15 48:5 64:3 73:15
  107:7,15 121:7 136:8 155:19
  161:10
**found** 10:16 84:25 85:2 128:5
  138:23 139:9,12 163:23 166:6
  172:24 187:11 192:24
**foundation** 74:1 164:16
**foundational** 117:15
**four** 18:19 19:3 47:23 48:12 56:12
  152:8 168:12 185:11
**four-point** 29:23 30:5 32:20 35:6
  48:14 53:1 56:9 78:7,10 79:12
  99:1,2 177:15 179:22 180:3,7,10
  181:10 190:7 191:13 192:18
**frame** 22:14 49:6 50:10 57:1 62:3,3
  **frames** 61:23
**frankly** 99:6
**free** 20:21,22,24 22:14 63:4 93:14
  93:14 107:8 120:21 135:22
  155:14 166:2 194:22
**freedom** 58:3,4
**freely** 194:23
**fresher** 69:8
**Friday** 66:17 126:20 129:7,24
**front** 34:17 49:9 72:14 75:6 96:8
  98:3 114:9 116:24 119:21 144:8
  144:21 159:10
**full** 106:16 152:7,9 190:16

**function** 97:1
**further** 39:7 43:19 80:24 93:3
  100:6,21 101:15,19 116:9,11
  118:18 120:19 124:23 127:15
  131:12 135:12 141:21 143:11
  145:16 148:13 149:16 152:15
  153:3,24 155:13 165:17 166:25
  195:1
**futile** 12:24
**future** 12:9,9,12 13:4 17:6 18:17
  19:6

**G**

**G** 3:1
**gain** 71:12 73:6
**Galloway** 68:6,9,11,13,15 69:2
  111:2,3 188:6,9 189:5,14 191:6
**gather** 167:15
**Gene** 154:13,13
**general** 3:18 51:22 67:8 71:1,15,23
  85:4,11 86:8,24 92:12 101:3
  122:15 175:22 185:9
**gentleman** 29:23 30:6 32:19 77:23
  99:2
**Georgia** 30:16 32:19,23 33:14
  35:21 36:17 37:19 47:24 48:9,18
  48:21 49:1 50:15 52:23 54:25
  55:4 57:17 58:1 61:22 62:17
  76:4,11 79:19 87:12 89:9 91:2
  91:25 102:8 103:7 104:5 115:8
  119:2,14 120:4,5 127:21 128:3
  130:11 140:10 142:2,3,6 145:22
  154:16 162:15 165:4 172:2
  191:6
**Gerard** 20:4
**getting** 4:18,19 48:25 100:11
  148:18,20,25 149:3 154:19
**Gibson** 2:1 3:19 23:9 36:15 37:4
  129:22 130:5,7,15 131:24
  132:16,25 133:1,3,12 136:7,10
  136:18,19 137:4 144:6 145:17
  174:16 176:5 184:14 188:13
  190:15 191:3 192:22 193:16
  196:9
**Gibson's** 174:5 186:2
**give** 7:3 11:15,15 13:4 26:2,3 28:24
  30:10 35:22 42:9,24 43:1,14
  45:14 47:23 64:16,18,25 69:4
  70:9,10 84:2 94:5 100:23 108:1
  108:2 121:19,19 129:4,7 134:9
  136:20,21 139:17 140:7 145:20
  150:8 151:18 155:8 156:6,7
  159:20 161:25 162:7 176:8,15
  176:18 177:1,2,18 178:5 188:24
**given** 9:13 30:21 34:1 42:4 56:13
  62:11 70:8 84:11 86:23 96:22
  97:18 98:11,11 124:21 142:15
  161:10 162:6,9 177:21 178:1
  187:22 190:16
**gives** 24:8
**giving** 67:15,17 76:14,19 91:14
  92:6 106:23 144:23
**glad** 42:11 90:8 148:4 173:16
**glasses** 173:15 178:3
**go** 5:17 6:4 12:24 14:17 18:12
  22:14,19 23:13 24:9 25:13 30:20
  30:22,24 31:3 34:3 40:12 42:13
  43:19 44:15,23,25 45:1 54:15
  58:19 63:4 67:3,6,11,24 73:5
  80:1,1 81:10 85:6,13 87:3
  90:14 92:15 93:14 97:10,10
  99:16 102:8 103:13 105:21,22
  106:12 107:7 112:11,20 114:23
  120:21 124:5 128:19 130:1
  134:6 135:22 139:2 140:16,25
  141:4 145:8 146:1,20,21 148:15
  155:15 164:16 166:2 175:6,10
  175:16 176:10 184:16 185:1,22
  186:12 190:2,18
**God** 195:8
**goes** 22:23 102:4 192:5
**going** 7:1,2 17:1,7,12,20,20 21:3
  21:14,14,17 22:4,5,9,25 32:8
  34:22 35:22 40:13,16 41:9 44:14
  44:15 58:20,23 59:17 62:7 67:24
  73:21 85:17,22 97:2,12,15 101:5
  102:1 103:24 112:8 113:17,18
  114:23 124:5 127:12 128:19,24
  130:1 131:16 139:17,18 146:6
  146:15,22 147:8 148:12 150:15
  155:2,8 161:18 162:3 176:15

**gold** 106:17
**golden** 177:5
**good** 3:4,13,20 11:12 22:24 25:11
  26:17 57:15 81:7,8 98:3 102:22
  108:17,23 122:8,9 144:6,7
  156:20
**gotten** 12:25
**Governor** 45:10 125:6 126:3
**Grady** 1:7 2:1 3:6,16,18 133:9
  186:19
**grant** 17:12 31:18 32:14,22,25 33:3
  38:8,12 86:15 184:12 188:18
  194:17
**granted** 4:12 23:19 28:14 35:11
  36:24 62:22 154:15 141:18
  194:23
**granting** 17:11 115:20
**grounds** 117:3
**group** 124:12,20,22,23 125:3,4,24
  126:17,25 127:8 128:5,13,18
  130:1 138:6
**guarantee** 143:6
**guarantees** 95:14
**guess** 138:8
**guidance** 162:2,6
**guts** 140:1
**G-I-B-S-O-N** 136:18

**H**

**H** 118:2
**habit** 163:17
**hadn't** 149:2
**half** 9:17 22:20 27:3 123:2
**hall** 75:12
**hallucinating** 29:20 37:1
**hallucinations** 34:15
**hallway** 72:12,22 73:9 74:6
**hamstrung** 18:11
**hand** 17:7,13 189:18 197:16
**handcuffed** 36:22
**handcuffs** 30:6 34:8,10
**handed** 139:3
**handicap** 76:18,25 77:3,4,10 99:1
  99:7
**handle** 110:22 112:22 122:17
  132:11
**handled** 46:21 122:19 184:22
**handling** 31:1
**hands** 77:2,20
**Hank** 1:21 3:16
**happen** 17:8 18:20 28:24 97:15
  193:23
**happened** 31:11 49:8 79:15 112:3
  141:16 146:5 148:13 153:18
  163:6 184:5 189:2 193:24
**happy** 20:12 90:8
**hard** 143:3
**harm** 28:22 82:22
**harmful** 57:21,21
**Harvey** 18:2,5,6 77:23,24 78:7,17
  78:23 79:3,8 82:2,4,13,16,22
  98:15 99:2,4,14 103:13,15,20
  105:24 106:1,2,4 119:10,11
  163:13,15,16,19,23 164:2,7,10
  164:20,23 178:24 179:2,14,22
  179:24 180:2 181:7 190:6 193:5
**hashed** 140:5 145:17,18
**hasn't** 9:8 70:7
**haven't** 49:12 55:7 56:6,13 142:12
  151:18 173:21,22 177:24
**head** 158:7
**heads** 139:13
**health** 29:19,24 58:2 59:9 79:1
  81:24 82:7 120:10 157:6,15,18
  157:19
**hear** 3:21 20:12 23:4 82:3 94:11
  107:9 108:7 124:9 173:9,11
  182:5
**heard** 22:13,20 39:17 44:7 86:1
  110:11 111:24 117:19 138:10
  150:2 173:7 181:22
**hearing** 12:5 93:24 156:6
**hearsay** 103:22 128:8 163:24
**held** 79:8,22 97:19,21 190:14
**help** 4:15 8:7 9:6 45:5,9 143:7
**helpful** 148:13
**helping** 58:23
**hereto** 197:12
**hereunto** 197:16

**here's** 175:9
**he's** 52:7 69:13 86:8 99:8 101:5
103:21
**Hi** 156:21
**hide** 143:1
**high** 154:24
**Hillsborough** 197:4,17
**HIPPA** 154:25
**Hoelscher** 4:10
**hold** 107:4,6 186:17
**hole** 48:5
**Holiday** 77:9
**Holloway** 30:16 32:19,23 33:14,19
33:21,25 34:4,5,12,13,16,25
35:3,21 36:17,19,20 37:2,19
47:24 48:10,18,21 49:2 50:15
52:23 54:25 55:4 57:18 61:22
62:9 76:4,11,17,21 77:10 79:20
87:12,19 88:1 89:9 91:3,25 98:2
102:8 103:7,19 104:5 115:8
119:2,14 120:4,5 127:22 128:3
130:11 140:11 142:2,3 145:22
146:23 154:16 162:16 165:4
172:2 173:4 191:6,7,8
**Holloway's** 34:20 35:8 58:1 62:18
142:7
**Hollywood** 137:25
**home** 59:5
**honestly** 153:23
**HONORABLE** 1:10
**hope** 195:8,9
**hopeful** 100:19 101:13 149:14
**hopefully** 100:5 152:13 153:1
**hospital** 37:10 58:17 78:13 82:23
**hospitalizations** 99:6
**hour** 48:25 187:24
**hours** 11:15 15:20 18:23,23 44:21
47:3,16,17,19 48:16,20 49:2
62:6 66:4,11,17 86:4 88:5 97:7,8
176:7 177:4 187:10
**housed** 37:8 103:15 118:2 161:7
**hundred** 144:21
**hunky-dory** 149:24
**h.campbell@vcttalawyers.com**
1:24

**I**

**idea** 46:13 87:11,17,18 111:24
**identification** 18:24 31:17 71:6
128:13 148:4
**identified** 18:3 38:10,17 78:23
81:15 95:22 102:16 125:8
168:17,18 179:25 180:2
**identify** 48:12 70:23 78:16 79:3
100:8 102:19 172:11 174:15
178:23
**identifying** 6:12 28:9
**identity** 103:1
**Illinois** 96:24
**illness** 72:7
**illnesses** 92:4
**immediate** 44:21,23,25 97:5
**impeach** 43:15
**impeached** 44:3
**impeachment** 43:9,11 44:2 68:3
70:7 91:17 92:7,11,17 171:18
**implementation** 5:19
**important** 106:13
**imposed** 103:4
**impressed** 94:9
**impression** 88:18
**improper** 68:3 91:16 92:7,11,17
**improperly** 91:12
**incident** 35:7 49:8,10,13,21 50:14
50:20 51:6,9,11 53:20 55:12,15
98:5 177:25 192:9
**incidents** 99:20,22,23 165:10,13
**include** 173:1
**included** 90:22
**includes** 14:9 100:2 152:12,25
**including** 19:21 20:24 88:25
152:24 154:9 169:24 172:8
**inclusive** 197:13
**incoherent** 36:25
**inconsistent** 70:8 101:17 102:3
**incorporated** 3:6 185:7
**incorporates** 100:18
**incorrect** 106:15
**incorrectly** 40:7
**incredibly** 155:1
**incurred** 14:13
**independent** 172:25

**INDEX** 196:1
**indicate** 104:13
**indicated** 39:12 154:5 179:21
**indicates** 18:1
**Indicating** 165:6
**individual** 16:10 28:21 29:17 31:23
32:20 33:8 81:20 97:19 134:12
151:22 154:16 188:9,21 190:6
193:4
**individuals** 4:25 7:19 17:24 27:6
27:17,25 28:6,19 30:11,13 32:17
33:4 35:22 37:12 38:4,5,13,22
40:2 62:23 68:16 69:3 99:21
100:3,3 103:1,5 110:20 127:18
128:14 130:6 143:12,19 152:13
153:1,13 154:9 158:3 172:1
173:22 174:7 183:24 184:10
187:2
**individual's** 82:10
**indulgence** 195:6
**inform** 113:10
**informant** 18:4 29:9,16 30:2,4,10
30:18 33:9 38:10,18,25 62:16
95:22 172:10
**information** 18:8 28:9 30:10 32:9
50:11 54:19 61:7 67:9 86:23
104:20 105:10 106:23 125:2,6
125:23,23 126:16 127:2,4 128:1
128:12 137:6 138:9,17,23 139:3
139:10 142:14 147:18 176:8
177:2 179:11 180:15 187:11
**informed** 89:8 113:18 124:20
127:17 128:1,16
**initial** 6:18
**initially** 67:5 69:19 79:16 90:5
111:8 115:3 154:3 158:19
187:22
**injunction** 15:9 16:6,7,18,19,22
95:6
**injunctive** 3:22 13:4 16:4 94:24
95:13
**injured** 50:1 98:6
**injuries** 97:25
**inmate** 18:2 67:12 78:2 82:16,21
85:6 89:9,20 92:13 98:24,25
103:15,19,20 104:9 107:1
111:25 118:25 119:1,1,4,13
127:21 130:10 138:25 140:11
145:23 146:23 158:21 163:12,15
164:15 181:7
**inmates** 7:24 15:6 37:22 69:5
91:12,12,20 92:3,4,13,21,24,25
98:21,22 109:14,15,21,23 118:1
119:6 130:8,9 132:11 141:12,15
158:20 159:23 161:7 178:15
181:6 189:9
**inmate's** 119:8
**inquired** 124:21 171:13
**inquiries** 15:5
**inquiry** 117:15 160:18 171:9,15,17
184:7 192:18
**insofar** 172:21 189:20
**inspect** 48:1,7
**inspection** 16:14,16 52:21,22
191:4,5
**instance** 47:18 117:10
**Institutional** 1:17
**instruct** 138:11 156:14
**instructed** 124:22 126:1 128:7,10
129:3,5
**instruction** 128:6
**instructions** 128:24
**insure** 13:5 160:5
**insuring** 21:10
**intact** 98:4
**intellectual** 29:18
**intend** 19:9 67:22 115:24
**intends** 21:13
**interact** 77:19
**interacted** 77:19 90:6
**interacting** 109:15
**interaction** 51:14 109:22 110:6,13
119:12 130:23
**interactions** 68:11 76:17 77:9
**interest** 103:19
**interested** 118:24 160:24 183:23
**interfering** 14:24
**interim** 107:9
**intermingles** 160:5
**interpret** 19:13
**interrogatory** 169:6
**interruption** 100:6,21 101:15

**intervention** 6:10
**interview** 7:5 33:25 35:2 37:2,19
48:18,20 103:6 111:16 152:25
154:12,15
**interviewing** 50:15
**interviews** 100:2 152:12 153:12
154:9
**intimate** 109:25
**introduce** 93:21 148:12 166:16,19
**introduced** 36:15
**investigate** 3:24 27:7 29:3 30:20
89:7 97:5 99:20 187:1
**investigated** 11:4
**investigating** 13:15 15:1,3 106:25
155:3
**investigation** 6:19 18:11 19:17
20:16 28:3,10,16 29:5 31:7
38:24 40:25 42:19 44:15 54:20
55:8 56:14 61:19,21,22 62:4,15
62:19 68:17 74:9 89:7 90:10
96:18 99:11,15 100:6,21 101:14
101:17,22 105:14,15 106:12,16
106:21 134:5,11 140:22,23
149:15 152:11,14 153:3,11
155:7 169:2,13 170:1,4 182:12
184:2 187:12
**investigations** 27:9,16,23 28:12
28:13 43:1 45:1 176:20
**investigative** 101:13
**investigator** 9:22 26:21 27:5
182:11 184:4,12 187:7
**investigators** 31:8 126:8,12
137:21 138:6
**investigatory** 5:11 45:21 86:15
96:24
**invoked** 20:19
**invoking** 20:17
**involve** 123:21
**involved** 28:17 29:2 108:21 110:1
110:23 112:21 113:1 129:19
130:3 156:24
**involvement** 109:9 115:19 116:20
**involving** 172:24
**In-House** 2:1
**Iowa** 20:4
**irrelevant** 24:3 166:7
**isn't** 15:7 42:22 53:2 55:16 58:23
131:8 147:17 191:14
**isolation** 72:15
**issue** 4:5 9:8 10:14,15,21 11:2,5,5
14:15 19:20 21:5 23:3,18 24:2
54:25 68:13 98:13,14 110:1,4
117:8 122:19 131:8 148:24
153:7 161:3 162:11 169:21
182:15 184:20 194:6
**issues** 24:4 29:19,22,25 30:25 58:2
**Item** 118:2,2
**items** 150:15
**it's** 10:15,15 11:12 15:17 18:22
19:20 25:25 34:22 41:9,17 42:18
43:12,18 44:2 47:15 53:9,9
54:20 55:24 56:18 59:12 60:22
73:21 84:6 91:17 92:17 95:19,21
96:22 97:12 100:25 101:1,17
102:2 103:23,24 105:7,11,18,19
106:13 109:18 110:4 112:13
115:22 117:4,20 142:5 144:9,10
147:12,16 148:12 152:17 159:13
161:3 166:6 168:9 169:10,22
172:8,18 175:19 176:10,16,22
177:17 178:13,19 180:25,25
183:13,16 191:23,24 192:19,19
193:2
**I'd** 23:13,18 24:18 70:22 93:10
94:12 114:9 116:23 118:18
155:17 160:9,10,15 167:8
**I'll** 5:25 6:1 13:23 14:1 15:23 27:22
142:11 68:22 73:5 78:23 92:15
93:9 94:12 107:4 113:3 148:3
161:10 167:9 171:21 173:16
178:20 187:3
**I'm** 3:16 4:19 5:12 8:5 13:20 15:7
15:16 20:12 22:4 23:16,24 27:20
29:13 34:19 36:14 39:16 42:18
43:10,13,20,25 45:2 49:17 51:4
51:10 55:16 61:20 63:15 65:8
67:24 74:1,4 77:5 85:17 91:6
92:22 93:24 96:20 101:10
103:24 104:8 107:5 109:3
115:10 119:18 122:12 124:5
125:13 133:18 134:6 137:17

134:5 149:16 152:15 153:3
144:13,13,19,21 145:25 146:19
148:12 151:19 152:8,16 157:18
161:1 166:17 170:3,9 173:14
174:12 176:12 178:22 180:9
185:17,22 186:12 191:18 195:7
**I've** 4:2,15 23:2,2,2 39:16 112:18
122:22 123:1 135:1 137:19
150:2 154:1 159:8 164:5 172:23
173:7 181:16
**I.D.s** 36:6

**J**

**J** 121:9,17
**jails** 27:14 109:8 114:4 187:23
**jail's** 47:7
**January** 1:6 3:2 117:5,20
**Jean** 155:17,21 196:11
**job** 8:11 26:20 27:4 188:14
**joint** 24:17,24 70:23 71:7 86:3
98:14 99:16 100:25 133:16
144:8 179:13 180:23 182:24
196:16
**Jonathan** 18:2 77:23,24 99:2
103:15 105:23 106:1,2 119:10
119:11 163:13,15 179:2,14,24
**Judd** 1:7 2:1 3:6,16,18 133:9
137:16 138:2 186:19
**Judge** 1:11 10:4 103:4,4 106:20
152:19 154:10
**Judges** 94:6
**judgment** 10:7 20:3 94:13,15 95:1
95:6 167:4 194:10,11
**judicial** 6:9 8:22
**July** 137:19
**jump** 185:17
**jurisdiction** 194:24
**justice** 8:20 26:4 64:19 108:4
121:21 136:22 156:8

**K**

**Katherine** 104:16
**keep** 21:13 109:19
**keeping** 78:10
**keeps** 105:8
**Kentucky** 11:12
**kept** 98:19,20 138:10,23 139:10,11
140:11 145:23 153:18 180:5,10
184:25
**kind** 6:16,21 60:20 82:14,16
109:18 114:24
**Klentz@filsinc.org** 1:20
**knew** 43:5 98:25 119:2 140:10
146:15 147:19 153:4,15 185:10
**knowing** 112:18 179:6
**knowledge** 19:23 47:16 61:17
109:23,25 110:7 120:6 134:22
134:23 153:20 182:19
**known** 89:22 157:7 173:4
**knows** 94:14
**Kristen** 1:17 3:12

**L**

**lack** 21:1 23:7
**lady** 29:17 30:8
**Lakeland** 1:23
**Lane** 26:23
**language** 8:10,15 15:16,21 16:23
114:1 169:9 174:4
**largely** 5:13
**large** 38:2 54:11 180:25
**late** 4:3,4 23:6 29:11 51:21 139:16
16:19,25 18:17,18 19:6 31:10
94:15 95:1,13 99:19 102:19
126:19 139:12,19 167:4 174:2
177:22 189:24 193:19 194:13
**laws** 10:20
**lawsuit** 6:14 12:22 43:7 101:19
110:7 135:3,5,9 185:12
**lawyer** 45:5 64:22
**lawyers** 137:10 195:9
**lay** 74:1 164:16 190:6
**layout** 72:10
**Lazzara** 10:4 103:4
**learn** 29:7 34:24 37:18 67:6
**learned** 82:13 103:1 179:1
**learning** 124:6
**Leather** 106:8
**leave** 11:20 37:15 46:3 71:1 88:13
88:14 93:14 120:24

leaving 147:3
led 151:24
Ledra 104:14
left 35:16 53:25 54:17,18 89:13
115:3 144:10 147:8 149:24
189:4
leg 30:9 34:8 36:22 159:25 160:1
legal 1:17 8:21 19:19 23:2 31:9
67:8 88:20 100:7,22 112:24
113:9 114:22 122:19 126:20
134:7 137:17,18,19 149:1,17
154:21 162:2,6 175:9 184:20,21
184:22,23 185:1 187:15
legitimate 112:16 184:24 193:19
legs 30:7
length 6:14
Lentz 1:17 3:12
letter 99:18 100:19,25 133:9,12,22
134:16,21,25 135:2 144:14,15
144:18,20 145:1,4,6,9,11 149:9
149:10,23,25 150:6,19,20,23
151:15 152:4 153:9,17 173:17
174:15,21,21,22,22,24 175:12
176:3 177:9,12,12,13,14,16,23
178:3,11,16,17 185:12
letterhead 83:19
letters 12:19 56:1,5,8,15,17 59:22
60:1 101:2,9 105:13,17 132:15
132:23,25 145:5 148:18,20,22
148:23 173:25 174:1 178:2
181:21 183:3,4 185:6,7,9 193:10
193:11,11,12
let's 23:4 116:15 186:15 188:4
level 6:24 7:13,15 15:8 19:23 109:9
109:23 189:4 193:20
liability 128:17
liaison 109:7
license 31:13 36:6 83:13
lies 5:10
Lieutenant 68:6,7,9,11,13,15 69:2
111:2,3
lieutenants 109:13
lightning 194:2
likewise 102:24
limine 4:3 23:17,18
limit 169:19
limitation 103:8
limited 14:11 100:3 109:19 150:15
182:12 194:24
limits 18:13
Linda 20:15 25:12,17,25 110:14
111:12 133:23 158:14 196:3
line 41:21,22 43:5,22 67:22,25 68:4
82:3 76:14 91:8 92:2 152:6,18
lines 67:24
list 99:17 103:4,5 104:13 148:1
lists 21:12 25:5
litigants 195:9
litigate 5:12
litigated 12:8
litigating 14:15
litigation 122:17
little 94:22 108:19 113:8 115:5
living 163:5
loads 62:7
lobby 31:19 32:1 35:4 110:20
111:8 112:7 113:5,12 114:18
119:22
locate 15:23 127:6,6
located 30:13 65:23
location 26:22 66:1
log 14:1
logic 5:18
long 18:22 27:1 63:12 65:13
108:17,21 122:21,24,24 137:18
142:23 156:22,24 157:19 172:25
182:2
longer 189:3
look 7:5 9:16 12:2 15:10 45:11
47:3,7 74:25 75:9 90:24 96:7,19
98:1 114:9 116:23 117:19,21
118:1 150:12 160:9,20 164:15
174:3 176:15 177:11 190:2
lookback 12:7
looked 34:18 50:18 96:24 113:3
160:17 176:9 187:8
looking 6:18 11:10 12:8,8,11,12
16:4 28:16 46:20 67:6 91:6
96:25 99:17 106:10 119:18
127:5 152:2
looks 4:15,16 17:7
lot 50:22 115:4 143:5,7

lunch 63:19
luncheon 63:21

M

main 159:20
maintain 7:10 19:1
maintenance 4:6
Major 32:1,4 36:11,13,14,14 85:10
87:16 88:14 107:14 108:17
109:3 116:20 117:19 118:23
making 46:20 103:21 123:21 129:9
160:19 176:25
male 7:23 18:2,3 33:1 38:9,17 52:4
52:16 72:14 74:5,16,17,19,24
75:1,6,20,24 76:1 79:8,12,24
80:1,2,10,14,21 81:10,15 98:9
98:12,12 102:10 104:15 118:25
119:1,6 148:14 160:4 168:19
179:25 180:2 190:15,19,23
males 99:14 102:2
man 35:6 48:14 53:1,3,9,21 56:9
105:3,5 177:15 178:23 179:2
191:12,15,24 192:10,18
management 82:18,21 99:7
mandating 100:8 134:8
Manila 119:23
Manual 159:3,4,13
Mario 121:6,9,17 137:21 138:5
196:8
mark 148:4 161:17
marked 41:18 84:17 114:10 116:23
118:15 159:8
MARY 1:10
master 90:3 142:22
material 137:5 160:1
matter 3:5,22 10:14,17 20:20,23
94:15 110:6 153:22 167:4
184:21
matters 23:13 63:22 122:17 127:8
ma'am 25:21 33:10 64:11,21 65:3
75:8,11,14 79:4 80:15 82:5
108:6,13 118:10 119:21 136:24
137:8,11 146:6,12 147:6 148:17
149:6 150:4 152:5 160:4
McKinley 1:21 3:17,17 4:9,13 14:3
21:20 22:1 107:13 108:16 114:6
114:8 116:1,8,18,19 117:9,17,18
118:11,14,17,22 120:1,18,22
121:5 122:7 123:13 125:16
127:14 128:22 129:17,18 131:10
135:15,17,21 135:12,21 155:17
156:19 157:13 159:6,7 160:10
160:14,16,22 161:5,9,12 162:12
162:13 163:6 164:1,5,9,13,17
165:8,16 196:8,9,12
mean 8:12 19:5 30:4 37:6 105:16
109:18 114:20,21 134:1 146:9
150:2,5 151:20 153:5 174:10
175:7,19 183:3
meaning 44:5 53:8 191:23
means 5:15 178:9 180:5
meant 41:14 133:6 153:10
mediation 6:14
medical 35:8 49:7 50:3,24 58:6,10
74:14 110:2,2 117:1 120:16
132:2,2,3,9 140:12 142:5,7
145:24 154:18 157:8 172:21
181:4
meet 5:3 18:17 30:1 33:14,16,19
33:24 36:17,19 47:24 62:9 87:11
88:10 90:12 111:6 112:14
140:18 146:3,16,18 186:21,24
meeting 51:15 52:22 131:20,22,22
131:25 138:1 139:23,25 158:1
190:9 191:6
member 75:20
members 31:1
memo 179:21
memory 69:8 144:23 163:16
memos 174:3
mental 29:19,24 58:2 59:9 72:7
76:11,18,21 77:3,4,10,13,14,15
77:20 83:8 92:4,4 99:1,7,22
106:5 109:24 120:7,10 158:3
mentally 4:6,25 19:17 24:7 136:2
141:15 162:19,25 164:2 165:4
mention 110:24 115:7 120:4,5
165:9
mentioned 84:11 90:22 92:21,24
114:19 125:14 143:4 148:14
154:18 179:11
men's 55:9 105:22 140:16 146:1,16

146:18,20 148:15 182:20 184:16
merely 8:5
merits 182:9
message 129:5
met 31:13 33:17,21 34:4 111:14
139:24 140:24 155:7
metal 30:6 34:8,9 36:21,22
method 18:20 23:24 188:4
methods 120:14
mic 4:19
Michael 107:14,17,25 196:7
microphone 6:6 48:3,4 176:11
microphones 94:2
mid 40:11 46:7,9 47:1
Middle 1:1 197:7
mind 57:19 92:9
minimum 171:23
minute 135:17 186:12
minutes 63:14,17 124:16 186:11
misleading 176:8 177:1
missing 34:17
misstates 12:14
mistake 133:8 188:16
mistreatment 3:25 4:24
modes 97:2
mom 188:23
moment 80:25 93:1 118:19 143:24
145:14 151:18 165:19 167:15
Monday 66:7
monitoring 97:1
month 100:17
months 18:10 102:25
morning 3:4,13,20 21:15 25:11
26:17 29:11 39:25 40:1,10 44:22
46:6,25 129:24
motion 4:2,12 13:24 20:3 23:17,18
23:19,21 93:10 94:13,14,15
107:6 117:16 167:13 194:18,22
move 44:3 55:23 57:9,14 59:19
64:4 80:18 92:18 115:24 116:1
160:10 161:10
moved 32:1
movement 58:4,4
moving 166:8
multiple 51:20 82:23 92:24,25
95:23,25 138:21 142:10
multi-point 165:13
Murray 60:11,13 61:3,6 154:13
155:17,21 156:4,5,20,22 159:8
159:12 161:13 171:13 190:9
196:11
mystery 186:17
M-U-R-R-A-Y 156:4

N

N 1:14 3:1
naked 18:3 33:1 35:6 48:13 53:1,3
53:21 56:9 79:12 98:9 102:10
168:19 177:14 178:23 179:2,25
180:2 190:6 191:12,15 192:10
192:18
name 25:23,23 28:9 30:15 64:13
64:13 69:21,24 77:23 82:10
83:14,19 96:6 107:23,23 113:23
119:8,9 121:15,15 124:21 125:4
125:13 127:21 130:8,11 136:16
136:16 145:2 156:2,2 158:9,9
named 130:8 163:13,15
names 18:8 30:11 79:1 81:10,24
103:2 104:21 158:5
national 59:1
nationwide 58:17
natural 43:3
nature 21:1,25 29:5 56:11 89:15
97:5
nearby 28:23
nearly 9:17
necessary 19:1 28:2 71:2 105:7,24
169:22 185:18
necessity 17:3
need 7:10 8:7 11:15,15 18:12,22
19:8 21:23 23:4 25:13 47:13
55:20 58:19,24 89:15 112:15
120:23 134:13 143:8 159:21
167:6,15,19 169:23 177:12,14
178:5 182:20,21 185:5
needed 9:15 30:25 31:2 35:13 54:2
54:4,8 58:4 86:13 88:19 89:8,11
89:20 110:21 114:19 128:18
131:11 139:7 141:22 165:1
170:20 192:15
needs 21:23 41:24 146:13

negative 53:8 186:7 191:23
neglect 3:24 6:23 7:4 11:3 13:6,15
24:4 27:7,7,9 28:3,4,5 29:6,7
34:24 37:19 45:21 46:25 52:15
57:17,19 62:5 95:17 96:19 97:14
98:18 99:21 106:7,8 107:1
143:15 169:3,14,14 170:1,5
183:10,25 187:1,5,6 190:22
neglected 172:9 188:9 190:1
neither 71:15 174:16
never 19:22 39:16 49:8 78:23
79:15,18 90:6 92:25 98:10,11
101:25 105:8,10,11 110:11
135:1 147:17,22 148:14 154:1
172:10,13 177:9 179:24 181:20
184:3,16 195:9
new 128:1 147:17 188:14 194:18
Newberry 1:18,19
nice 102:20
night 51:20,21 138:19 139:17
176:6
Nine 168:22
non-exhibit 154:20
non-existent 177:25
Norma 155:17,21 156:4 196:11
normal 34:23 61:23 66:11,16 97:6
97:8
normally 28:24 40:25 42:14,18
45:8 112:14 161:25
north 2:3 72:16
notebook 144:9
notes 18:1 86:18 90:23 92:20,23
98:19 117:20 185:25
notice 18:22 43:2,14 47:23 149:19
184:24 193:17
notification 42:4,19,24 44:8,9,10
61:18 176:19
notified 85:8,10
notify 43:22
notion 5:18 187:23
novel 186:17
November 12:18,22 101:1,20
131:4,15,16 132:8,19,24 133:3
133:10,23 174:22 181:21 183:5
185:12
number 5:9,10 13:19,21,23 24:5,18
43:17 48:17 70:23 86:3 98:14
99:16 100:17,25 103:13 144:11
145:1,8 151:8 159:9 168:11
179:20 180:20
numbered 197:13
nurse 60:11,13 61:3,6 102:5
171:13 190:10
nurses 72:13
nurse's 38:2
nursing 59:5 156:22,25 157:2

O

O 1:23 3:1
oath 26:1 64:16 108:1 121:18
136:19 156:5
object 26:9 58:18 64:25 78:19 80:4
91:16 108:10 116:4 117:2 122:1
137:2 147:16 156:13 169:24
170:17 173:8
objected 105:7 168:11,22,23,23
171:22 172:15,16,17
objection 22:4 24:21 26:9 27:18
42:9 43:23 47:10 49:16,17 51:23
52:6 57:3,24 58:11 64:25 80:8
83:1 87:20 90:1 91:19 101:11
108:11 116:3 118:12 122:2
128:8 129:9 131:8 137:2 147:14
156:14 160:12 163:24 164:1,11
166:10 168:6,16,20 169:9,15,17
170:13 173:1 180:4 182:25
objections 103:8 167:3
objects 43:17 78:14 82:22,24 99:5
163:18 165:1
obligations 189:9
observations 34:11
observe 34:4 37:22 97:25
observed 18:3 58:6,8,9,21 85:25
121:21 136:22 156:8
obstruction 26:4 64:19 108:4
121:21 136:22 156:8
obtain 67:9
obtained 187:5
obvious 76:17 77:9
obviously 11:17 93:25 112:17
occasion 183:17
occasionally 163:9
occasions 6:13

occur 15:20 16:16 31:25 88:23
184:9
occurred 46:5 51:19,20 88:3,25
99:24 137:6 193:18
occurring 85:23 169:15 170:2,5
October 12:18 100:18 132:24
133:13 145:1 149:9 174:21
181:21 183:4
offer 19:9 166:5
offered 171:13
office 29:15 32:2 36:12,13 42:5
43:22 51:22 65:12,14 74:14 85:4
85:11 86:9,24 88:2 101:13
108:18 111:9 122:11,12,16,18
123:1,7,10 126:21,23 140:2
143:11 146:11 174:17 184:23
187:17 189:8
officer 33:23
offices 72:13 73:10 74:6
official 1:17 2:3 140:22 186:19
197:6,20
officials 6:25 7:20 19:1
oh 41:16 80:23 93:12 131:3 170:11
193:15
old 11:13 113:22
once 7:3 11:4 13:10 46:24 50:2,16
50:16 51:16 54:20 70:5 87:13
99:10 100:22,23 142:12 145:1
181:15
ones 20:2
one-on-one 109:21
one-sheet 113:24
open 30:19 72:15,20 74:19,20 75:3
109:18,21 144:11
opened 119:24
opening 177:10,10 187:25
operate 113:18
operates 164:13
operating 160:23
operation 109:6
operations 65:21
opinion 11:7 140:5
opportunity 7:18 33:13,18 167:22
167:24 192:25
opposed 40:23
opposing 26:8 108:10 148:7
182:25
opposite 153:18
oral 132:12 175:13
order 13:9,19,21 14:4,20 17:6,10
17:11,13,13,21 18:15,16,18 25:6
25:7 31:9 42:13 57:1 71:12,21
71:24 83:18 84:2,6,6 85:12
86:13,14 87:10 97:14 99:25
103:3 113:11 114:19,20,23
125:5 126:1,2,4 127:6,20 139:4
139:5 152:10 153:11 169:11
170:21,23 176:17,18 183:20
185:5
ordered 18:9,21
orders 71:19
organization 45:3,6 52:16 56:3,25
59:23 60:11 68:16 69:22,25 70:3
71:14,17 81:10,16 83:21 91:24
110:13 113:20,25 127:20 157:22
157:24 158:2 190:23
original 70:16 71:19 84:6 126:10
ought 40:18 175:1
outcome 35:11
outside 7:25
outstanding 153:7
overruled 27:19 42:10 47:11 49:19
51:25 57:25 58:13,25 78:20 80:5
80:8 82:20 87:21 90:2 91:19
101:11 116:5 128:9
oversee 65:21 109:6
o'clock 124:16,17 126:11

**P**

P 1:23 3:1
PA 1:22
page 15:10 41:17,18,21 67:22,25
68:4,23 70:6 76:13,14,14 91:6
92:2,2,8 99:17 103:14,14 118:1
151:7 152:6,9,17 173:18 180:20
180:22,24 196:2
pages 42:12 67:25 161:17 175:19
197:13
PAIMI 123:15 139:12 140:18,21
143:4 146:4 155:1,7
palsy 29:19 34:6,9
paper 83:19 113:21,24 140:19,25

146:4 155:4
papers 4:2,15 23:1 187:25
paragraph 99:17 100:19 101:12
134:1,3 151:7,15 152:7,10,18,18
152:21,23 153:1 178:13 181:1
parameters 16:15 24:14
Pardon 123:8
pared 21:20
parking 115:4
party 19:17 17:14 22:20 23:21 33:9
34:21 40:10,12 43:12,15 54:20
67:3 68:20 82:25 98:11 123:21
124:1 140:14 152:20 159:13
161:2,3 170:9 179:4 180:14,16
184:6,7 193:2
partial 94:13
particular 47:18 81:20 84:5 89:9
118:24 119:4 125:9 160:23
161:17 162:7 164:15 174:3
parties 4:2 8:3 13:10 148:7 162:10
167:15 174:13 194:7
parts 161:19
party 13:16 21:22
pass 73:2
passed 113:8
path 58:23
pathway 58:20
patient 54:11 81:15 154:23 159:22
164:15 173:23
patients 7:21 19:4 154:23
Paul 1:13 3:10 110:14 111:12
128:11,14 149:23 158:9
Paull@disabilityrightsflorida.org
1:16
pause 14:2 14:2 39:6 41:5 56:23
60:6 70:14 81:2 118:21 134:2
136:4 144:1 145:15 148:10
165:20 178:7 186:14
penalties 26:3 64:18 108:3 121:20
136:21 156:7
pendency 93:16 120:25
penmanship 175:8
people 7:7 10:24 18:9,25 19:2,3
24:7 37:1 39:9,13 45:2 60:14,25
61:4 75:9 81:25 90:15 95:23
96:4 97:13 100:4 103:2,11
104:21 109:13 111:19,22 112:16
112:19 120:10 126:7 138:6
142:21 154:17 158:5 162:1,3
162:1,15 163:9 165:4,10,13
172:4 179:18 183:12,14 184:15
187:19,21,25 188:1,17 189:25
people's 21:12
perceived 187:18
percent 144:22
performed 27:10
period 20:23 46:23 47:2,19 66:10
78:11 96:15 98:10 117:7 184:24
189:2,12
perjury 26:3 64:18 108:3 121:20
136:21 156:7
permanently 14:23
permission 36:23,24 134:4 179:7
permit 18:5 24:7 71:21 74:5 79:24
80:2,10,17,21 100:5,20 101:13
149:15 152:14 153:2
permitted 7:24 34:2 71:9 74:3
85:13 97:23 174:14,14
persisted 190:5
persistence 190:14
persistent 193:14
person 18:24 29:22 33:8 40:7
48:13 53:21 54:8 67:13 69:24
78:17,23 79:19 81:15 91:24
102:8 104:5 106:7 111:1,3 125:9
125:20 130:12 142:21 154:12
162:21,22,23 168:14,17,18
190:9,10 192:11,22
personally 54:22 150:19
personnel 6:25 10:10 46:17,17
52:14 53:6 58:7,10 61:7 111:6
142:15 190:21 191:20
persons 3:25 7:5 13:14 19:3 46:2
62:21 66:12,12 79:21 81:18,22
96:11 110:8 111:10 123:19
124:7 157:23 177:23 190:11
perspective 47:2,7,8,15
pertained 114:4
pertaining 114:5
pertinent 10:20
Phillips 65:23

phone 112:6 125:6 126:24 127:17
129:12 138:9,22 150:7,21
photo 34:20 69:24 71:6 96:6 98:2
photocopies 77:18 148:25 149:3
153:4,20,25
photocopy 83:18 87:10
phrase 154:8
physical 26:22 34:11 58:1 109:23
153:7,24 188:6
picture 119:6,19,20,24
piece 83:19 113:21,24 180:15
pieces 9:18
place 6:23 7:4,5,6 17:2 22:2 29:8
29:10 34:1 41:15 44:21 55:9
74:9 87:14 117:6 183:20
placed 147:14 180:6
Plaintiff 1:5,1,13 3:9 5:14,25 6:1 9:20
10:11,23 11:8 13:12 14:20,22,23
25:11 84:20 93:8,20,21,22 94:16
94:17 95:2 112:5 123:18 142:16
143:10,20 166:13,25 186:23
187:4 189:25 193:13,15 194:14
195:2
Plaintiffs 12:7 86:12,16 110:25
180:15,16 193:13
Plaintiff's 81:9,16 83:14 89:13
94:20 178:10
plan 42:13 47:23 48:17
planned 176:10,14
planning 40:13 44:20
plate 153:14 154:10 173:24 175:20
play 142:25
pleading 12:3
pleadings 167:2,6
please 3:4,8,10 15:8 23:12 25:10
25:15,22,23 26:17,24 55:23 57:9
57:14 59:19 63:24 64:3,12,13
67:20 68:4 73:4 80:18 90:25
92:13 107:11,15,22,23 121:4,7
121:14,15 129:16 136:6,8,15,16
144:2,11 155:19 156:1,2 176:11
177:11
pleasure 63:5 120:24 135:23 166:3
pled 12:2
ploy 82:24
plural 98:23
podium 6:4,6 64:4
point 11:12 14:14 15:21 19:8 21:21
22:6 49:10 52:25 57:5 62:14
73:3,15 85:3 96:17 103:22
111:21 113:19 115:1 118:2,23
125:22 127:2,10 128:23 138:23
139:5 140:12,14 141:14 145:24
145:25 153:15 163:20 170:7
184:11,19,19 185:4 191:11
points 146:24
policies 10:25 23:21,23,25 50:23
50:24 51:1 58:16 59:11,13 160:17
116:20 142:6 160:22 161:13,22
161:25
policy 5:19 78:5 87:14 97:22 118:5
159:3,4,13,19 160:25 166:6
polite 129:12,15
Polk 13:14 29:3,8,17 30:14 31:3,11
31:15 35:17 42:4 43:22 46:19
59:24 65:12,13 66:1,13 69:5
71:9 95:19,23 96:5 98:7 101:13
107:2 122:12 153:9 186:20
poor 186:6
popul 174:1
popping 174:4
portion 17:23 79:8 108:23 134:22
166:24
position 7:9 10:23 12:7 65:20
100:14,15 122:10 137:16 151:8
157:4 176:1 177:3,9 183:2,2
186:2
positive 53:8,11 186:1,4,6,8
191:22,25
possess 185:13
possible 187:6 195:10
potential 10:18 42:25 187:1
powers 176:17,19
practice 31:10 115:22
precedent 5:4
preceding 22:17
precise 8:10
predecessor 103:3
prefer 93:15 101:6
preliminary 23:13
preparation 34:21 150:13
prepare 85:23 130:5 179:5

prepared 30:19 140:7 145:20
147:23,24 153:22 154:17
preparing 130:3
presence 88:13 110:17
present 22:1 32:3 33:21 36:13
60:10,13 71:24 79:12 83:16
86:14 130:18 131:21 141:18
162:14 167:12
presentation 147:19
presented 69:19,21 70:16,20 71:18
83:18 84:9 87:10,13,22 94:23
96:5,11,12 97:18 102:16 113:21
119:5 167:5 193:25 194:8
pressing 60:24
presume 17:9
pretty 115:22 142:20 176:24,25
prevail 186:23
prevailing 9:9
prevented 106:22
preventing 14:24
previous 133:5
previously 100:7,22 134:7 189:3
Pre-Trial 20:3
primary 120:11
prior 42:4,12 44:7,9,10 51:15 61:18
99:6 100:19 101:2 110:6,23
123:4,15 151:15 167:13
prison 5:16,20 6:24,25 8:11 19:24
19:25 193:23
prisoner 10:18 12:6
prisoners 52:16 58:17 59:7,8,10
190:24
prisons 27:14 59:1
privacy 154:25
private 28:25 37:3,10
privilege 43:19,24 148:6,7
privileged 148:5
privy 52:1,3,7
probable 5:6,8,9 10:14,15,16,21
11:2,21 23:17 24:2 45:20 58:20
58:22 99:23 130:5 169:5,8,14,20
probably 6:6 55:18 63:16 69:10
89:21 90:12 94:10 108:23
173:24
problem 5:24 13:3 17:14 82:16,18
82:21 99:8 143:15 154:18 162:5
170:11
procedural 132:10
procedure 5:19 19:24 88:21 118:6
159:3,4,13,14 194:2
procedures 11:1 23:21,23,25
50:24,24 51:1 106:17 116:21
142:6,9 159:21 160:16,23
161:14,22 162:1
proceed 26:13 65:4 68:4 72:12,16
77:21 90:9 92:13 108:14 137:12
156:17
proceeding 3:21 147:20
proceedings 195:13 197:11,15
process 8:22 55:11 142:10
produce 55:15 98:5 115:14
produced 17:23 55:14 128:11
174:19 175:3
production 12:6 57:2
professional 88:8 115:9,12,17
195:7
program 188:13
programs 15:3 149:18
promote 182:14
prompt 11:23
promulgate 8:10 19:7,10,12
promulgated 8:13
proofread 130:7
proper 43:9,11 44:2 70:7 112:20
properly 12:3 94:3
proposed 14:20 15:11 18:15,16,18
167:21,24 168:10,11 179:7
184:25
prospective 13:17 14:11 16:5
protected 43:24
protection 95:14 134:13 176:22
protocol 78:10 109:14 180:6,13,15
181:8,16
protocols 112:20 181:5,14
prove 122:20
provide 12:16,19 15:2 16:2 31:9
32:8 41:20 42:11 49:14,21 69:17
86:13,21,23 87:9 90:13 100:15
105:24 114:14 128:6 157:15
162:3 175:10 182:3 183:16
187:18 189:11 194:21

**provided** 14:25 24:12,15 30:15
31:16 36:5 49:5,12 50:1,22 51:1
54:5 70:19 83:20 84:19 95:22
96:13,14 100:7,9,13,22 114:14
134:7 149:12,19 175:20 181:20
181:25 184:8 194:3
**providence** 5:10
**provider** 132:3 142:5
**providers** 50:25
**provides** 19:14 94:23
**providing** 12:20 139:21 148:13
**psychiatrist** 83:7 163:7,8,10,19,22
164:4,7,10,14,19,22 165:2
**psychosis** 34:14
**public** 111:8 122:18
**pull** 48:3,4
**purport** 193:22
**purported** 83:17
**purpose** 3:21 15:3 67:10 111:15
127:9 182:11
**purposes** 86:15 171:18
**pursuant** 53:3 99:19 169:13 170:1
170:5 191:15
**pursue** 184:4
**push** 22:25
**put** 5:23 159:8 161:18 167:8
**putting** 54:3 192:15
**P&A** 3:23 11:13 15:1,2,13 18:19
19:10 24:8 69:17,21 71:9 78:17
78:24 79:12 95:16 96:4,18,21
97:2 98:11 99:10 102:14 106:23
123:5,16 181:20 183:2,8,10,13
184:23 188:7 190:5,17 192:21
193:8,9,19,24
**P&A's** 14:24 62:12 99:13 183:2

---
**Q**
---

**query** 168:12
**question** 5:5,13 8:19 20:7 24:7,11
26:8 41:1,23 43:4,12 51:23 53:2
53:13 55:19 60:7,16 61:2 64:22
64:23 68:12 69:1 70:18 71:4,20
73:4 76:15,20 78:19,21 79:6
80:2,7,9,19 82:8 86:6 91:17,22
102:7,9 105:23 121:25 127:13
129:16 137:1 141:14 151:3
155:2 156:11 164:6 168:13,13
171:9 175:1,2 186:6 189:13
191:14,22 192:2,2,5,7,20
**questioned** 10:4 113:15
**questioning** 10:5 53:18 108:7
**questions** 26:2 43:18,20,25 55:21
64:17 97:4 105:12 108:2,8
116:16 120:20 121:19 135:15
136:20 145:16 154:14 155:13
165:21
**quick** 127:13
**quicker** 143:5
**quickly** 11:10 56:22 194:3
**quite** 99:9 109:22 140:7 142:24
145:20 153:23 187:19
**quote** 13:13
**quoting** 15:4 152:24

---
**R**
---

**R** 3:1
**raise** 11:4
**raised** 10:21 11:5 24:4
**reacted** 153:22
**read** 4:2,15 23:1,2,2,2 69:13 86:5
92:8 105:17 152:23 153:1
173:12,12,13 175:7 185:22
**reading** 92:9,16 107:9 134:3
151:25 152:19 173:7,9,11,14,15
177:8 178:12
**real** 195:9
**realize** 112:15
**really** 12:8 21:13 62:18 94:9 97:4
110:4 114:3 120:17 127:12
143:2 154:24
**reason** 9:8 12:23 40:10 66:19,21
100:13 104:25 125:17 128:16
159:21 175:22 176:2 193:18
**reasonable** 5:15,17,20,8:5,14 9:14
11:16,22,23 12:16 15:2,13,19
16:2 19:16 20:8 24:12 46:23
47:2,8,15,19 57:1 95:18,19
96:22 139:14 155:2 189:7,11,11
193:21 194:20
**reasonableness** 57:13 96:13
**reasonably** 11:6 183:24 194:3

**reasons** 12:20 29:1 38:16,21
102:23 128:18 134:11,19 179:6
**rebut** 185:18
**rebuttal** 166:13
**rebutted** 180:1
**recall** 42:1,3,15,17,18 43:21 46:9
46:11,12,16 51:4 52:12,14,18,20
52:25 53:6,8,13,15,18,24,25
56:8,11,15,16,17,25 60:22,24
66:12 67:15,17 68:2,9,12,21
69:1,6,19 70:4 75:5 76:13 81:23
83:6 89:25 91:5,14,20,22,22
92:6 113:25 115:3 124:6 137:20
140:13 141:16 142:14 145:7,13
148:3,23 150:7,10,18,21 158:5
174:19 181:23 186:9,10 190:21
191:1,3,11,19,22 192:3,4,7,13
193:2
**recap** 128:4
**receive** 13:6 28:4 39:8 56:6 79:21
96:21 125:22,23 127:15 133:2
168:4
**received** 4:16,24 7:17 24:23 29:9
38:15,20,25 39:11,12 46:24
49:24 55:17 56:6 62:15,17 69:4
71:6 79:11 88:19 91:3,11 92:3
95:16 98:8 101:3,24,25 102:14
102:18 116:5 124:11 125:4,7,25
126:2,5,15 133:3,10,20,22 145:4
145:5 149:13 169:2 179:10
187:5
**receiving** 56:2 95:15 111:1,3
126:22 139:11 187:10
**receptionist** 31:16,18 36:5,7
**recess** 63:20,21 135:17 136:3
186:11,16
**recognize** 17:1 159:12
**recognized** 8:23 102:22 103:14
185:25 186:7 192:20
**recollection** 70:10,11 149:2 178:25
185:25 186:7 192:20
**reconsideration** 194:19
**record** 5:21 25:24 51:6 64:14 98:1
99:15 101:6,9 103:10 105:9
107:9,24 121:16 132:23 136:17
137:4 147:23 156:3 166:5 171:2
171:3 172:25 176:13,14 180:3
181:24 182:2 189:21 190:4
194:20
**records** 12:6 13:11,24 14:25 35:8
35:21 45:24 48:9 49:5,7,12,14
49:21,25,25 50:9 52:5,21,22,23
52:22 54:2,4,5,6,6,12 55:2 56:2
56:10,14 57:2,3,12 83:4 99:19
105:18,19 112:18 130:25 131:5
131:8,12 132:2,4,9,10,10,20
140:13,13 141:7 142:7,7,9
143:19 145:24 146:24 147:25
148:25 149:3,12 151:21 152:1
152:17,21 153:4,9 154:18,23
161:2,3 162:8 175:19,19,20
176:22 177:13,20,21,22,24
178:4,19 191:5 192:15
**Redirect** 61:12,15 90:20 151:5
176:13
**reference** 56:17 86:4 100:18
152:13 180:22,24
**referenced** 59:22 153:8
**references** 151:14 173:18,20
**referencing** 114:11
**referred** 77:18,18 119:4
**reflect** 83:4 185:25
**reflected** 52:15 83:17 190:23
192:19,19
**reflection** 85:25
**refresh** 41:24 70:9,11
**refusal** 184:11
**refuse** 49:20
**regard** 8:18 18:4 23:20 25:4 58:17
101:8 103:12 113:6 118:1,18
130:4,24 157:16,22 161:10
163:23 184:2
**regarding** 32:6 62:4 67:9 124:12
128:2 129:25 131:4 137:21
138:2 143:14 146:18 153:9
**regards** 61:21 91:11
**regs** 152:13 177:21
**regular** 66:4
**regularly** 58:9
**regulation** 19:13
**regulations** 8:18,21 11:11 15:17
15:18 19:7,10,11,14 20:5 24:6

24:13 61:18 96:19 123:22 124:3
**regulators** 11:14
**regulatory** 8:10,13,20
**rehearing** 194:15
**relate** 20:6
**relates** 173:16
**relating** 55:5 59:24
**relatively** 188:14
**relay** 129:5
**release** 104:21
**released** 149:2
**relevance** 27:18 42:9 49:18 57:24
73:20 82:19 90:1 116:4 160:12
166:10
**relevant** 57:4 117:4,10 160:18,21
161:3,5,8 180:14
**relief** 3:23 8:22 13:5,18 14:11,22
15:8 16:5 94:24 95:13 194:22
**relying** 101:10
**remain** 100:19 101:13 149:14
**remaining** 13:12 22:5
**remains** 186:24
**remember** 60:21 70:8 76:19
130:10 150:4,20 162:17 171:14
**remembered** 119:6
**removal** 50:1
**removed** 57:14 78:14 82:24 104:24
**render** 94:25
**renew** 23:18 107:8 118:12 167:3
167:13 180:12
**repeat** 46:15 78:21 94:21
**repeated** 99:13 101:21
**repeatedly** 116:16 185:6
**rephrase** 30:3
**reply** 78:5
**report** 6:19 10:15,16 11:3 13:6
28:4 35:7 39:8,12 40:12 44:21
45:21 46:6,24 49:11,13,15,21
50:14,20 51:6,9,11 53:20 55:12
55:15 79:11,21 95:15,16,22
96:21 98:5,8,9,16 102:18 169:3
169:7,8,13,23 170:5,9 171:9
171:14 176:8 177:25 183:9
192:10 197:10,14
**reported** 32:19 79:13 99:3,22
170:8 172:1,9
**Reporter** 1:27 2:2,3 197:6,20
**reports** 13:15 49:8 98:21,22
**representative** 20:15 22:5 97:8
172:19,21 182:10
**representatives** 7:11 69:17 71:9
73:22 78:16,24 79:11 81:9 83:14
89:13 96:4 97:16 172:18 173:3
**representing** 21:22
**request** 10:13 11:6,21,22 15:12
32:11,17 54:3 71:23 85:9 87:18
96:21 111:18 112:8,13,17 132:9
135:6,9 149:11 152:17 153:23
154:12,22 167:1,4,9,11,18,21,22
178:14 180:12 183:8,17 192:16
193:7 194:18,21
**requested** 9:21 35:5 55:12 56:2
62:22 71:21 85:5 89:18 98:22
99:18 110:21 123:25 130:12
132:2,5,7 143:11 151:22 173:21
173:23 174:6 179:6 184:14
187:18 193:6
**requesting** 67:1 69:3 133:13
**requests** 15:6 35:12 132:12,13,14
132:19 173:21 174:25 175:19
178:18 185:15 187:17
**require** 71:12,20 189:24
**required** 10:25 100:13 102:17,18
103:3 159:22 180:15
**requirement** 17:16 22:8 102:19,21
193:17
**requirements** 5:3 17:10 18:17
**requires** 61:18 97:17
**requiring** 99:5
**rescinds** 117:21
**research** 51:16 66:23 122:18
123:24 124:23 126:17 127:5
128:4,18 129:25
**researched** 94:18
**researching** 139:8
**residents** 14:25 15:2
**resolution** 184:24
**resolve** 8:2 168:9 175:11 178:20
184:17
**resolved** 90:8 162:9,10 194:6,11
**resort** 12:25

**resources** 94:6
**respect** 15:8 22:8,14 23:23 162:11
168:16 190:14 194:5
**respectfully** 95:7
**respond** 13:7 14:7 145:6,11 168:7
180:18 183:17 185:3,5,11
**responded** 23:24 149:20,21
175:12
**responding** 134:21 150:18 177:7
185:9
**response** 11:22,23 12:25 26:8,10
47:9 52:18 53:6 61:23 64:23
65:1 87:7 89:17,21 101:4,10
108:9 113:14 137:1 144:20,23
148:21 162:20 174:20,23,24,25
175:4,5,11,12,13 181:20,25
182:2 191:1,19 193:17,18
**responsibilities** 27:4 65:16,20
109:1
**responsibility** 109:2,6 120:11
**responsible** 8:17 21:10
**rest** 92:8 107:7,10
**restate** 73:4
**restrain** 10:24
**restrained** 16:11 33:1 34:5 38:9
57:23 97:20 177:15
**restraining** 10:18,23 57:18
**restraint** 24:7 58:16,21 78:3 99:1
161:6 181:5
**restraints** 4:5 18:4 29:24 30:3,4,5
30:8 32:20 35:6 48:14 53:1 56:9
57:19 58:2 59:2 78:7,10 79:13
79:22 97:20,21 99:1,3 102:10
159:16,22,23,24 165:14 179:22
180:3,7,10 181:11 189:19 190:7
191:13 192:19
**restrictions** 17:2
**rests** 93:22
**result** 102:12,25
**retired** 65:8
**retrial** 194:18
**return** 35:17,19,24 51:16 63:19
**returned** 86:18 87:22
**review** 11:12 19:11,17 48:9 49:5
54:5,14 55:3 57:12 83:22 84:22
86:24 151:19,19 161:13 188:3
194:20,21
**reviewed** 50:9,12 54:6 135:5
151:18
**revisit** 117:15
**rhetorical** 55:19,20,22
**right** 4:11 8:16 9:2,3 13:13,18 14:9
14:10 15:25 17:5,5 22:7 23:10
48:20 50:13 53:2 61:3 63:9,18
64:2 69:15 70:20 72:4,14,15
73:11 76:23 93:13 95:14 96:2,3
96:16 101:20 106:20,24 107:3
107:10 108:20,25 110:15 111:13
114:17 115:13,16 116:12 117:25
118:16 119:9,16,25 120:2,18
122:14,23 123:3,12 124:4 125:1
126:14 127:23 129:2 130:14
135:16,21 158:7,8,16 164:9
165:16 167:10 172:8 175:25
181:2,8,12 182:13 186:5 191:14
**rights** 1:3,14 3:6,11 7:12 8:2,4
12:17 13:13 26:19 27:1,6,11
102:13 110:10 123:19 187:16
**right-hand** 72:19 73:8,11
**ring** 158:9
**risk** 183:25
**RN** 157:2
**Road** 65:23
**role** 31:7 138:19 157:16
**room** 33:24 34:1,3 36:20,21 37:8
37:10,13 38:3 72:13,15,18,22
73:3,6,12,17 74:5,12,14 75:9,16
75:18 113:2 142:8 146:10
188:10,10 189:15
**roots** 50:2
**rose-colored** 173:15 178:3,11
**route** 87:17
**RPR** 2:2
**rule** 20:17,18,19 21:6 26:9 64:25
93:10 94:13 108:10 122:1 137:2
156:13
**ruled** 181:16
**rules** 11:14 124:2 180:14 194:20
**ruling** 12:9,12 13:23 23:17 43:13
161:8,10 166:5 167:1 169:20
187:4 194:10,16,19
**rulings** 166:23

**run** 16:25 109:5 112:15 187:23

**S**

**S** 1:10,27 3:1
**safety** 183:23
**salient** 22:11
**sanctions** 21:7
**save** 18:8
**saw** 7:22 89:20 104:22 111:24,25 114:13 119:19 160:21,22,25 163:19 164:7,19
**saying** 15:21 16:12 43:20 56:5,8 68:21 69:4 89:25 105:8,14 149:23 153:19 155:5 177:16 178:4
**says** 8:6 15:8,9,19,19 16:19 18:16 18:18 19:5 69:7 70:8,15 101:12 103:18 105:22 133:20 145:24 149:10 151:8 152:10 169:12 170:7 175:12 176:17 178:12 179:18 190:10 192:24
**scheduling** 51:15
**schizophrenia** 29:21
**scholars** 187:15
**school** 176:19
**schools** 114:1,1 176:10,20
**scintilla** 100:12
**scope** 7:25 8:8 13:13,18 14:9,10 14:10 74:8 89:6 106:9,25 140:22 155:6,7 169:19 182:12
**SCRIVEN** 1:10
**seat** 4:16 25:22 31:19 48:4 64:12 80:8 107:22 121:14 136:15 156:1
**seated** 119:22
**Sec** 96:9
**secluded** 33:24
**seclusion** 159:17,22 161:6
**second** 41:9,21 48:7 52:22 91:7,9 100:19 115:6 133:25 179:15,15 181:3 191:5
**Secondly** 17:15
**section** 114:22 184:23
**secure** 72:11,17,24 73:2,5,14 112:16
**secured** 27:13,24 28:13,22 34:9 124:24
**secures** 74:23
**securing** 132:11
**security** 6:25 7:7,10 17:3 19:2 29:1 65:21 109:3 110:4 112:19 128:17 154:22 189:9
**Sedell** 104:16,23
**seeing** 52:4 119:6 146:22,23 152:16
**seek** 8:22
**seeking** 3:22 13:2 14:22 59:24 96:12 182:13
**seen** 34:19 39:16 49:8 75:18 89:19 89:19 98:22 102:1 130:12 134:25 135:1 142:2,12 145:8 147:9 163:9 178:19
**Seminole** 138:1
**send** 22:16 126:1
**sense** 102:7 115:20
**sense** 6:11 12:19 60:2 78:13 82:23 101:1 132:17,25 134:16 149:10 163:16 174:15
**sentence** 86:5 152:9 153:10 154:8 173:12
**separate** 97:23 188:10
**separates** 74:24 75:19
**sequestered** 21:23 22:19 137:7,10
**sequestration** 20:19,24 21:4
**series** 43:20
**serve** 69:10
**Service** 157:18,19
**services** 1:17 27:6 79:1 81:25 82:7 120:16 132:3 134:13 157:6,8,15
**set** 16:15 73:15 115:11,17 130:15 137:10 149:16 193:11 197:16
**setting** 5:5 11:18 57:22 58:17 59:5 59:9 87:12 88:1
**seven** 102:25 168:13
**shackle** 160:1
**shackled** 159:25 189:18
**shackles** 160:6
**share** 23:7 138:17
**sharing** 161:21
**sheet** 31:14
**Sheriff** 2:1 3:16,17,18 4:25 21:22 22:6,11,15 36:16 44:8,9,11

51:15 86:9 101:2 103:9 106:16 109:7 122:25 123:21,23 137:16 138:2 143:19 145:12 157:14 185:8,10,11 198:20
**Sheriffs** 90:12,14
**Sheriff's** 19:1 42:5 43:22 46:17 65:12,13 88:2 101:13 108:18 122:10,12,15,17 123:1,6,9 126:21 142:15 143:10 174:17 187:16 189:8
**she's** 22:1,5,9,11,3,13,23 58:6,6,9 97:24 98:6 104:17
**short** 187:24 189:2
**shorthand** 197:11,14
**shortly** 122:25 126:10,22
**shoulder** 119:19
**shove** 188:24
**show** 7:23 9:12 10:9 17:6 73:21 115:11 133:14 160:21 174:20 175:3 176:7 185:6,7
**showed** 4:23 10:12 17:10,19 48:16 97:9 129:25
**showing** 17:24 40:24 49:25 133:18 188:1
**shown** 115:21
**shows** 18:24 96:3,8 98:15 103:9 182:25 193:24
**sic** 188:6,10 189:5,14
**side** 43:13 72:19 73:6,8,11,12 160:3,4,5 169:4
**Siemer** 20:15 25:5,12,17,25 26:1 26:17 27:1 28:2 29:2 33:13 37:22 38:8,15 39:25 61:17,21 62:8 67:11 71:6 79:16 87:11 97:24 98:24 102:9 104:4,8,22 110:14 111:12 112:7 113:5 130:24 133:23 142:24 147:6 158:14,17 161:22 162:14 168:15 169:1,12 170:20 177:24 178:23 182:10,14 184:1,20 187:6,7 188:20 190:13,20 193:1 196:3
**Siemer's** 101:23 148:3 183:15 184:14 185:23
**sign** 130:6 140:23 147:21 154:21
**signed** 128:3 140:25 147:5,6,7,7 147:22 155:4
**significant** 8:3
**signing** 100:22
**signs** 29:20
**silence** 105:12
**similar** 10:5
**similarly** 16:10
**simpler** 143:7
**simply** 94:21
**single** 174:19
**sit** 5:18 48:4
**site** 148:25
**sitting** 36:13 119:24
**situated** 16:10
**situation** 9:11 28:18 43:2 110:3 113:7
**six** 21:21 43:23 168:12 177:16
**small** 34:1 37:8
**sole** 5:10
**solid** 73:15
**somebody** 28:7 45:10 60:10,11 61:3 91:2 103:21 104:6,24 179:11
**someone's** 119:18
**somewhat** 21:21
**soon** 187:10 195:9
**sorry** 13:20 27:20 29:13 36:14 42:18 43:10 45:2 49:17 51:4,10 60:12 74:4 92:22 104:8 107:5 119:18 125:13 134:6 144:13 145:25 152:8 157:4 166:17 170:3 174:12 176:12 178:22 180:9 191:18
**sought** 55:2 94:24 101:25 183:10 183:21 193:12,13
**source** 61:6 182:18
**South** 109:4 126:23 138:20,21
**space** 23:7 28:24
**SPANGLER-FRY** 1:27 2:2 197:6 197:20,23
**speak** 7:18 19:4 31:21 36:7,10 79:19 106:6 127:24 142:11 147:1 150:5 154:17
**speaker** 4:20
**speaking** 142:3 153:25
**specific** 15:12 16:9,10,15 28:5

67:11 76:16 77:8,8 100:16 111:25 119:13 144:23 153:23 181:5
**specifically** 6:12 12:15 14:22 16:3 17:12 18:13 20:5 28:13 42:14 68:21 75:5 81:20 96:20,25 98:25 100:8,14 117:24 120:9 151:13 167:7 170:23 171:8 174:15,25
**specifics** 105:18
**specify** 177:13
**speculation** 47:10 51:24 52:8 58:12 87:20 164:11
**speed** 10:10 194:2 195:8
**spell** 25:23 26:24 64:13 91:23 107:23 121:15 136:16 156:2 157:10
**spoke** 128:1,7,15 129:8 150:4 154:13
**spoken** 25:4
**SS** 197:3
**staff** 7:23 11:4,5 28:19 36:5,23 38:16,21 74:15 75:20 77:20 86:10 109:16,17,19 122:12 152:12,25 153:13 154:9,12 163:7,8 164:14 173:20 174:7 181:5
**staffs** 100:2
**stage** 95:12
**stand** 26:9 64:24 108:10 122:1 136:3 156:13
**standard** 5:9 18:23 106:17 115:22
**standards** 186:21
**standing** 73:17 119:21
**stands** 99:15 161:8 186:11
**start** 23:6 26:8 28:3 64:23 72:18 94:22 108:8 121:25 123:6,9 137:1 156:12
**started** 32:1 126:17 148:18,20 187:24,25
**starting** 3:8 47:17 61:19,22 76:14 91:8 92:2
**starts** 152:20
**state** 3:8 11:1 20:1 25:23 43:3 58:16 64:13 107:23 121:15 123:22 126:19 136:16 156:2 194:2 197:3,17
**stated** 58:19 89:11,20 90:11 164:18 173:3 197:12
**statement** 26:4 64:19 91:14 103:16 103:21 108:3 121:20 130:6,7,10 134:18 136:22 156:8 172:5 174:1
**states** 1:1,11 99:18 121:7 170:23 172:10 197:7
**stating** 8:5 38:16,21
**station** 38:2
**stations** 72:13
**statute** 5:3,8 8:6,15,24 9:1 15:5 16:23,24 17:7 19:11 20:5 56:18 56:18 100:13 127:6 129:25 186:21 187:16,18 188:11 189:10
**statutes** 8:21 15:15 45:10 61:18 123:22 177:21
**statutory** 6:12 56:25 70:2,18,19,20 96:7,9 169:9
**stay** 6:4 63:4 73:11 93:14 120:24 135:22 155:14 166:2 170:25 186:12
**staying** 186:12
**stay** 63:1 93:5 106:22 120:23 155:14 165:22
**stepped** 112:7 142:2
**steps** 112:3
**stickies** 161:19
**stipulate** 7:16
**stipulated** 13:10,11,24 14:4
**stipulation** 4:12 194:7
**Stokes** 25:14
**stonewalled** 106:23
**stopgap** 188:4
**stopped** 140:14
**stopping** 66:13
**straightforward** 72:12
**strenuously** 95:3
**stretch** 142:23
**strong** 9:18
**stuff** 101:8
**subject** 106:8 110:6 175:15,18 194:8
**submit** 10:3,19 24:19 178:11
**submitted** 95:2 117:5 134:19 147:17

**subsequent** 130:20,24 171:15 193:10
**subsequently** 18:2 179:1
**substance** 124:18
**substantially** 4:4
**success** 21:1,2
**sue** 153:22
**suffer** 94:2
**suffered** 34:16
**suffering** 195:7
**sufficiency** 57:3 7:14,16,18 47:16 56:13 94:20 182:14 186:21 188:11
**suggest** 5:2 185:24
**suggested** 15:7 57:1 154:11 173:22
**suggesting** 5:7
**suggestion** 9:7 87:25 174:6
**suggests** 5:14 11:9
**suit** 176:6,7 177:8 183:18
**Suite** 1:15,18
**summary** 20:3
**Supervising** 7:20
**supervision** 6:24
**supervisor** 149:7
**supervisors** 19:4
**support** 19:9 94:20 129:22
**supported** 171:2,2
**supporting** 87:9
**supports** 95:13
**supposed** 94:7 193:23 194:4
**supposedly** 176:9
**sure** 5:12 15:7,16 23:16,25 34:19 39:16 43:4 46:20 53:17 66:20 90:5 123:21 124:2 144:19 147:2 176:25 185:10 188:3 192:6
**suspect** 104:17
**suspected** 78:17,24 105:25 106:9 173:4 188:9
**suspense** 186:18
**sustained** 57:9 83:2 97:25 118:13 131:9 160:13 163:25 164:12 166:11
**swallow** 82:22
**swallowed** 78:14 165:1
**swallowing** 99:5 163:17
**sworn** 25:15,18 64:3,8 107:15,18 121:7,10 136:8,11 155:19,22
**system** 95:14 99:8,22 149:17
**System's** 11:13
**S-I-E-M-E-R** 25:25
**s/CLAUDIA** 197:23

**T**

**T** 1:13,21
**tab** 144:11,25
**tag** 83:14
**tagged** 54:6
**take** 13:1 17:2 23:1 25:22 29:10,12 29:14 31:1,8 40:16 41:9 45:5,8 45:13 47:22,22 64:12 96:7,19 98:1 105:16 107:22 112:4 117:6 121:14 135:17 136:15 148:11 151:8 153:5 156:1 177:3 186:15
**taken** 7:4 21:18 25:6 38:1 42:1 63:21 89:1 186:16
**takes** 45:20 177:16
**talk** 21:2 28:17,18,19 35:4,13 36:24 36:25 51:17 68:13 89:24 109:1 121:25 127:21 128:3 140:17 146:3 177:22 186:13
**talked** 83:12,13 97:2 6,6 114:22 146:13 154:19
**talking** 37:1 43:5 46:4 64:24 96:20 105:25 108:9 152:24 156:12 178:8,8 181:14
**talks** 11:13 20:4 96:21 100:10 154:8
**Tamayo** 1:22
**Tampa** 1:2,6,15 2:4 197:7,17
**Tarwater** 8:23
**task** 132:19
**tasked** 5:11
**team** 31:1
**technical** 5:22
**technique** 34:23
**teeth** 34:17 35:8 49:9,13,25 50:22 98:3,4
**telephone** 29:10,16 30:17 124:11
**tell** 10:1,6 11:8 15:8 16:12,21 15:19 16:22 18:12 19:15 20:11 23:22

23:23 25:18 26:17 28:2,20 34:16
40:18 64:8 68:15 94:5 96:12
107:18 121:10 131:6,24 136:11
149:17 155:4,22 159:14 169:1
172:23 173:16 185:4 186:18
187:3
telling 16:7,8 35:20 59:16 184:25
Ten 168:22
tend 142:20
Tender 81:3
tenor 21:1
termination 15:5,5
terms 30:2 62:23 109:1 119:17
120:6 159:18
test 140:18,24 146:3,16,18 155:7
testified 25:19 44:8 45:18 51:5
63:5 64:9 85:11 88:25 97:24
98:24 102:10 104:4,8 107:19
121:11 136:12 155:23 164:19
170:20 171:6,19,25 176:5 179:9
182:15 190:8 192:22
testify 20:20 21:7 22:9,10,14 24:5
33:7 101:5,7 155:16 170:24
192:24,25 193:1
testifying 21:11
testimony 9:22 20:25 21:1,2,25
22:12,13,17 23:4 25:6 44:7 63:2
63:12 69:14 73:20 91:5 93:15
97:7,12 98:18 99:4 101:18,24
102:3,11 104:11 105:24 107:8
107:10 120:25 133:5 135:23
150:13 166:22 167:23 168:15
169:4 170:21 171:8,12,18,19
172:4 174:5,18 178:25 179:1,8
180:1 181:9,22 182:5,7,19,23,24
183:15 184:6,14 185:23 186:2
190:13
Testing 4:22
thank 4:13 9:5 14:6 25:9 26:14
33:11 39:5,22 44:4,18 49:22
52:10 60:5 61:10,11,14 62:25
63:1 90:17 93:19 94:4 95:8,9
116:18 117:17 118:11 121:3
123:14 129:17 137:13 143:23
155:10,11 157:12 158:11 161:9
162:12 165:18,22,23 166:12
172:14 178:6,20 185:14,21
194:25 195:6,11,12
theory 193:1
Therapeutic 159:16
there's 9:18 11:12 20:7 23:12 24:5
42:21,25 49:10 53:23 56:17
72:13 75:20 94:17 97:20 98:5,17
99:23,24 100:12 101:9 102:5,13
102:14,15,19,21 105:11 106:1
106:19 109:25 111:3 134:12
142:23 143:6 148:7 163:12
168:13,15 172:6 175:12 179:14
181:24 190:13 192:12
they'll 24:23 28:24
they're 7:1,2 13:17 20:24 28:25
56:12 59:15,17 91:1 94:7 98:3
102:17,18 105:13 114:23 120:16
128:3 134:4 152:23,24 181:10
187:20
they've 106:22 170:15 172:24
175:3
thing 24:16 70:11 89:18 92:18
138:10 153:8 188:16
things 18:19 44:20 46:5 47:24 50:2
106:18 175:8 184:20 6
think 23:1,3,22 46:19,23 47:17,23
52:25 53:17,20 56:12 57:4 58:20
58:22 60:20 78:15 80:4 105:7
112:11 113:2 114:3,19,23 119:9
122:22 145:23 146:2 153:10
160:18 168:8,13 169:10 173:10
174:5 175:18 189:7 191:11
192:6,9
third 48:10 101:12 173:18 181:4
thorough 62:19
thought 77:11 104:8 153:13,24
154:11 171:12 173:24 177:5
179:9 184:24 185:25 186:4
thoughts 167:16
threat 28:21 42:22,23,25
three 6:13 11:16 19:1,4 27:3 31:16
56:12 78:15 99:5 150:8 168:12
175:19
threshold 11:2
throw 188:25
thwarted 184:20

till 40:11 124:16,23 136:2
timeliness 57:13
timely 16:2 193:21
times 27:24 54:18,22 55:2,7 78:13
78:15 82:23 89:6,10 142:10
150:8 163:17
time-line 69:9 85:23 86:11 88:3
91:1 169:10 170:22 192:19
tip 4:24 5:3
title 26:20 159:16
today 10:5 19:15 21:23 44:8 51:7
52:24 69:8 127:13 150:13 154:1
167:5,23 170:16,24 171:20,25
175:6 177:25 179:8 182:6
184:13 191:10
told 7:25 29:16 32:8 35:13 36:20
38:7 40:3,5,7 51:17 54:7 61:20
69:2 79:2,4 85:12 86:11,12,16
87:15 88:8 91:2 104:5,6 105:14
111:25 125:19 126:24 128:24
129:13 130:4,5 139:1 140:10,12
140:17,23 142:13,25 143:4
145:21,23 146:2,2,17 147:1
150:25 153:21 154:3 168:14,21
172:2,13 175:21 183:20 184:7,8
tomorrow 17:6 188:17
top 158:7
total 21:21
tour 144:20
track 16:23,24
traded 138:9,21
traffic 109:20
trained 120:16
training 120:14
transcript 1:10 41:6 168:4
transcription 197:10,14
transparent 143:1
transpiring 126:24
trapes 187:21
trauma 34:16
treat 44:15
treated 91:12
treatment 4:6 7:20 97:17
trial 1:10 3:22 63:20 94:14 95:12
95:21 105:8 136:2 137:6,10
147:17,19,20,23,23 161:4
166:24 167:2,3,23 169:21
170:16 174:4 175:6 179:4,6
182:8 194:8,18 195:8
Tribe 138:1
tried 9:20 67:9 169:19 184:22
trigger 45:21
Trohn 1:22
true 12:11 15:7 16:4 23:20 44:10
183:22,24 197:13
truth 25:18,19,19 64:8,9,9 107:18
107:19,19 121:10,11,11 136:11
136:12,12 155:22,23,23
truthful 26:2 64:17 108:2 121:19
136:21 156:6
try 6:9 13:23 22:15 36:24 43:18,19
47:24 73:5 78:23 82:22,25 84:22
109:19 112:14,17 126:18 139:6
146:12 175:8 193:22
trying 18:11 24:11 43:15,25 74:1
99:8 106:12,14 139:5,6,13
142:25,25 149:1 153:18 154:24
174:15 184:20 185:22
turn 83:10 84:5 86:3 118:15 134:24
144:25 149:5 151:15 168:10
turned 34:6,8 54:20 194:2
turning 54:11 187:25
turn-around 194:1
twice 50:15
two 5:10 18:25 19:2 21:15,18 23:1
29:22 34:17 42:6 62:9 78:13
95:25 96:1 98:3 99:5 101:1
109:3,5 110:20 127:18 128:13
146:24 168:12
two-point 30:4,8 57:18 189:18
type 5:8 6:9 8:8 28:8,14 45:24
76:11,18,21 77:10 78:2 86:14
101:3,25 106:5 140:3 175:3
typical 62:3
typically 28:23 109:20 110:2

U
U 1:27
ultimately 106:10
un 34:13
unaccompanied 5:15,20 8:5,14
11:16 15:2,19 19:16 20:8 24:12

189:11
unannounced 5:15 15:13,15,21
40:24 44:16 45:1,14 86:15 97:3
188:2
unclear 8:25
unclothed 33:8
uncontroverted 95:15,21
understand 19:8 22:24 23:3 26:5
26:11 45:18,20 57:15 60:12 63:7
64:20 65:2 66:19,21 92:9 93:17
108:5,12 114:21 115:1 119:13
121:1,22 122:3 126:8,9 133:25
135:6,19,25 136:3 143:2 146:8
146:12 149:24 156:9,15 158:17
159:18 162:3,25 163:22 164:2
170:15
understanding 77:6 126:7 135:8
138:16 146:19 150:14 158:19
161:14
understood 90:7 111:1 113:9
138:24 139:1 151:20 154:1,5
155:1 169:20
undertake 187:12
undisputed 5:13
unfamiliar 124:22
unfettered 5:15 187:20
United 1:1,11 197:7
universe 184:2
unlimited 58:4
unlock 7:2,8
unnamed 38:9 173:23 190:6
unnecessary 182:8
unreasonable 40:20
unreasonableness 96:14
unrebutted 186:3
unsecured 5:16
unusual 187:19
upgraded 188:8
urgency 42:21
USC 96:9
use 4:5 34:23 59:2 87:17 92:12
99:8 159:16,20 176:11 185:1
188:4,4 197:10
usually 28:15 42:24 46:3

V
Valenti 1:22
various 11:17 97:2
vein 10:5
venue 90:13
verbatim 15:4 16:20
verdict 94:15
verify 45:11 54:9
version 117:21
versus 3:6 184:10
vestibule 72:11
victims 97:14
video 75:19
viewed 75:16 148:25 149:4 153:5
violate 57:10
violated 16:1 21:6
violation 12:21 193:8
visit 44:11 45:14 66:19,22 67:10
73:23 88:8,16 102:21 109:11
115:12,17 129:20,23 130:4
158:6 188:24
visitation 97:22,23 115:12
visited 50:18
visiting 33:17
visitors 109:16
visits 115:9,23
Vizza 4:19
voice 3:16
voir 117:13
VS 1:6

W
W 1:18
wait 26:7,9 41:21 64:22,25 108:7
108:10 121:24 122:1 124:23
136:25 137:2 156:11,13
waiting 175:21
walk 75:1,12 112:19 138:7,8 154:4
154:23
walked 38:2 74:13 184:1
walking 72:23 73:9 142:22
walks 148:15
wall 72:17 73:8,15 75:19
want 6:16,21,22 10:1,2,6 12:9 13:3
13:25 43:2 56:6,9 57:7,7,10 70:5
73:11 101:19 105:14,15 133:19

144:25 146:14,14,21 147:1
150:1 151:19 155:3 159:24
166:16,18 167:16 168:1,24
173:15 175:10,10,11 177:3,5
178:3 185:1,2,3 186:5
wanted 48:13 49:5 50:14 67:11
68:17 81:16 90:5 91:25 110:22
111:16,18,19 112:9,10 113:10
119:13 124:20 125:14,19 127:20
130:17 131:24 138:7 140:8,10
140:12,13 145:21,22,24 146:8
146:12,23 147:9 151:21 153:4
153:20 154:1,3 155:4 158:2,18
158:19 161:14 162:17 176:1
178:1 185:9 190:16
wanting 85:6 115:7 124:12 125:21
126:12,25 128:3 138:12,24,25
140:6,6 145:19,19 146:20 147:3
153:19
wash 188:25
wasn't 15:22 40:6,22 50:22 53:4
66:20 67:2 76:20 85:9 97:15,16
97:17,18 104:23 105:10 119:5
131:21 138:13 154:10 169:21
170:18 184:6,6 185:9 193:2
way 13:1 16:21 34:9 77:19 106:1
113:17,18 120:9 129:22 132:11
153:5 177:20 183:19 187:9,11
187:20
week 94:18 131:4
weeks 101:1 185:12
weigh 94:19
weighing 94:17
well-being 183:23
went 6:10,11 28:20 31:15,19 34:21
35:4 36:18,24 44:22 46:7,9 47:1
61:3 67:8 96:4 102:15 113:12
115:4,6 126:17 139:25 142:8,9
146:7,9
weren't 17:12 37:1 40:3 71:17 90:5
102:1 104:3,9 111:17 165:5
177:20 184:8
we'd 6:19 105:22 121:5 167:3,3
we'll 63:19,19 94:2 105:24 107:9
107:13 115:11 117:14 135:17
188:18
we're 4:18 6:17 10:25 12:7,8 13:2
16:2,4 17:20,20 19:12,13 22:25
23:6 28:15,16,16 42:12 58:20,23
63:20 73:17 87:8 106:10,12,13
113:17,18 124:2 139:5 157:12,19
142:25,25 143:1 174:13 175:9
175:21 177:10,10 188:3
we've 6:14 9:2 12:23,25 14:14
18:11 21:20 54:15 62:18 98:8
102:1 106:20,21,22 112:14
113:17 142:25 161:2
whatnot 110:1
whatsoever 153:7 175:1 180:2
what's 5:24 13:19,21 17:7 21:3
49:17 59:12 73:20 84:17 116:23
118:15 123:5 137:16 144:13
159:8 163:4 193:23
wheelchair 34:2,5,7
wheels 187:24
WHEREOF 197:16
whichever 93:15
white 1:13 3:12 25:11 26:14,16
27:21 33:11,12 37:17 39:3,5
42:9 47:10 49:16,18 51:23 62:6
52:10 57:3,24 58:11,18 61:12,14
61:16 62:1,2,25 63:3 144:9
196:4,5
who's 63:10 157:4
WILLIAM 1:21
window 74:25 75:6,10,15
wing 182:20
wire 154:24
wish 64:23 122:20 120:23
withdraw 167:9
withdrawn 167:11
witnesses 20:20,21,22,25 21:9,10
21:11,12,15,18,22 22:9,13 23:4
25:4,14 71:2 93:20 137:5 182:20
183:1
woman 104:14 188:5
women's 142:1 146:24
won't 9:17,19 59:16 105:9
word 53:7,7 91:20 92:13,21 149:13
words 151:9 177:16
word-for-word 191:21
wore 188:15

**work** 5:23 6:9 9:7 26:22 46:24
73:24 89:5 112:4 120:10 122:10
129:22 142:21 143:3 153:19
175:8
**worked** 9:9,11 27:1 112:18
**working** 66:10 94:3
**works** 124:11 133:23
**world** 106:18
**wouldn't** 49:14 85:13 110:4 169:9
173:24 175:6
**wrap** 139:13,17
**wrapped** 142:20
**writ** 178:5
**write** 134:21 150:9 175:22 176:2
**writing** 100:15,24 145:6 149:21
150:9,20 174:18 177:12,14
**written** 12:19 38:15,20 56:1 100:10
100:12 101:4,10,25 103:16
125:23 132:12,14 134:18 144:20
149:18 174:23,24,25 175:4,5
181:20,25 182:2 193:17
**wrong** 179:5 188:16
**wrote** 148:23

---

**Y**

**Yalaha** 26:23,24
**Yeah** 109:18
**year** 9:17 60:22 123:1,2
**years** 11:13 27:3 65:15 108:19,24
122:22
**young** 29:17 30:8 105:2
**you'd** 94:9
**you'll** 15:10 84:5 115:11 134:24
168:10 174:4
**you're** 10:5,23 12:11 16:6,12,14
17:4 19:6 20:9 21:3,9,14,14,17
26:1,18 28:21 55:18 63:4 64:16
72:23 73:9 88:16 93:14,14 94:18
107:8 114:11 121:18 135:22
136:19 146:20 149:7 151:9,10
152:2 155:14 166:2 173:11
172:22 188:18
**you've** 21:18 27:23 44:3 45:17
63:5 86:4 117:19 137:6,10
164:18 166:8
**Y-A-L-A-H-A** 26:25

---

**Z**

**zero** 47:18

---

**$**

**$100,000** 14:15

---

**1**

**1** 24:17,24 59:25 70:23 71:7 116:24
196:16 197:13
**1st** 17:23,25 29:13 30:22,24 38:25
39:15 40:11 42:13 44:22 46:6,25
62:16 76:4 77:25 78:8 95:20
98:13,14,15 99:6 103:6 104:14
174:21 179:20 183:10 189:23
**1-A** 96:8
**1:00** 63:20
**10** 118:1 124:16
**10:30** 1:7
**100,000** 14:18,19
**1000** 1:14 96:9
**100801** 96:9
**108** 196:8
**11** 41:22 133:6 168:23
**116** 196:17
**12** 108:23 168:23,25 169:9,12
**122** 196:8,9
**13** 17:24 103:4 168:23
**137** 196:10
**1386.22(i)** 134:20
**14** 11:13 168:23,25 169:10 170:13
**144** 196:10
**1450** 88:12
**14620** 1:18
**15** 11:13 41:22 63:13,16 108:23
135:17 171:2
**1500** 86:4
**151** 196:11
**1510** 86:18
**1530** 88:9
**1550** 88:5
**156** 196:12
**16** 92:2
**16th** 67:17 91:5
**17th** 13:23

---

**18** 15:10 65:15 108:19 122:22
171:2
**19** 171:22 172:15
**197** 197:13
**1994** 122:22
**1998** 157:1

---

**2**

**2** 9:11 12:8 55:5 85:22 87:5 118:15
143:18,18 169:12 171:24 180:20
180:22,24
**2nd** 12:17,18 14:10 17:25 29:11
31:4,5,12 32:12,15,18,22,25
33:3,13,22 39:9,13,16 40:11
44:23 46:7,10 47:1 51:20,21
62:9,12 66:8,14 68:10,12 71:10
71:11,13 72:5,7,9 76:7 79:25
80:3,11 81:13 84:3 88:15 92:20
92:23 97:9 101:1 103:17 110:12
116:10 117:6 118:23 119:2
120:3,4,5 123:4 124:6 129:1
131:22 135:10 142:15 150:15
153:22 171:7,10,17 172:6
174:22 177:10 181:21 183:5,7
183:11 185:12 189:15
**2-A** 98:2
**2-B** 144:13
**2:30** 35:25
**20** 117:5,20 172:17
**200,000** 14:18
**2000** 156:23
**2003** 96:23
**2008** 157:21
**2010** 29:3 39:1 59:25 65:9,17 66:8
71:10,13 72:5 76:5 77:25 78:8
110:12 117:7 123:4,11,15 124:6
132:21,22,24 133:3,6,10,24
135:10 137:19,20 158:18 169:12
171:24 173:2
**2011** 13:24 67:17 117:5,21 131:4
132:8,21
**2012** 1:6 3:2 197:18
**21** 43:6 149:9 152:18 173:6 181:21
**21st** 12:18 100:18 145:1 174:21
183:5
**22** 76:14,14 173:6 178:8,9
**2369** 1:23
**2390** 65:23
**24** 11:15 44:21 47:3,16,17,18 48:16
48:20 49:2 62:6 177:3 187:10
196:16
**24-hour** 49:6 50:10 194:1
**24/7** 109:20
**25** 67:25 68:23 178:22
**26** 67:25 68:23 178:23 196:4
**28** 149:10 178:22 180:4
**28th** 12:18 152:4 173:17 174:21
181:21 183:4
**29th** 12:22

---

**3**

**3** 9:11 12:8 55:5 85:22 99:16,17
144:11 151:16 152:2,6,7,9,17
**3rd** 7:12,17 12:17 14:11 35:18,24
36:2,10,13,17 37:20 38:8,12
39:14 40:4,8 48:17 51:1,15 52:5
53:25 54:17,18 55:3 60:14 76:9
80:22 81:13 84:3 92:20,23 98:13
103:11 104:1,10,23,24 105:12
116:13 117:6 129:19,25 130:15
130:20,24 131:1,2,3,20,21,25
132:6,8 141:10,11,16 143:9
149:4 150:16 153:6,21,23
154:13 158:18 173:2 182:21
183:7,7,13 184:2,5 189:16
190:17
**3:00** 124:16,16,16 126:11
**3:15** 135:18
**3:30** 127:16
**30** 63:17 176:7 182:4
**32** 41:19,21
**32669** 1:19
**33602** 1:15 2:4
**33806-2369** 1:23
**34797** 26:23
**352)375-2494** 1:19
**39** 196:4

---

**4**

**4** 91:8 100:17 133:14,16,19,21
145:1 149:5,9 151:8,14 152:6

---

159:9 160:11,11 180:13,16
**40** 27:15,16,23 28:13
**41** 14:4
**412** 1:18
**42** 91:6 96:9,20 134:19
**44** 14:4 70:6
**48** 62:6
**48-hour** 96:15

---

**5**

**5** 1:6 3:2 100:25 133:18 134:24
145:8 161:11 166:5,6 180:13,16
**5:00** 18:23 66:7,11
**51.42(b)** 96:20
**52** 76:13,14
**52(c)** 93:10 94:13

---

**6**

**6** 84:15,17 98:14 114:10 115:24
116:2,6 179:13 196:17
**6th** 179:16 197:18
**61** 196:5
**640** 1:15
**65** 196:6
**69** 92:2

---

**7**

**7** 18:10 86:3 90:23 103:13 179:20
180:20
**7th** 2:4
**70** 27:12,13
**7600** 26:23

---

**8**

**8:00** 66:7,11
**8:10-Civil-2666** 3:7
**8:10-CV-2666-MSS-TGW** 1:3
**801** 2:3
**81** 196:6
**813)301-5575** 2:5
**850)488-9071** 1:16
**863)686-0043** 1:24
**87-151** 84:6

---

**9**

**9** 24:18,18,24 196:16
**9-A** 84:5,5
**9-O** 83:11,22
**9/3/10** 180:25
**9:00** 18:23
**90** 196:7
**9770** 1:16